# Exhibit 3

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV040620-910

JEFFERSON GRIFFIN, )
)
                Petitioner, )
)
        v. )
)
NORTH CAROLINA STATE BOARD OF )
ELECTIONS, )
)
                Respondent. )

**STATE BOARD'S RESPONSE IN
OPPOSITION TO
PETITIONER'S PETITION FOR
JUDICIAL REVIEW**

NOW COMES Respondent, the North Carolina State Board of Elections ("Respondent"
or "State Board"), to respond in opposition to the Petition for Judicial Review filed by Petitioner
Judge Jefferson Griffin on December 20, 2024. For the reasons explained below, the Court
should affirm the agency decision challenged by the Petition and deny the Petition for Judicial
Review.

## **INTRODUCTION**

The petition should be denied for three threshold reasons.

*First*, Petitioner's request that this Court retroactively change election rules to alter the
result in his recent election violates North Carolina's version of the *Purcell* principle. As Justice
Dietz has explained, the *Purcell* principle "recognizes that as elections draw near, judicial
intervention becomes inappropriate because it can damage the integrity of the election process."
Am. Order at 1 (Jan. 7, 2025) (Dietz, J., dissenting). Strict, dispassionate adherence to this
doctrine "protects the State's interest in running an orderly, efficient election" and preserves the
public's "confidence in the fairness of the election." *Democratic Nat'l Comm. v. Wisc. State
Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring).

The circumstances of this case call out for application of the *Purcell* principle. Petitioner, like all candidates, has the right to file post-election protests claiming that irregularities occurred during the course of the election. But Petitioner does not claim here that the Board counted votes in violation of the rules in place at the time of the election. He instead seeks to retroactively *change* longstanding election rules by bringing novel legal claims—including claims that would require courts to strike down statutes passed by the General Assembly. And the result would be to retroactively disenfranchise more than 65,000 voters, many of whom have been voting in North Carolina elections without controversy for decades. Under *Purcell*, these claims can and should be litigated on a going-forward basis. But it is far too late to alter the rules of an election that has already taken place.

Our Supreme Court's decision in *James v. Bartlett* is not to the contrary. 359 N.C. 260, 607 S.E.2d 638 (2005). In that case, as Justice Dietz has explained, the Board decided to count certain ballots that were "unlawful under the election rules that existed at the time of the election." Order at 1 (Jan. 22, 2025). In this case, "by contrast, the State Board of Elections complied with the election rules existing at the time of the election." *Id.* at 2. Unlike in *James*, therefore, the *Purcell* principle applies here because Petitioner is seeking to cancel votes by retroactively changing the rules of an election *after* that election took place.

*Second*, Petitioner's requested remedy would violate the Fourteenth Amendment as well as North Carolina Supreme Court precedent. As several federal courts have held, it is flatly unconstitutional for a court to retroactively cancel votes that were cast in compliance with official guidance from election officials. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1075-76 (1st Cir. 1978); *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983). This is true even when that guidance turned out to be inaccurate. *See Burns*, 570 F.2d at 1075-76. When

2

voters have cast ballots in accordance with "the instructions of the officials charged with running the election," it violates due process to cancel their votes. *Id.*

North Carolina Supreme Court precedent is even more directly on point. The Court has twice specifically held that it is unlawful to discount votes based on alleged noncompliance by election officials during the registration process. *See Woodall v. Western Wake Highway Comm'n*, 176 N.C. 377, 388-89, 97 S.E. 226, 231-32 (1918); *Overton v. Mayor of Hendersonville*, 253 N.C. 306, 315-16, 116 S.E.2d 808, 815 (1960). These precedents recognize that when a lawful voter casts a ballot after being registered, it would be "hostile to the free exercise of the right of franchise" to cancel their ballot merely because "the voter may not actually have complied entirely with the requirements of the registration law." *Woodall*, 176 N.C. at 388-89, 97 S.E. at 231-32.

Petitioner's requested remedy is unconstitutional for another reason as well. As the U.S. Supreme Court has held, it violates the federal Equal Protection Clause to arbitrarily "value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam). But Petitioner asks this Court to do just that. He specifically seeks to cancel votes of people who he claims are improperly registered, but *only* those who voted absentee or early in-person—leaving intact the votes of identically situated persons who voted on election day. Likewise, Petitioner seeks to cancel the votes of military and overseas voters who did not submit a copy of their photo ID along with the absentee ballot application supplied by the federal government for such voters. But he asks that only such voters from four large, urban counties have their votes cancelled. All the other identically situated voters in the State's other 96 counties, according to Petitioner, should continue to have their ballots counted. Granting this arbitrary request would clearly violate the Equal Protection Clause.

3

*Third*, Petitioner's protests should be denied because he failed to provide voters with adequate notice that he was challenging their votes. To comply with procedural due process, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of [a matter] and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr., Co.*, 339 U.S. 306, 314 (1950). Petitioner failed to do so here. Challenged voters were mailed a postcard stating that their votes *may* be subject to a protest, along with a QR code that, when scanned with a smartphone, linked to a list of *hundreds* of protests, many of which contained *thousands* of names, out of alphabetical order, on *hundreds* of pages. Because this form of notice guarantees that a "significant number" of voters would not understand their votes were being challenged, it violates procedural due process. *Greene v. Lindsey*, 456 U.S. 444, 453 (1982).

For each of these independent reasons, the petition should be denied at the threshold. Petitioner's claims can and should instead be resolved on a prospective basis. But even if this Court were inclined to consider the merits of Petitioner's protest in this posture, it would fail on the merits.

Petitioner claims that over 60,000 voters should have their votes disregarded because they allegedly registered to vote improperly under the federal Help America Vote Act (HAVA) and its state law analog. But Petitioner has failed to establish probable cause to believe that any challenged voter *actually* registered to vote and cast ballots in violation of the law. HAVA and corresponding state law explicitly contemplate numerous situations in which a voter may lawfully register and vote, even though their records lack a social security or driver's license number in the Board's database. For example, some challenged voters registered *before* HAVA was even enacted, and nothing in HAVA requires previously registered voters to provide an

4

identification number to remain on the rolls.  As another example, HAVA and state law explicitly allow voters to register without providing an identification number, if they lack such numbers.  And yet another example:  HAVA and state law recognize that, due to database-matching errors, many voters who *did*, in fact, provide an identification number at registration may not have that number reflected in the Board's database.  HAVA and state law therefore provide that these voters also may vote if they show a HAVA ID before voting for the first time.

Because Petitioner failed to satisfy his burden to show that any individual voter whose registration records lack an identification number *actually* was ineligible to register and vote, the Board correctly dismissed Petitioner's first protest.  Indeed, in response to Petitioner's arguments here and in other post-election litigation, the Board conducted a preliminary data analysis showing that at least half of the voters that Petitioner challenges (and likely many more) actually *did* provide a driver's license or social security number on their voter-registration form or were not required by law to do so.  This preliminary data analysis only confirms that Petitioner failed to meet his burden of showing probable cause that any individual challenged voter was ineligible to register and vote.

For these reasons, Petitioner's protest fails on the merits.  But even if this Court were to disregard all of the above and conclude that Petitioner's protests state valid claims for relief, Petitioner is wrong that this Court can skip past factfinding and the Board's remedial process and award him the election.  Below, the Board dismissed Petitioner's protests at the preliminary stage—akin to a dismissal on the pleadings.  Thus, the only remedy available to Petitioner at this stage would be a remand to the Board for further proceedings, including an evidentiary hearing. At that evidentiary hearing, the State Board or county boards could conduct any necessary

5

factfinding on an individualized basis—rather than disenfranchising more than 60,000 voters *en masse* as Petitioner demands.

In sum, this Court should deny the petition outright as procedurally and constitutionally defective.  But even if this Court were to consider Petitioner's arguments, those arguments fail on the merits.  And even if this Court were to consider and agree with the merits of Petitioner's claims, the only proper relief would be a remand to the Board.

## STATEMENT OF FACTS

### A.  Petitioner files hundreds of election protests.

Petitioner Judge Jefferson Griffin and Intervenor Associate Justice Allison Riggs were candidates in the statewide 2024 general election for Associate Justice on the North Carolina Supreme Court.  Final canvassed results show Justice Riggs prevailed by 734 votes.[1]

On November 19, 2024, Petitioner filed hundreds of election protests throughout the State challenging the election results, alleging that certain voters' ballots were invalid.  (Agency R p 5369)  In his protests, Petitioner challenged, among others, the following three categories of voters:

- 60,273 ballots cast by registered voters with allegedly incomplete voter registrations.  However, these challenged ballots include only those cast by individuals who voted early or voted absentee.  They do not include tens of thousands of identically situated ballots cast in-person on election day.[2]

---

[1]  *NC SBE Election Contest Details*, N.C. State Bd. of Elections, bit.ly/3PA7R6P (last visited Feb. 3, 2025).

[2]  (*See* Agency R pp 21-64, 81-116, 133-47, 164-232, 249-87, 304-48, 375-94, 411-40, 457-88, 505-40, 526-40, 557-660, 677-98, 715-56, 773-830, 857-72, 889-929, 979-98, 1015-101, 1128-48, 1165-237, 1248-70, 1287-367, 1388-401, 1418-503, 1568-88, 1605-51, 1668-738, 1755-80, 1797-815, 1832-83, 1900-17, 1934-55, 1972-2008, 2024-74, 2091-253, 2270-88, 2305-37, 2354-400, 2411-26, 2443-73, 2491-547, 2564-600, 2617-33, 2650-99, 2716-31, 2748-88, 2805-81, 2898-936, 2953-3024, 3041-87, 3103-77, 3210-398, 3415-90, 3507-62)

- 1,409 votes cast by military and overseas voters registered in Guilford County who did not include a copy of a photo identification with their ballots. He also challenged similar votes in three additional counties (Buncombe, Durham and Forsyth), but did not identify specific voters.[3]

- 266 ballots cast by overseas citizens who voted absentee and who have never resided in the United States.[4]

**B.     The Board takes jurisdiction over three categories of protests.**

When an election protest is filed with a county board, the State Board may take jurisdiction over the protest and resolve it in the first instance. N.C. Gen. Stat. § 163-182.12. On November 20, the Board voted unanimously to take jurisdiction over the three categories of protests listed above, which "presented legal questions of statewide significance." (Agency R p 5371) The Board instructed county boards to consider Petitioner's other protests, "which were focused on individual, fact-specific determinations of voter eligibility."[5] (Agency R p 5371)

---

[3]     (*See* Agency R pp 349-58, 1102-11, 1238-47, 1504-51) Petitioner initially challenged voters in Cumberland and New Hanover counties as well, but declined to pursue these challenges. (*See* Agency R pp 831-40, 2401-10)

[4]     (*See* Agency R pp 5-20, 65-80, 148-63, 233-48, 288-303, 359-74, 395-410, 441-56, 489-504, 441-56, 489-504, 541-56, 661-76, 699-714, 752-72, 841-56, 873-88, 930-45, 963-78, 999-1014, 1112-27, 1149-64, 1271-86, 1402-17, 1552-67, 1589-604, 1652-67, 1739-54, 1781-96, 1816-31, 1889-99, 1918-33, 1956-71, 2009-23, 2073-90, 2254-69, 2289-2304, 2338-53, 2427-42, 2474-90, 2548-63, 2601-16, 2634-49, 2700-15, 2732-47, 2789-2804, 2882-97, 2937-52, 3025-40, 3088-102, 3178-209, 3399-414, 3419-506)

[5]     The remaining three categories of protests challenged ballots allegedly cast by voters (1) who were serving a felony sentence; (2) who were deceased; and (3) whose registrations were denied or removed. (Agency R p 5371) On December 27, 2024, the Board dismissed these protests for failure to substantially comply with service requirements and because they challenged an inadequate number of votes to change the outcome of the contest. N.C. State Bd. of Elections, Decision and Order at 1-2 (Dec. 27, 2024). Petitioner declined to appeal that decision to this Court by the January 9, 2025 statutory deadline. *See* N.C. Gen. Stat. § 163-182.14(b). As a result, the Board was required by statute to certify the election by January 10, 2025 absent a court order. *See id.* On January 7, 2025, the North Carolina Supreme Court issued a stay of the statutory certification deadline. Am. Order at 2.

7

After this meeting, Petitioner filed additional untimely protests after the statutory deadline. *See* N.C. Gen. Stat. § 163-182.9(b)(4). These protests sought to add additional ballots to Petitioner's challenges with respect to the second and third categories listed above.

With respect to the third category, Petitioner tried to update his protests by newly challenging the votes of 4,100 military and overseas voters in Buncombe, Durham, and Forsyth counties. (Agency R pp 3790-926, 4006-42) He did not, however, seek to challenge the more than 25,000 identically situated voters across the State.[6]

### C. The Board dismisses the protests.

Having taken jurisdiction over the protests initially filed with a county board, the Board followed the same procedures for resolving the protests as the county boards would have. *See* N.C. Gen. Stat. §§ 163-182.10, -182.11(b), -182.12. Those procedures first require the Board to give the protest "preliminary consideration." N.C. Gen. Stat. § 163-182.10(a). At this preliminary consideration stage, the Board must answer two questions. First, did the protest comply with the protest-filing requirements in N.C. Gen. Stat. § 163-182.9? *Id.* Second, did the protest "establish[] probable cause to believe that a violation of election law or irregularity or misconduct has occurred"? *Id.* For a protest to proceed beyond the preliminary consideration stage, the Board must answer both questions in the affirmative. *Id.*

Protests that meet these preliminary requirements then proceed to an evidentiary hearing. *Id.* §§ 163-182.10(a), (c)-(d). Following this hearing, the Board must issue a "written decision" with findings of fact and conclusions of law. *Id.* § 163-182.10(d). The findings of fact must be "based exclusively on the evidence" presented at the hearing "and on matters officially noticed." *Id.* § 163-182.10(d)(1). The conclusions of law must be based on whether there is "substantial

---

[6]     Petitioner did not include in the appendix to his petition the protests for seven additional counties that he filed on the second category.

evidence of a violation, irregularity or misconduct sufficient to cast doubt on the results of the election." *See id.* §§ 163-182.10(d)(2)(a)-(e).

If the Board finds substantial evidence of a violation, the Board may correct vote totals, order a recount, or take "[a]ny other action within [its] authority." *See id.* § 163-182.10(d)(2)(e); *see also id.* § 163-182.12. In addition, under certain circumstances, the Board may order a new election. *Id.* § 163-182.13. Decisions of the State Board may be appealed to Wake County Superior Court. *Id.* § 163-182.14.

In line with this procedure, on December 11, 2024, the Board held a public meeting to consider the protests over which it had retained jurisdiction. (Agency R p 5368) Two days later, the Board dismissed the protests at the "preliminary consideration" stage—concluding both that Petitioner had failed to comply with procedural filing requirements, and that he had failed to establish "probable cause" of a violation of law. (Agency R pp 5368-410) With respect to all three categories of protests, the Board held that Petitioner "failed to serve" affected voters, in violation of the North Carolina Administrative Code and "the requirements of constitutional due process." (Agency R p 5373) The Board reasoned that Petitioner's chosen method of service—a postcard with a QR code—did not provide affected voters adequate notice that their vote was being challenged. (Agency R pp 5378-381)

The Board also recognized that the additional protests that Petitioner filed after the deadline "may not have been timely filed under [section] 163-182.9(b)(4)," but did not decide whether these protests were timely since it "dismiss[ed] these protests for other reasons." (Agency R p 5373 n.4)

The Board then examined each category of protests individually, outlining the reasons why each protest was "legally invalid." (Agency R p 5407) Pertinent to this appeal, on the first

9

category of protests about alleged incomplete voter registrations, the Board held that the federal Help America Vote Act (HAVA) foreclosed Petitioner's requested relief to cancel the votes of affected voters. (Agency R pp 5381-87, 5394) The Board further held that, "to the extent there is a potential violation of HAVA involved in registration of voters in the past, it was remedied consistent with a separate provision of HAVA." (Agency R p 5387) That "separate provision . . . states that a new voter registration applicant must provide an alternative form of identification before or upon voting for the first time, if the state did not have a system complying with the requirement to collect a driver's license number or last four digits of a social security number." (Agency R p 5386 (citing 52 U.S.C. § 21083(b)(1)-(3)))

The Board also noted the recent decision of the U.S. District Court for the Eastern District of North Carolina in *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-cv-00547, slip op. at 4 (E.D.N.C. Nov. 22, 2024)—a case in which the federal court denied the plaintiffs in that case relief similar to what Petitioner seeks here. (Agency R p 5387) Acknowledging the federal court's reasoning that "there had been no meaningful opportunity for the voters at issue to address any potential deficiency far enough in advance of the election to comply with the law," the Board similarly concluded that votes cannot be invalidated *after* an election when eligible voters complied with all the instructions they had been given when they registered and voted. (Agency R pp 5387-92) Doing so, the Board held, would violate "substantive due process protections under the U.S. Constitution." (Agency R pp 5390-92)

The Board also rejected Petitioner's protests as to the votes of military and overseas voters who did not include a copy of their photo identification with their ballots. (Agency R p 5399) One of its administrative rules, the Board explained, expressly provides that these voters

were "not required to submit a photocopy of acceptable photo identification" with their absentee ballots. (Agency R pp 5403-04 (citing 08 N.C. Admin. Code 17 .0109(d))).

The Board further explained that absentee voting by military and overseas voters is governed by the Uniform Military and Overseas Voters Act (UMOVA), a law unanimously passed by the General Assembly in 2011, which allows these voters to use special procedures to register to vote, request an absentee ballot, and submit an absentee ballot. *See* (Agency R pp 5399-403); N.C. Gen. Stat. §§ 163-258.1 *et seq*. These procedures, the Board noted, do not require military and overseas voters to include a copy of their photo identification when submitting their absentee ballot. (Agency R pp 5399-401) Moreover, because these procedures originate under the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), which UMOVA applies to state elections, the Board concluded that imposing an identification requirement on voters covered by UOCAVA that is inconsistent with federal law would likely violate the Supremacy Clause of the U.S. Constitution. (Agency R pp 5404-06)

The Board also rejected Petitioner's protests as to overseas voters who have never resided in the United States but whose parents had been North Carolina residents. (Agency R p 5396) In dismissing this category of protests, the Board noted that UMOVA "specifically authorized U.S. citizens who have never lived in the United States to vote in North Carolina elections if they have a familial connection to this state." (Agency R pp 5396-97) The Board elected not to "ignore" this state statute. (Agency R p 5396)

D.      **Petitioner files petitions for judicial review, and the Board removes to federal court.**

On December 20, 2024, Petitioner filed three petitions for judicial review in this Court of the three categories of protests over which the Board took jurisdiction. *See Griffin v. N.C. State Bd. of Elections*, No. 24CV040622-910 (Wake Cnty. Sup. Ct.); *Griffin v. N.C. State Bd. of*

11

*Elections*, No. 24CV040619-910 (Wake Cnty. Sup. Ct.); *Griffin v. N.C. State Bd. of Elections*, No. 24CV040620-910 (Wake Cnty. Sup. Ct.). The Board removed those petitions to federal court. *See Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-00731 ("*Griffin II*"), D.E. 1 (E.D.N.C.). On January 6, 2025, the district court *sua sponte* remanded the three petitions for judicial review to this Court, *Griffin II*, D.E. 24, 25, in light of its decision to remand Petitioner's petition for a writ of prohibition to the North Carolina Supreme Court in *Griffin v. North Carolina State Board of Elections*, No. 5:24-CV-00724-M-RN (*Griffin I*) (E.D.N.C.). One of these three petitions for judicial review addresses the category of protests concerning alleged incomplete voter registrations, and that is the petition that is before this Court in this case.

Respondent appealed the district court's remand decisions in both *Griffin I* and *Griffin II* to the U.S. Court of Appeals for the Fourth Circuit. *Griffin I*, D.E. 52; *Griffin II*, D.E. 26. The Board moved in the Fourth Circuit for a temporary administrative stay and stay pending appeal in each case, on which the Fourth Circuit has yet to rule. No. 25-1018 (4th Cir.), D.E. 10; No. 25-1020 (4th Cir.), D.E. 7. In *Griffin I*, the Fourth Circuit granted Intervenor Justice Riggs' motion for expedited review, setting a schedule that had that appeal briefed and argued by January 27, 2025. *See* No. 25-1018 (4th Cir.), D.E. 18, 33. The day after oral argument took place in *Griffin I*, the Fourth Circuit granted Justice Riggs' motion to intervene in *Griffin II*. No. 25-1020 (4th Cir.), D.E. 19.

On January 7, 2025, the North Carolina Supreme Court issued an order granting Petitioner's motion for a temporary stay of the certification of the election and setting an expedited briefing schedule. Am. Order (Jan. 7, 2025). On January 22, 2025, the North Carolina Supreme Court issued an order dismissing Petitioner's petition for a writ of prohibition, calling for the three categories of election protests that were the subject of the State Board's decision to

first undergo the statutorily prescribed appeal procedure. Order at 2-3 (Jan. 22, 2025). Thus, the Court ordered, the petitions for judicial review that were filed in Wake County Superior Court in accordance with such procedure are to proceed "expeditiously." *Id.* at 3. The Court further ordered that the stay of certification remains in effect. *Id.*

## STANDARD OF REVIEW

Because the appeal of a State Board's decision on an election protest to this Court is one seeking review of a final agency decision, that review is governed by Chapter 150B where not otherwise provided for in those General Statutes specifically governing election protest proceedings. *See generally* N.C. Gen. Stat. § 150B-43; *see also id.*, § 150B-2(1b) (defining "agency").

"When the trial court exercises judicial review over an agency's final decision, it acts in the capacity of an appellate court." *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 662, 599 S.E.2d 888, 896 (2004); *see also* N.C. Gen. Stat. § 150B-51(c) (providing that the superior court "shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record"). When a petitioner contends a "board's decision was based on an error of law, de novo review is proper." *Mann Media, Inc. v. Randolph Cnty. Plan. Bd.*, 356 N.C. 1, 13, 565 S.E.2d 9, 17 (2002) (cleaned up).

## DISCUSSION

### I. Petitioner's Requested Relief Violates the *Purcell* Principle.

The petition should be denied for a threshold reason: The relief that Petitioner seeks is foreclosed by the *Purcell* principle. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).

13

## A.    *Purcell* is a neutral rule of judicial restraint that guards against late-breaking judicial changes to election rules.

The *Purcell* principle "reflects a bedrock tenant of election law:  When an election is close at hand, the rules of the road must be clear and settled."  *Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Kavanaugh, J., concurring).  "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others."  *Id.* at 881.  A state therefore has an "extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures."  *Id.*  For that reason, courts recognize "the general rule that denies relief with respect to *past elections*," but that the "corollary to judicial reluctance to interfere with election results is the obligation to afford *prospective relief*."  *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (emphasis added).

Given these concerns, *Purcell* serves as an "important principle of judicial restraint." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring).  Adhering to *Purcell* "protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election."  *Id.*  It "also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process."  *Id.*

To be sure, the *Purcell* principle is a federal rule that applies to federal courts.  But "[the North Carolina Supreme] Court has long acknowledged a state version of *Purcell* (although not always by name)."  Am. Order at 5 (Jan. 7, 2025) (Dietz, J., dissenting).  The Court first recognized the principle just one year after *Purcell* was decided, in *Pender County v. Bartlett*, 361 N.C. 491, 649 S.E.2d 364 (2007). In that case, the Court held that a state house district was

not required under the Voting Rights Act and thus had to comply with our state constitution's whole county provision. *Id.* at 510, 649 S.E.2d at 376. The Court accordingly ordered the General Assembly to redraw the district. *Id.* The Court also recognized, however, that candidates had already been preparing for the upcoming 2008 election "in reliance upon the districts as presently drawn." *Id.* As a result, "to minimize disruption to the ongoing election cycle," the Court stayed its order requiring the General Assembly to redraw the district "until after the 2008 election." *Id.*

Several Justices of the North Carolina Supreme Court have since emphasized the importance of this principle. *E.g.*, Am. Order at 5 (Jan. 7, 2025) (Dietz, J., dissenting); *Holmes v. Moore*, 382 N.C. 690, 691, 876 S.E.2d 903, 904 (2022) (Newby, C.J., dissenting) (citing *Purcell* and dissenting from expedited consideration given an "impending" election); *Harper v. Hall*, 382 N.C. 314, 319, 874 S.E.2d 902, 906 (2022) (Barringer, J., dissenting) (stating that expedited consideration of challenge to state election rules "would appear to be a clear violation of the Supreme Court of the United States' 'repeated emphasis' that 'courts ordinarily should not alter state election laws in the period close to an election'" (cleaned up) (quoting *DNC*, 141 S. Ct. at 30) (Kavanaugh, J., concurring)).

### B. If ever there were a case that called for applying the *Purcell* principle, this case is it.

It is difficult to imagine a case that more squarely calls for *Purcell*'s application. To begin, there can be no doubt that this case involves a challenge to election rules in a period close to the election—and that "the changes in question" are not "feasible before the election." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). The election concluded two months ago, followed by multiple recounts confirming the winner. To change the rules of the election now—months after millions of North Carolinians have already cast their ballots—would

15

"fundamentally alter[] the nature of the election" and "gravely affect the integrity of the election process."  *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424-25 (2020) (per curiam).  That is exactly the intolerable outcome the *Purcell* principle seeks to avoid.

Moreover, Petitioner unduly delayed challenging the election rules.  *See id.*  Petitioner, like all candidates, has every right to bring post-election protests over alleged irregularities in the election process.  But Petitioner here is attempting to cancel votes based on the Board following longstanding election rules and practices.  That kind of post-election protest seeking to change the rules of the game after it has been played violates *Purcell*.

Specifically here, Petitioner challenges voters who lack a driver's license or social security number in the Board's database.  But it is undisputed that the voter-registration form that he contests was in place long before this election—with affected voters likely casting at least hundreds of thousands (and possibly *millions*) of ballots without challenge during that time.[7]  It was not until October 2023 when a voter took issue with the form.  (Agency R p 4825)  In December 2023, the Board concluded that "the appropriate remedy is to implement changes recommended by staff to the voter registration application form and any related materials" only on a going-forward basis.  (Agency R p 4828-29)  Petitioner thus had almost a year before the election to challenge this decision.  He did not.  *Purcell* bars Petitioner from waiting until *after* the election to challenge this rule.  *See Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring) (party challenging election rule "delayed unnecessarily its pursuit of relief until more than a month after the deadline for submitting signatures").

---

[7]     While this case was in federal court, intervenors filed affidavits from voters whose votes Petitioner has challenged.  Those voters affirmed that they most recently registered to vote in 2009, 2014, and 2020 and had regularly voted since without issue until Petitioner challenged their votes.  *See Griffin*, No. 5:24-cv-00724, D.E. 24-2, 24-3, 24-4 (E.D.N.C.).

16

In this way, *Purcell* is an election-law analog to laches. *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (Sutton, J.) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so."). For example, the Wisconsin Supreme Court has applied laches to bar post-election challenges to roughly 220,000 votes under Wisconsin's election-protest statute. *Trump v. Biden*, 951 N.W.2d 568, 570 (Wis. 2020). The court explained that "the proposition that laches may bar an untimely election challenge . . . appears to be recognized and applied universally." *Id.* at 572-73 & n.7 (collecting cases). Applying this principle, the court found unreasonable delay in bringing election challenges when those challenges similarly concerned events and rules in place long before the start of the election. *Id.* at 575 ("Waiting until after an election to challenge the sufficiency of a form application in use statewide for at least a decade is plainly unreasonable."); *id.* (same for challenge to election-agency guidance "relied on in 11 statewide elections" since 2016). "The time to challenge election policies," the court explained, "is not after all ballots have been cast and the votes tallied." *Id.* at 575-76. Rather, "[p]arties bringing election-related claims have a special duty to bring their claims in a timely manner." *Id.* at 577. "Failure to do so affects everyone, causing needless litigation and undermining confidence in the election results." *Id.* The Wisconsin Supreme Court's decision is on all fours here. Petitioner here was on notice long before the election of the rules that he now contests.

Making the changes that Petitioner requests at this late date will also come at "significant cost, confusion, [and] hardship." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Accepting Petitioner's arguments would create "chaos for candidates, campaign organizations, independent groups, political parties, and voters"—in this and future elections. *Id.* at 880. "Permitting post-election litigation that seeks to rewrite our state's election rules—and, as a

17

result, remove the right to vote in an election from people who already lawfully voted under the existing rules—invites incredible mischief."  Am. Order at 5 (Jan. 7, 2025) (Dietz, J., dissenting). "It will lead to doubts about the finality of vote counts following an election, encourage novel legal challenges that greatly delay certification of the results, and fuel an already troubling decline in public faith in our elections."  *Id*.

To be clear, nothing in the Board's arguments here means that "the legal issues presented are foreclosed from further judicial scrutiny."  *Trump*, 951 N.W.2d at 577 n.11.  *Purcell* does *not* bar Petitioner from seeking *forward-looking* relief for future elections if he challenges the rules sufficiently in advance of the next election.  *Hendon*, 710 F.2d at 182.  In fact, this protest is the subject of other pending lawsuits, outside of the context of this particular case, that seek changes to the State's election rules for future elections.  For example, plaintiffs in a case pending before the U.S. District Court for the Eastern District of North Carolina are currently seeking prospective relief of this kind with respect to the alleged HAVA violations here.  *Republican Nat'l Comm.*, slip op. at 4 (*Purcell* does not apply when a plaintiff "seek[s] prospective relief unconnected with the most recent election.").  Thus, applying *Purcell* here will not immunize these or other future election challenges from judicial review.  Many are currently being litigated, and can be resolved in plenty of time before voters next go to the polls.

Nor does *Purcell* foreclose challenges based on unanticipated events that take place during an election.  Because the *Purcell* principle seeks to ensure clear and settled election rules, it does not apply to claims arising from unforeseen election-day errors or improprieties.  When a party brings "claims . . . of improper electoral activity"—rather than "issues that arise in the administration of every election"—those claims do not face the *Purcell* bar because the party

lacked advance notice of the alleged impropriety. *See Trump*, 951 N.W.2d at 577 (drawing this distinction for purposes of evaluating undue delay).

But the *Purcell* principle recognizes that changing election rules mid-stream—or, even worse, after the fact—"fundamentally alters the nature of the election" and "gravely affect[s] the integrity of the election process." *Republican Nat'l Comm.*, 589 U.S. at 424-25; *see also, e.g.*, Am. Order at 5 (Jan. 7, 2025) (Dietz, J., dissenting) ("[O]nce people are actually *voting* in the election, it is far too late to challenge the laws and rules used to administer that election."). For this reason, the Supreme Court has repeatedly invoked the *Purcell* principle after votes have already been cast. In so doing, the Court has made clear that any votes that were cast that complied with the election rules in place at the time *may not be thrown out*. *See Andino v. Middleton*, 141 S. Ct. 9, 9-10 (2020) (invoking *Purcell* to stay an injunction that had been entered against a state election rule, but expressly ordering that ballots cast before the stay "may not be rejected for failing to comply" with the reinstated election rule).

As this decision recognizes, moreover, *Purcell* continues to apply even if the challenger's underlying claims may have merit. Under *Purcell*, the proper posture for litigating election claims is prospectively, not retrospectively. Thus, in many cases, courts have applied *Purcell* even while "recogniz[ing] and respect[ing] the seriousness of the [challenger's] claim." *Liddy v. Lamone*, 919 A.2d 1276, 1290 (Md. 2007); *compare also, e.g.*, *Merrill*, 142 S. Ct. at 882 (Kavanaugh, J., concurring) (applying *Purcell* while emphasizing that any change to election rules "can take effect for congressional elections that occur after [the election]"), *with Allen v. Milligan*, 599 U.S. 1, 42 (2023) (later affirming change to election rules and permitting it to take place for future elections). The *Purcell* principle thus applies here, regardless of this Court's

19

views on the merits of Petitioner's arguments. Those arguments can be considered in due course before the next election cycle.

As Judge Dever recently put it in a case involving a similar effort to rewrite the State's election rules close to an election, the *Purcell* principle is a "heavy gate with flashing red lights amplified by loud sirens" calling for judicial restraint. *Pierce v. N.C. State Bd. of Elecs.*, 713 F. Supp. 3d 195, 242 (E.D.N.C. 2024), *aff'd*, 97 F.4th 194 (4th Cir. 2024). And as the U.S. Supreme Court has demonstrated, the *Purcell* principle may be applied consistently to guard against late-breaking changes to election rules—regardless of the challenger's political affiliation. *Compare, e.g.*, *DNC*, 141 S. Ct. at 30 (Kavanaugh, J., concurring), *with, e.g.*, *Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring). Following *Purcell*'s neutral and evenhanded rule preserves the public's faith in the election process, and ensures against courts excessively entangling themselves in hotly disputed political contests. This Court should deny the petition under the *Purcell* principle.

### C. *James* does not override the *Purcell* principle here.

Petitioner ignores the *Purcell* principle, instead analogizing this case to the North Carolina Supreme Court's decision in *James v. Bartlett*, 359 N.C. 260, 607 S.E.2d 638 (2005). In *James*, two candidates challenged whether the Board could lawfully count provisional ballots cast on election day at a precinct other than the voter's correct precinct. 359 N.C. at 263, 607 S.E.2d at 640. The defendants argued that the challengers had waited too long to contest the Board's counting such out-of-precinct provisional ballots. *Id.* at 265, 607 S.E.2d at 641.

The Court rejected this delay argument, observing that "[t]he facts do not support defendants' allegations." *Id.* The Court explained that the election marked "the first time in North Carolina history that State election officials counted out-of-precinct provisional ballots."

20

*Id.* What is more, when one of the challengers had asked the Board *before* the election whether the Board intended to count such votes, the Board's General Counsel "failed to indicate that [it] would count out-of-precinct provisional ballots." *Id.* "This response, coupled with the absence of any clear statutory or regulatory directive that such action would be taken, failed to provide plaintiffs with adequate notice that election officials would count" the ballots. *Id.* The challengers therefore did not unreasonably delay in bringing their claims.

After concluding that the petitions were timely, the Court held that the Board had improperly counted the challenged ballots. *Id.* at 271, 607 S.E.2d at 645. Relevant statutes and the Board's own regulations said "clearly and unambiguously" that "voters must cast ballots . . . in their precincts of residence." *Id.* at 267-68, 607 S.E.2d at 642-43. As such, "the [Board] violated the election rules by counting those votes." Order at 1 (Jan. 22, 2025) (Dietz, J. dissenting).

Given these facts, this case hardly comes before this Court "in the same posture" as *James*, as Petitioner claims. *See* Br. 13. Unlike the challengers in *James*, Petitioner was on notice long before the election of the rules that he now challenges. *See, e.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections* (*RNC*), 120 F.4th 390, 399 (4th Cir. 2024) (alleging that voter registrations were missing required information). Also unlike in *James*, where the Board deviated from its historical practice, the election here was conducted in accordance with longstanding rules. As Justice Dietz has recognized, in *James*, the ballot counting in question "was unlawful under the election rules that existed at the time of the election." Order at 1 (Jan. 22, 2025) (Dietz, J. dissenting) (citing *James*, 359 N.C. at 269). In this case, "by contrast, the State Board of Elections complied with the election rules existing at the time of the election." *Id.* at 2 (Dietz, J. dissenting). And there is no allegation (as there was in *James*) that Petitioner

relied on contrary, pre-election statements from the Board in deciding whether to bring a challenge. *See James*, 359 N.C. at 265, 607 S.E.2d at 641.[8]

Petitioner is therefore wrong that applying *Purcell* here would be inconsistent with *James*. As Justice Dietz has explained, the Court's subsequent *Pender County* decision is instead controlling here. Am. Order at 5 (Jan. 7, 2025) (Dietz, J. dissenting).

Petitioner also wrongly suggests that *James* compels the remedy he seeks. Br. 12-13. At the time *James* was decided, the "general rule" was that courts would "den[y] relief with respect to past elections." *See Hendon*, 710 F.2d at 182 (striking down election law as unconstitutional, but only prospectively); *Owens v. Chapin*, 228 N.C. 705, 712, 47 S.E.2d 12, 17-18 (1948) (refusing to discount absentee ballots despite technical irregularities); *State ex re. Quinn v. Lattimore*, 120 N.C. 426, 26 S.E. 638, 639 (1897) (votes should not "be rejected" after an election even if "registrations [were] irregularly made"). Although the Court in *James* made clear that it thought the challenged votes were cast unlawfully, it did not actually order those votes to be discounted. *See James*, 359 N.C. at 271, 607 S.E.2d at 645. Instead, it simply "remand[ed] the case . . . for further proceedings." *Id.*[9]

---

[8]    Petitioner argues at length that this case is similar to *James* because the defendants in that case *claimed* that out-of-precinct votes had been counted prior to the election, pointing to the primaries leading up to that election. Br. 10-13. But the North Carolina Supreme Court squarely *rejected* that argument, concluding that this isolated episode did not provide "adequate notice" where the Board had later advised that these votes would *not* be counted in the general election. *James*, 359 N.C. at 265, 607 S.E.2d at 641. More importantly, unlike here, counting the contested ballots was *unlawful* under the rules at the time of the election. *Id.* at 267-68, 607 S.E.2d at 642-43.

[9]    After the Supreme Court's remand, the General Assembly passed legislation clarifying that it had intended to allow out-of-precinct voting and that "[i]t would be fundamentally unfair to discount the provisional official ballots cast by properly registered and duly qualified voters voting and acting in reliance on the statutes adopted by the General Assembly and administered by the State Board of Elections in accordance with its intent." N.C. Sess. Law 2005-2, § 1(11). The General Assembly also enacted procedures for the General Assembly alone to determine contested legislative and Council of State elections. N.C. Sess. Law 2005-3.

22

Finally, the remedy sought in *James* is distinguishable for another reason as well: The challengers in *James* sought to discount *all* similarly situated votes on a statewide basis. *Id.* at 262, 607 S.E.2d at 639 n.2. Here, by contrast, Petitioner has arbitrarily selected only certain, disfavored voters for disenfranchisement. For example, on his challenge to military and overseas voters who did not present a copy of a photo ID, Petitioner has inexplicably challenged only voters from four, large urban counties. As explained *infra*, granting that irrationally selective demand would clearly violate the Equal Protection Clause.

In sum, comparison between this case and *James* only confirms that the *Purcell* principle applies to bar Petitioner's requested relief here.

## II. Retroactively Changing Election Rules Would Violate the Fourteenth Amendment to the U.S. Constitution and the Voting Rights Act.

The Court should deny the petition for another threshold reason as well. If the Court declines to follow the *Purcell* principle and instead opts to retroactively change the rules of the election after all the votes have been cast, it would violate the Fourteenth Amendment to the United States Constitution and the Voting Rights Act.

### A. Retroactively cancelling votes violates due process.

It is "patent[ly] and fundamental[ly]" unfair to change the rules governing an election after it has already taken place. *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978); *see Hendon*, 710 F.2d at 182 (describing this principle as "settled"). For that reason, the Fourteenth Amendment's Due Process Clause bars the systematic, "retroactive invalidation" of votes. *Burns*, 570 F.2d at 1079-80.

The seminal case on this point is *Griffin v. Burns*. There, election officials in Rhode Island issued absentee ballots in a party primary—a practice which had been in place for seven years, and which the officials believed was authorized by state law. *Id.* at 1067. After the

primary, the losing candidate asserted the use of such ballots was unlawful. *Id.* The state supreme court agreed, invalidated those ballots, and changed the outcome of the election. *Id.*

The First Circuit held that this abrupt reversal violated due process. *Id.* at 1078. As the court explained, because absentee voters had cast their ballots in an "officially-endorsed manner," invalidating their ballots en masse resulted in "broad-gauged unfairness" of a constitutional magnitude. *Id.* at 1073, 1077. Put another way: the U.S. Constitution forbids a state from discounting votes cast in accordance with "long-standing practice" and "the instructions of the officials charged with running the election." *Id.* at 1075-76; *see also, e.g.*, *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998); *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995) (retroactively eliminating a requirement of Alabama law that absentee ballots contain the signatures of two witnesses or a notary after voting had begun violated due process); *Baber v. Dunlap*, 349 F. Supp. 3d 68, 76 (D. Me. 2018) ("For this Court to change the rules of the election, after the votes have been cast, could well offend due process").

Our Supreme Court's precedent similarly recognizes the acute unfairness that would result from cancelling votes that were cast in compliance with guidance from election officials. In fact, the Court has specifically held that an error by election officials in the processing of voter registration cannot be used to discount a voter's ballot. In *Woodall v. Western Wake Highway Commission*, 176 N.C. 377, 97 S.E. 226 (1918), registrars failed to administer an oath to voters, which was then a legal prerequisite to registration. *Id.* at 388, 97 S.E. at 231. The North Carolina Supreme Court rejected the argument that those votes should be canceled, explaining:

> A vote received and deposited by the judges of the election is presumed to be a legal vote, although the voter may not actually have complied entirely with the requirements of the registration law; and it then devolves upon the party contesting to show that it was an illegal vote, and this cannot be shown by proving merely that the registration law had not been complied with.

24

*Id.* at 389, 97 S.E. at 232. To hold otherwise would "be regarded as hostile to the free exercise of the right of franchise." *Id.* Our Supreme Court reaffirmed *Woodall* decades later. It held in *Overton v. Mayor of Hendersonville*, 253 N.C. 306, 316, 116 S.E.2d 808, 815 (1960):

> [A] statute prescribing the powers and duties of registration officers should not be so construed as to make the right to vote by registered voters depend upon a strict observance by the registrars of all the minute directions of the statute in preparing the voting list, and thus render the constitutional right of suffrage liable to be defeated, without the fault of the elector, by the fraud, caprice, ignorance, or negligence of the registrars.

These principles fully apply here. The rules Petitioner challenges have long been in place, without issue or protest. Like in numerous past elections, the challenged voters were informed that they were registered voters, and consistent with that status, they were offered ballots by election officials in the general election upon request. They have thus voted in line with longstanding state law, administrative guidance, and judicial decisions. It would therefore be unlawful to cancel their ballots.

In sum, voters who followed all the official guidance in place when they registered and cast their ballots may not be retroactively disenfranchised because of alleged errors by election officials. Were the law otherwise, it would "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon*, 710 F.2d at 182 (cleaned up). Both the Fourteenth Amendment and our Supreme Court's precedents bar that patently unfair result.[10]

---

[10]    In arguing against the applicability of *Woodall v. Western Wake Highway Commission*, 176 N.C. 377, 97 S.E. 226 (1918), and *Overton v. Mayor of Hendersonville*, 253 N.C. 306, 116 S.E.2d 808 (1960), Petitioner seems to change his position on exactly *who* shoulders the blame for the votes cast by voters with allegedly incomplete registrations. Specifically, Petitioner attempts to distinguish *Woodall* and *Overton* by claiming that the registration issues were the fault of elections officials, whereas here the fault lies with individual voters. Br. 38-39. This

**B.** *Anderson-Burdick* **produces the same outcome.**

Although the Board discussed the above due-process protections at length, Agency R pp 5373, 5378-81, Petitioner does not mention them at all in his brief to this Court. *See* Br. 35-40. Instead, he asserts that the *Anderson-Burdick* line of cases provides the right framework for evaluating any Fourteenth Amendment concerns stemming from his protests. *See* Br. 35-40.

Assuming that *Anderson-Burdick* even applies to post-election challenges like these, it yields the same result. Under that test, state actions that "impose a severe burden on ballot access" are "subject to strict scrutiny." *Pisano v. Strach,* 743 F.3d 927, 933 (4th Cir. 2014). The protests here clearly fail to satisfy that standard. Were the protests to succeed, they would impose the severest possible burden on voting—literally cancelling votes—while advancing only peripheral state interests at best.

In arguing otherwise, Petitioner mischaracterizes both the relative "burden" and the State's interests. Br. 36-40. Asking voters to append a driver's license or social security number to their registration form would perhaps impose a modest burden *before an election takes place*. The same is clearly true for photo ID requirements. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-90 (2008). But the relevant "burden" here is Petitioner's attempt to irrevocably nullify voters' ballots *after the fact*, when they were *not* asked to provide these numbers in order to vote. Doing so is plainly unconstitutional under *Anderson-Burdick*.

**C.** **Petitioner's requested relief would also violate the Equal Protection Clause.**

Separately, sustaining Petitioner's protests would violate the Equal Protection Clause. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and

---

position cannot be squared with Petitioner's overall claim that "*the State Board* failed" to adequately comply with the registration law. Br. 38. That is precisely the same allegation that the North Carolina Supreme Court held in *Woodall* and *Overton* cannot justify disenfranchising individual voters.

disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam). But were Petitioner to prevail, "the standards for accepting or rejecting" ballots would "vary" for wholly arbitrary reasons. *Id.* at 106.

Even though the Board has repeatedly explained in its prior briefing that these protests contravene the Equal Protection Clause, Petitioner inexplicably does not address this issue in his opening brief. While Petitioner tellingly fails to confront this issue, his arbitrary selection of voters to challenge, if sustained, would effectuate a clear violation of the Equal Protection Clause.

Petitioner claims that "anybody who wants to vote in North Carolina must be a resident and lawfully registered—no exceptions are allowed." Br. 36-37. Under the hood, however, his protests tell a different story. The votes that Petitioner seeks to cancel by this protest were cast by a certain category of voters—those whose registration records in the Board's database do not include a social security or driver's license number. Critically, Petitioner does not challenge *all* voters in this category. Instead, he challenges only the approximately 60,000 of these votes that were cast *before* election day—either absentee-by-mail or early in-person. He has not challenged the tens of thousands of identically situated voters within this category who voted *on election day*. *See, e.g.*, *RNC*, 120 F.4th at 399 (noting allegation that 225,000 registered voters were missing this data in their records). By seeking only to invalidate a subset of identically situated voters, Petitioner would force the Board to arbitrarily "value one person's vote over that of another." *Bush*, 531 U.S. at 104-05. This would plainly violate the Equal Protection Clause. *Id.*; *see Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 920 (E.D. Va. 2018) ("Courts have generally found equal protection violations where a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters.").

27

**D.      Petitioner's suggested remedy also violates the Voting Rights Act.**

Petitioner's requested relief would also violate the Voting Rights Act.  Under the VRA, election officials may not "fail or refuse to permit any person to vote who is entitled to vote" or "otherwise qualified to vote," or "willfully fail or refuse to tabulate, count, and report such person's vote."  52 U.S.C. § 10307(a).  Petitioner's proposed remedy would violate this provision.  Whether a voter is entitled to vote is a separate determination from whether that voter properly registered under HAVA.  Here, the Board has determined that the voters whose ballots are being challenged *are* qualified to vote.  Indeed, Petitioner does not dispute that the voters he challenges are lawful, eligible voters.  The VRA thus prohibits the Board from refusing to count their votes.  Moreover, Petitioner seeks to invalidate the votes of countless voters who registered in *compliance* with HAVA and its accompanying state laws.  As described below, there are several reasons why a voter's records might lack an identification number, but the voter is still properly registered.  *See infra* Part IV.

Petitioner claims the VRA does not apply here, claiming that the law applies only where parties have alleged racial discrimination.  Br. 34-35 (citing *Powell v. Power*, 436 F.2d 84, 87 (2d Cir. 1970)).  But this argument cannot be squared with the plain text of the VRA provision at issue here, which instructs that officials may not "fail or refuse to permit *any person* to vote" who is entitled or otherwise qualified to do so.  52 U.S.C. § 10307(a) (emphasis added).  Nothing in the provision's text suggests that it is limited to refusals based solely on racial discrimination.  This absence is particularly notable when considered alongside other sections of the VRA which explicitly require proof of racial discrimination.  *See, e.g.*, *id.* § 10301(a) (outlawing the imposition of any "voting qualification or prerequisite to voting" which denies voting rights "on account of race or color"); *League of United Latin Am. Citizens - Richmond Region Council*

*4614 v. Pub. Int. Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *3-4 (E.D. Va. Aug. 13, 2018)) (rejecting argument that § 10307(b) requires evidence of "racial animus" given the absence of such language in the statutory text); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) (same).

Petitioner's sole authority for his atextual interpretation of the VRA, moreover, is inapt. The Second Circuit in *Powell* rejected an attempt to use the VRA as a sword to exclude ballots. 436 F.2d at 85-86. There, plaintiffs were members of a political party who argued that it violated the VRA to have allowed persons who were not members of that party to vote in the party's primary elections. *Id.* at 85-87. The court rejected this argument, noting its concern with greenlighting this "sweeping and novel" theory of the VRA to prevent ballots from being counted. *Id.* at 86-87. Here, by contrast, the VRA properly functions as a shield against Petitioner's demand that the Board exclude ballots in violation of § 10307(a).

## III. Petitioner's Failure to Adequately Notify Voters of His Protests Violates Procedural Due Process.

This Court should also deny Petitioner's petition for judicial review for another threshold reason: Petitioner did not provide voters with constitutionally adequate notice of his protests or properly serve his protests on voters.

As an initial matter, Petitioner's protests denied voters procedural due process. Voters have a "constitutionally protected liberty interest" in their right to vote. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020); *see Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("[V]oting is of the most fundamental significance under our constitutional structure.") (cleaned up). As a result, when a voter's "ballot [is] challenged," due process requires that voters be "given notice," so they can take steps to protect their vote. *Democracy N.C.*, 476 F. Supp. 3d at 228. Constitutionally adequate notice must be "reasonably calculated,

29

under all the circumstances, to apprise interested parties of the pendency of [a matter] and afford

them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339

U.S. 306, 314 (1950); *see also In re Chastain*, 909 S.E.2d 475, 481 (N.C. 2024) (same).  That is

why the Board's rules direct protesters to serve voters with copies of protests that concern "the

eligibility or ineligibility of particular voters."  08 N.C. Admin. Code 02 .0111.[11]

      Here, the notice that Petitioner provided voters was not "reasonably calculated" to inform

them that he sought to invalidate their votes.  *Mullane*, *Co.*, 339 U.S. at 314.  Petitioner did not

send physical copies of his protests to voters' addresses.  Instead, Petitioner's political party

mailed voters a postcard, which stated that their "vote *may* be affected by one or more protests

filed in relation to the 2024 General Election."  (Agency R p 4889 (emphasis added))  The

postcard did not inform voters that their vote *was* actually under protest.  It also did not inform

voters that it was meant to effect formal service of an election protest.

      Rather, the postcard merely directed voters to "scan this QR code to view the protest

filings."  (Agency R p 4889)  This QR code, when scanned with a smartphone, took users to a

website where hundreds of protests were listed.  (Agency R p 5408-09 (showing smartphone

screenshots))  Voters then, to find out if any protests concerned them, had to scour hundreds of

protests to try to locate their names on attached spreadsheets.  (Agency R p 5409)  These

spreadsheets listed voters' names in small print, out of alphabetical order.  (Agency R p 5409)

Some spreadsheets contained hundreds of pages, listing thousands of names.  (Agency R p 5409)

---

[11]    The Board specifically directs protestors:  "You must serve copies of all filings on every person with a direct stake in the outcome of this protest ('Affected Parties'). . . . If a protest concerns the eligibility or ineligibility of particular voters, all such voters are Affected Parties and must be served."  08 N.C. Admin. Code 02 .0111.

30

In these circumstances, neither the postcard nor its QR code were reasonably calculated to apprise voters that their votes were being contested. The postcard did not even inform voters that their votes had *actually* been challenged. (Agency R p 4889) Vague, equivocal notice of this kind, which does not "specifically" disclose that a person's rights will be impaired, does not give "adequate notice." *In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993); *see e.g.*, *Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000) (if a "notice is unclear," it is not adequate); *Griffin v. Griffin*, 348 N.C. 278, 280, 500 S.E.2d 437, 439 (1998) (a party's notice to an attorney only saying it was seeking sanctions against him was inadequate because "[t]he bases for the sanctions must be alleged").

This lack of specificity, moreover, was not cured by the QR code. Many voters do not own smartphones. *See* Pew, *Mobile Fact Sheet* (Nov. 13, 2024), https://tinyurl.com/yeywjxfn (noting that one in five senior citizens do not have a smartphone) (last visited Feb. 3, 2025); *see also* No. 5:24-cv-00724, D.E. 24-2, 24-3, 24-4 (E.D.N.C.) (affidavits from voters attesting that they do not know how to use QR codes). These voters would therefore not have been able to scan the code to learn if a protest affected them. As a result, in "a significant number of instances," notice by QR code would not "provide [voters with] actual notice" of protests. *Greene v. Lindsey*, 456 U.S. 444, 453 (1982). As the U.S. Supreme Court has held, where a chosen form of notice will not notify a "significant number" of persons, as here, it does not satisfy "due process." *Id.*[12]

---

[12]     Petitioner notes that the Board has sent voters mailers with QR codes. Br. 51. The mailers that Petitioner references, however, were not meant to provide notice of formal proceedings. Unlike the postcards that Petitioner sent voters, moreover, the Board's mailers did not rely on QR codes to convey their primary message. *See* N.C. State Bd. Voter ID Mailer, *available at* https://tinyurl.com/ykavb4up (last visited Feb. 3, 2025).

Despite this precedent, Petitioner argues that the U.S. Supreme Court has held that notice is sufficient so long as most affected persons receive notice. Br. 30. Petitioner is mistaken. The Court has actually held that where service of papers via "the mails" is possible, then that form of notice is *required*. *Mullane*, 339 U.S. at 319; *see also Greene*, 456 U.S. at 455. By relying on QR codes instead, Petitioner failed to provide adequate notice.

But even if a QR code could theoretically provide adequate notice, it did not do so here. The Fourth Circuit, for instance, has held that an eviction warning provided inadequate notice when "it [was] time-consuming to wade through" the entire form at issue to locate the warning, which was listed "in small print two-thirds of the way down the back of a form." *Todman v. Mayor of Baltimore*, 104 F.4th 479, 488-89 (4th Cir. 2024). Here, for voters to find out if protests affected them, they had to "wade through" hundreds of protests, some of which listed thousands of names "in small print." *Id*. This kind of needle-in-a-haystack notice offends due process as it is not "reasonably calculated" to convey notice. *Id.* at 488.

Separately, Petitioner's protests also fail because he did not properly serve voters with physical copies of his protests. The Board's rules, as noted above, specify that when protesters dispute "the eligibility . . . of particular voters," then "all such voters . . . must be served" with copies of the protests. 08 N.C. Admin. Code 02 .0111.

The rules, moreover, also contemplate service of *physical* copies, consistent with how service is provided in other contexts under state law. *See* N.C. R. Civ. P. 5(b)(2) (providing that "papers" must be served on parties by "hand[ ]" or "mail[ ]," absent consent otherwise). The Board's rules do so, for instance, because they mandate that "parcel[s]" with protests be served. 08 N.C. Admin. Code 02 .0111. Because Judge Griffin served postcards on voters, not parcels with physical copies of protests, his protests also fail for this reason as well.

Despite his noncompliance with these rules, Petitioner suggests that his failure to properly serve his protests and provide voters with constitutionally adequate notice should be ignored because he had no obligation to serve his protests on voters at all. Br. 28-29. He claims that the county boards have exclusive statutory responsibility for "giv[ing] notice" of "protest hearing[s]." N.C. Gen. Stat. § 163-182.10(b).

Notwithstanding that statutory duty of county boards, however, the Board also has distinct statutory authority to "promulgate rules providing for adequate notice" of election protests. *Id.* § 163-182.10(e). The Board's rulemaking authority is thus not limited to prescribing rules for the *county boards* to follow when they provide notice of a *hearing*, as Petitioner argues. *Id.* § 163-182.10(b)(2). Instead, the Board has ample authority to require that separate notice also be provided when persons *file protests* that initiate legal proceedings, as Petitioner did here. That authority is especially important where, as here, protests directly implicate constitutional rights.

The Board's duly promulgated rules, moreover, leave no doubt that Petitioner was required to notify voters in this situation, *see* 08 N.C. Admin. Code 02 .0111—which Petitioner expressly agreed to do. (*See, e.g.*, Agency R p 8) Given this commitment, Petitioner cannot now claim he had no obligation to notify the voters he seeks to disenfranchise. *Cf. State v. Gillespie*, 362 N.C. 150, 152, 655 S.E.2d 355, 356 (2008) (noting that parties can "waive[]" arguments through "consent[]").

## IV. Petitioner's HAVA Protest Fails on the Merits.

Even if this Court were to address Petitioner's arguments on their merits, it should deny the petition because the Board correctly dismissed Petitioner's protest for failing to set out a valid claim for relief.

33

## A.    North Carolina law implements HAVA for state elections.

HAVA seeks to establish "uniform and nondiscriminatory election technology and administration requirements" across the States to govern federal elections.  Pub. L. No. 107-252, §§ 301-12, 116 Stat. 1666, 1704-15 (2002).  Among other things, HAVA directs States to establish "a single, uniform, official, centralized, interactive computerized statewide voter registration list" to "serve as the official voter registration list" for all federal elections.  52 U.S.C. §§ 21083(a)(1)(A), (a)(1)(A)(viii).

HAVA also imposes voter-list-maintenance and registration requirements on States.  As for voter-list maintenance, HAVA directs States to maintain voter lists "on a regular basis."  *Id.* § 21083(a)(2)(A).  But HAVA limits how they may do so.  For example, States may only remove individuals from the voter list consistent with the requirements in the National Voter Registration Act (NVRA), Pub. L. No. 103-31, 107 Stat. 77 (1993).  *Id.* §§ 21083(a)(2)(A)(i)-(iii).

As for voter-registration applications, HAVA generally prohibits States from "accept[ing] or process[ing]" any application unless it includes the applicant's driver's license number or the last four digits of the applicant's social security number.  *Id.* § 21083(a)(5)(A)(i).  HAVA instructs state election officials to establish a system to attempt to "match" the identification number provided in an application with existing government records, *id.* § 21083(a)(5)(B)(i), and to establish state-law procedures to address registrations that do not match with such records, *see id.* § 21083(a)(5)(A)(iii).  However, HAVA does not make a match a prerequisite to accepting an application.  *See id.* §§ 21083(a)(5)(A), (b).

HAVA allows certain voters who do not provide a driver's license number or the last four digits of their social security number in a registration application to register to vote.  For applicants who have not been "issued" either number, HAVA instructs States to instead assign "a number which will serve to identify the applicant for voter registration purposes."  *Id.*

34

§ 21083(a)(5)(A)(ii).  And if a State did not have a system complying with the requirement to collect a driver's license number or last four digits of a social security number, HAVA provides that a new voter registration applicant by mail may vote by providing an alternative form of identification before or upon voting for the first time.  *See id.* §§ 21083(b)(1)-(3).  This identification—a so-called HAVA ID—may include "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter."  *Id.* §§ 21083(b)(2)(A)(i)-(ii).

Although HAVA itself only applies to federal elections, in 2003, the General Assembly enacted a statute that applied HAVA's federal rules to state elections.  The law's express purpose was to "ensure that the State of North Carolina has a system for all North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002."  Act of June 19, 2003, S.L. No. 2003-226, sec. 1, 2003 N.C. Sess. Laws 341, 341.  The law specifically instructed the Board to ensure "[c]ompliance [w]ith [f]ederal [l]aw" by "updat[ing] the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002."  *Id.* sec. 6 (codified at N.C. Gen. Stat. § 163-82.11(c)).

Through this Act, the General Assembly amended several of North Carolina's voter registration and list-maintenance statutory provisions to incorporate HAVA's requirements.  For example, state law now requires all voter registration applications to "request" that voters provide their driver's license number or the last four digits of their social security number.  N.C. Gen. Stat. § 163-82.4(a)(11).  Like HAVA, however, the statute allows voters who have not been issued one of those numbers to receive a "unique identifier number" from the Board for

registration. *Id.* § 163-82.4(b). Like HAVA, North Carolina law also requires voters who register by mail and who have not had their driver's license or social security number validated beforehand to present a HAVA ID when they vote for the first time. *Id.* §§ 163-166.12(a)-(b), (f). And although state law directs county boards to attempt to match an identification number provided on a registration form with an existing government database, *id.* §§ 163-82.12(6)-(9), when the information provided by any voter, regardless of how they registered, does not match, voters may cast ballots by providing a HAVA ID before voting for the first time, *id.* § 163-166.12(d); *see also Voting Site Station Guide* 19, N.C. State Bd. of Elections, bit.ly/3BQDmWR (last visited Feb. 3, 2025) (same).

The result is that, like most States, North Carolina has a single voter registration system for both federal and state elections that incorporates HAVA's requirements. *RNC*, 120 F.4th at 401 ("North Carolina has a unified registration system for both state and federal elections."); N.C. Gen. Stat. § 163-82.11(a) ("The system shall serve as the single . . . official list of registered voters . . . for the conduct of all elections in the State."). North Carolina "thus is bound by" provisions of federal law, like HAVA, governing voter registration and list maintenance. *RNC*, 120 F.4th at 401.

### B.    Canceling the challenged votes would violate HAVA and the NVRA.

To begin, Petitioner's HAVA protest is meritless because his proposed remedy of canceling these votes would run afoul of HAVA and the NVRA. Both HAVA and North Carolina law require any voter-registration list maintenance to be performed in accordance with the NVRA. 52 U.S.C. § 21083(a)(2)(A); N.C. Gen. Stat. § 163-82.14. The NVRA only allows the removal of ineligible voters from the rolls in specific, enumerated circumstances: (1) at the request of the registrant, (2) for criminal conviction or mental incapacity, as provided by State law, (3) for death or a change in residence, and (4) if an individual has not participated or

responded to a notice in two consecutive federal general elections. 52 U.S.C. §§ 20507(a)(3), (a)(4), (b)(2). Petitioner does not claim that his basis for canceling these votes—and thus effectively removing these voters from the official list of eligible voters in this past election—falls among these narrow, enumerated reasons. The NVRA therefore squarely forecloses Petitioner's requested relief. *See RNC*, 120 F.4th at 402-03 (concluding that the NVRA does not authorize removal from voter rolls based on this same allegation of HAVA non-compliance).

Moreover, the NVRA forecloses Petitioner's relief for a separate reason as well. Under the NVRA, systematic removals, other than by registrant request, felony conviction, or death, must be completed "not later than 90 days prior to the date of a primary or general election for Federal office." 52 U.S.C. § 20507(c)(2)(A). While we are not technically within this quiet period, requiring the Board to purge voters now would clearly violate the quiet period's purpose. *See id.* Congress enacted the quiet period to "prevent the discriminatory nature of periodic voter purges." S. Rep. 103-6, at 20 (1993). It would be strange indeed for Congress to have instituted a prophylactic prohibition against voter purges for the 90-day period before an election only for the State to implement mass voter purges *after* an election has occurred and retroactively remove those voters' ballots from the election's tally.

### C. Petitioner has not established probable cause of any HAVA violation.

In any event, Petitioner has not shown probable cause of a HAVA violation here. At bottom, probable cause requires "'a reasonable ground for belief'" that the law has been violated, a belief that must be "particularized with respect to" the individual who allegedly committed the legal violation. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). The question is whether an objectively reasonable decisionmaker can reach a "reasonable conclusion to be drawn from the facts known . . . at the time" that a legal violation "has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

37

Under this standard, Petitioner has failed to show probable cause of any HAVA violation. Petitioner's protest is based on a list of over 60,000 registered voters—provided to him by the Board—who lack a recorded driver's license or social security number in the Board's database and who voted early or absentee in the 2024 elections. Petitioner carelessly assumes that all of these voters are improperly registered. Br. 13. But this assumption is indisputably false.[13]

For numerous reasons, a voter may lack a driver's license or social security number in their records and still be registered in accordance with state and federal law. For example: (1) a voter may not have a driver's license or social security number; (2) a database-matching failure resulted in identification numbers not being retained in the record; (3) voters who did not provide a driver's license or social security number, when applying to register by mail, could still register by providing a HAVA ID before or when voting for the first time; (4) voters who registered before the effective date of HAVA have a new post-HAVA registration that is not linked to their pre-HAVA registration; and (5) voters provided an identification number in a previous application under a registration record different than the one that is contested. Cox Aff. ¶¶ 9, 14.

*First*, voters who have not been issued a driver's license or social security number will necessarily lack this information in the Board's database. But these voters are nonetheless allowed to register to vote using a number assigned to them by the Board. 52 U.S.C. § 21083(a)(5)(A)(ii); N.C. Gen. Stat. § 163-82.4(b) (state law implementing this HAVA requirement). Cox Aff. ¶ 14(f).

---

[13]     Petitioner wrongly claims that the Board did not list a driver's license or social-security number as required on the voter-registration form since HAVA and its implementing state law were "enact[ed] in 2003" until "December 2023." Br. 16. In fact, as public records have long shown, the voter-registration form expressly listed this information as required until 2009 and was only changed to imply that the information was not required in 2013, during the McCrory administration. *See* Cox Aff. ¶ 16; Ex. A to Cox Aff.

*Second*, many voters who *did*, in fact, provide an identification number when they registered may nevertheless not have that number recorded in the Board's database because of a database-matching failure.  Cox Aff. ¶ 9; (Agency R p 5383 ("Unvalidated identification numbers are not retained in a voter's registration record."))  As discussed, HAVA instructs state election officials to establish a system to attempt to "match" the identification number provided in an application with existing government records.  52 U.S.C. § 21083(a)(5)(B)(i); N.C. Gen. Stat. §§ 163-82.12(6)-(9) (state law implementing this HAVA requirement).  But county workers may make "routine data-entry errors" that do not enable a match and cause the database to lack a recorded identification number.  (Agency R p 5391-92 n.16)  Voters may also make a data-entry error in their registration form causing the database to lack this information.  *See* (Agency R p 5383)  The matching error may also result from voters having different names at different points in their lives—for example, differences between married and maiden names or hyphenated last names.

Importantly, HAVA explicitly contemplates that these kinds of matching errors might occur and that voters are not improperly registered as a result.  *See* 52 U.S.C. §§ 21083(a)(5)(A), (b).  Instead, HAVA directs States to establish procedures to address registrations that do not match existing government records.  *Id.* § 21083(a)(5)(A)(iii); N.C. Gen. Stat. § 163-166.12(d) (implementing this HAVA requirement); *cf. Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1296 (W.D. Wash. 2006) ("HAVA's matching requirement was intended as an administrative safeguard for 'storing and managing the official list of registered voters,' and not as a restriction on voter eligibility." (quoting 52 U.S.C. § 21083(a)(1)(A)(i)).  North Carolina has done so by allowing voters to provide a HAVA ID before or upon voting for the first time.  In doing so, the General Assembly made clear that "[i]f that identification is provided and the board

of elections does not determine that the individual is otherwise ineligible to vote a ballot, the failure of identification numbers to match shall not prevent that individual from registering to vote and having that individual's vote counted." N.C. Gen. Stat. § 163-166.12(d). Thus, the law is clear that voters whose information was subject to a matching error *may register and vote* even though their voter records lack an identification number in the Board's database.

*Third*, even assuming that North Carolina's registration system did not previously comply with HAVA, voters who applied to register by mail without providing a driver's license or social security number would nonetheless have been eligible to register upon providing a HAVA ID before or when voting for the first time. *See* 52 U.S.C. §§ 21083(b)(1)-(3); N.C. Gen. Stat. §§ 163-166.12(a)-(b), (f) (implementing this HAVA requirement); Cox Aff. ¶ 9. Thus, both HAVA and state law make clear that these voters may register and vote even if the Board's database lacks an identification number.

Petitioner is simply wrong that HAVA and state law always require voters who register by mail to provide a driver's license or social security number to register. Br. 14. In a variety of circumstances—if such voters do not have this information when they register, if officials are unable to match their information with an existing government database, or if voters register under a system that is not set up to halt a registration that lacks an identification number—both HAVA and state law allow those voters to register and vote by providing HAVA ID on or before voting in their first election. 52 U.S.C. §§ 21083(b)(1)-(2); N.C. Gen. Stat. §§ 163-166.12(a)-(b). Voters who register by mail and who provide a driver's license or social security number that matches with an existing government database are merely *exempt* from the requirement that they provide HAVA ID. 52 U.S.C. § 21083(b)(3)(B); N.C. Gen. Stat. § 163-166.12(f)(2).

40

*Fourth*, although Petitioner purports to challenge only those voters who were registered after HAVA's effective date, some of these voters actually "registered *prior* to the effective date of HAVA but a new registration was created for them that is not linked to that older registration." (Agency R p 5391-92 n.16 (emphasis added)); see also Cox Aff. ¶ 14(a). Yet nothing in HAVA or the state law that implements HAVA required voters who registered to vote before HAVA's effective date to re-register in compliance with HAVA's requirements. Indeed, "HAVA did not direct states to purge all existing voters from state rolls and force them to re-register in accordance with the new federal requirements." *La Unión del Pueblo Entero v. Abbott*, 705 F. Supp. 3d 725, 752 (W.D. Tex. 2023). After all, "[s]uch a requirement would almost certainly violate the constitution." *Id.* at 752 n.21.

*Fifth*, voters may lack this information in the Board's database because they "supplied such a number in a previous application under a different registration record than the one challenged." (Agency R p 5392 n.16); see also Cox Aff. ¶ 14(b) and (c). But again, nothing in HAVA or the state law that implements HAVA provides any basis to conclude that such voters would be improperly registered.

In all of these ways, a voter may have registered to vote in full compliance with HAVA, but their records nevertheless lack an identification number in the Board's database. Petitioner has failed to even *attempt* to establish probable cause that *any* of the 60,000 voters he targets fall outside these circumstances. Lacking any particularized, objectively reasonable facts with respect to any individual voter, Petitioner cannot meet the probable-cause standard. *Ybarra*, 444 U.S. at 91 (probable cause must be "particularized with respect to that person"). As a leading treatise explains, "it is commonly said" that "events as consistent with innocent as with

41

[unlawful] activity," without more, are "too equivocal to form the basis" of probable cause. 2 W. LaFave et al., *Criminal Procedure* § 3.3(b) (4th ed.) (cleaned up). That is the case here.

### D. Petitioner's contrary arguments are unpersuasive.

At the outset, Petitioner contends that HAVA does not apply here, because the statute governs only federal elections. Br. 22-24. But as discussed, the General Assembly has expressly applied HAVA's federal-election requirements to state elections as well. *See supra* Part IV.A. Petitioner cites the North Carolina Supreme Court's decision in *James* for the proposition that HAVA itself does not apply to state elections. Br. 23. That is true. But as *James* goes on to confirm, the General Assembly then passed a law "in response to Congress' passage of the Help America Vote Act" that implemented HAVA's requirements for state elections. 359 N.C. at 267, 607 S.E.2d at 643. Thus, whether this Court examines HAVA itself or its implementing state laws, the analysis is the same.

When Petitioner addresses HAVA, his arguments are unpersuasive. Petitioner is correct that HAVA generally prohibits a State from processing a voter-registration application unless it includes a driver's license or social security number. 52 U.S.C. §§ 21083(a)(5)(A)(i)(I)-(II); *see* Br. 15-16. But Petitioner proceeds as if this were HAVA's only provision.

To the contrary, as discussed, HAVA elsewhere allows some voters to register and cast ballots absent this information. Moreover, HAVA explicitly contemplates that voters may still register when they provide one of these numbers but that number does not validate against other government databases. 52 U.S.C. § 21083(a)(5)(A)(iii). And importantly here, when a number does not validate, the voter's current database record will lack a number. (Agency R p 5383) Thus, there are many voters within this group who *did* provide a driver's license or social security number when registering, but because the number did not validate, the statewide database lacks an entry in that data field. (Agency R p 5383)

42

All told, HAVA expressly contemplates that many lawfully registered voters will not have a validated identification number in their voter records, and creates a process for verifying their identity to allow them to vote. Thus, no voter that Petitioner targets could have cast a ballot without at least first presenting election officials with a HAVA ID—just as federal law requires.

Petitioner's reliance on the so-called "cure" provision in section 163-82.4(f) reflects a simple misunderstanding of the statute. Petitioner claims that the procedures set out in this provision are the only way to "cure" voter registrations that lack a driver's license or social security number. Br. 15. But section 163-82.4(f) applies *before* a voter has been registered by a county board. N.C. Gen. Stat. § 163-82.4(f). And it requires the *county board*, not the voter, to take steps in the event of an incomplete voter registration by contacting the voter and giving the voter an opportunity to correct the application. *Id.* Here, by contrast, Petitioner is challenging the votes of voters who are *already* on the voter rolls. And as explained above, there are numerous ways that a voter may be registered in full compliance with federal and state law, but lack an identification record in the Board's database.

Petitioner's focus on the cure provision demonstrates a more fundamental defect in his arguments: Petitioner confuses voter registration with voter *eligibility.* Petitioner has never suggested that the more than 60,000 voters he challenges in this protest category are *actually* ineligible to vote in North Carolina elections. *See* N.C. Gen. Stat. § 163-55 (outlining statutory qualifications to vote); N.C. Const. art. VI, § 2 (same, constitutional). Moreover, all persons who register to vote, including those challenged here, are required to affirm that they meet all the qualifications to vote, under penalty of a Class I felony. *See* N.C. Gen. Stat. §§ 163-82.4(c)(1), (e); *see also* North Carolina Voter Registration Form, Section 11, bit.ly/4iUMGtv (last visited Feb. 3, 2025). Petitioner therefore openly seeks to use technicalities to disenfranchise tens of

thousands of *lawful North Carolina voters*—many of whom have been voting without controversy in North Carolina elections *for decades*. Nothing in HAVA or the state law that implements HAVA permits this audacious request. Indeed, the North Carolina Supreme Court has twice rejected arguments of just this kind. *See supra* Part II.A. And as discussed above, the federal constitution affirmatively forbids it. *Id.*

## V.     Petitioner's Proposed Remedy Is Improper and Unlawful

For all the above reasons, this Court should deny the petition. But even if this Court were to consider the petition and agree with Petitioner that the Board erred in adjudicating his protests, Petitioner's proposed remedy—that the Court order the Board to simply cancel the challenged ballots—is clearly improper. Under these circumstances, the only appropriate remedy would be for this Court to remand to the State Board for further proceedings, including factfinding hearings on Petitioner's protests.[14]

### A.     If this Court grants relief to Petitioner, the only proper remedy would be a remand to the Board.

As described above, the statutory framework for adjudicating elections protests involves multiple steps, including an evidentiary hearing to test a protester's allegations against the evidence. *See supra* at 7-8. Here, the Board dismissed the protests at a preliminary, threshold stage of the process. Specifically, the Board held that the protests failed at the outset because he failed to comply with filing requirements and failed to "establish[] probable cause to believe that a violation of election law or irregularity or misconduct has occurred." N.C. Gen. Stat. § 163-182.10(a); *see* (Agency R pp 5381, 5396)

---

[14]     Given the individualized nature of Petitioner's protests, on remand, the State Board may direct initial hearings to be conducted at the county level where individual voter records are most conveniently available.

44

Because the Board dismissed the protests at this initial stage, it never moved on to conducting a hearing, where it could receive evidence and engage in factfinding to test Petitioner's factual allegations. *See* N.C. Gen. Stat. §§ 163-182.10(a), (c). As a result, the question before this Court is limited to whether the Board's decision on its initial consideration of Petitioner's protests was legally correct. If this Court disagrees with the Board's legal decisions, the only appropriate remedy would be to remand to for evidentiary hearings. It is *at a hearing* that the State Board or county boards would apply the substantial-evidence standard to resolve Petitioner's protests. *Id.* § 163-182.10(d). Following hearings, the Board would be then required to "make a written decision on each protest" stating its findings of facts and accompanying conclusions of law. *Id.*

As a result, the question before this Court is limited to whether the Board applied the law correctly. Petitioner is simply wrong that this Court may consider his factual allegations under the substantial-evidence standard. Rather, the only appropriate remedy should the Board's threshold legal decisions be reversed, is to remand for evidentiary hearings, applying the substantial-evidence standard at that time. *See id.* §§ 163-182.10(a)(1), (c); *cf. Cmty. Sav. & Loan Ass'n v. N.C. & Loan Comm'n*, 43 N.C. App. 493, 497-98, 259 S.E.2d 373, 376-77 (1979) (reversing trial court decision that resolved legal conclusions in a petition for judicial review of an agency decision, and ordering that the case should instead be "remanded . . . for further [factual] findings").

### B. Petitioner is wrong that the appropriate remedy to any error is discounting the challenged ballots wholesale.

Petitioner asks this Court to simply "order the State Board to retabulate the vote with the unlawful ballots excluded." Br. 40. This remedy would clearly be improper at this stage of the process. And indeed, it is contrary to the remedy that Petitioner himself requested in his protests.

45

As detailed above, the State Board dismissed Petitioner's protests at the preliminary consideration stage. *See* N.C. Gen. Stat. § 163-182.10(a). If the Court were to find error in the Board's order dismissing at that preliminary stage, the only appropriate remedy would be a remand to the Board for further proceedings, including an evidentiary hearing, at which the State Board or county boards could conduct any necessary factfinding on an individualized basis rather than disenfranchising more than 60,000 voters *en masse* as Petitioner demands. *See id.* §§ 163-182.10(a), (c)–(d).

Petitioner has failed to establish that any voter *actually* registered to vote and cast ballots in violation of the law.[15] Petitioner's request that the Board simply discard all the challenged votes would therefore clearly be improper under the statutes and case law governing election protests. On remand, the Board would be authorized by statute to take a wide variety of measures, as appropriate, in response to an adjudicated election violation. Specifically, the General Assembly has authorized the Board, subject to judicial review, to correct vote totals, order a recount, or take any other action "necessary to assure that an election is determined without taint of fraud or corruption and without irregularities that may have changed the result of an election." *Id.* §§ 163-182.10(d), -182.12. In addition, under certain limited circumstances, the Board may also order a new election. *Id.* § 163-182.13(a).

---

[15] The burden of proof is on the protestor, not the State Board. *In re Appeal of Ramseur*, 120 N.C. App. 521, 525, 463 S.E.2d 254, 257 (1995); *In re Cleveland Cty. Comm'rs: Protest of Crawford*, 56 N.C. App. 187, 191, 287 S.E.2d 451, 455 (1982); and *In re Jud. Rev. by Republican Candidates for Election in Clay Cnty.*, 45 N.C. App. 556, 570, 264 S.E.2d 338, 346 (1980)). Nonetheless, as discussed, in response to some of Petitioner's arguments in this litigation, the Board chose to voluntarily perform a preliminary data analysis to evaluate Petitioner's assertions. Cox Aff. ¶¶ 8-13. That analysis shows that, as predicted in earlier filings, roughly half, and likely many more, voters challenged by Petitioner did in fact provide a driver's license or social security number when they registered. Cox Aff. ¶ 13.

46

Moreover, here, Petitioner does not contest that the vast majority (if not all) of the voters he challenges in this protest are lawful, eligible voters. As a result, on remand, any remedy provided by the state and county boards would have to provide challenged voters an opportunity to address any deficiencies that this Court identifies before their voters are discarded. Indeed, this is exactly the remedy that Petitioner himself requested in his protests. Petitioner did not ask the Board to cancel votes outright in his protests. Instead, in all of his protests on this issue, he asked that:

> The State Board of Elections should (1) notify all voters who registered by a voter registration form since January 1, 2004, and failed to provide a drivers license or social security number that their voter registration was deficient and, absent correction, their vote cannot be counted; (2) inform such voters that they have a cure period during which the voter can provide the missing information; (3), for all such voters who provide a validated drivers license or social security number during the cure period, count the ballots in the election contest identified above; (4), for all such voters who fail to provide a validated drivers license or social security number during the cure period, not count the ballot in the election contest identified above; and (5), after the cure period, correct the vote count accordingly in the election contest identified above.[16]

This request appropriately recognizes that the outright cancelling of votes cast by lawful, eligible North Carolina voters—without any opportunity to cure—would be inappropriate if this protest ever proceeds to the evidentiary hearing and remedial phases.

In sum, should this Court reverse the Board's initial legal determinations and order a factfinding hearing, and should the Board ultimately find that Petitioner has adduced substantial

---

[16]      (Agency R pp 22, 50, 82, 97, 134, 165, 181, 199, 215, 250, 305, 376, 412, 458, 476, 506, 527, 558, 586, 615, 632, 647, 678, 716, 735, 774, 858, 890, 907, 947, 980, 1016, 1129, 1166, 1249, 1288, 1318, 1334, 1349, 1369, 1389, 1419, 1569, 1606, 1636, 1669, 1689, 1705, 1726, 1756, 1798, 1833, 1870, 1901, 1935, 1973, 1994, 2026, 2042, 2058, 2092, 2223, 2239, 2271, 2306, 2355, 2412, 2444, 2492, 2533, 2565, 2587, 2618, 2651, 2684, 2717, 2749, 2774, 2806, 2837, 2861, 2899, 2919, 2954, 2971, 2991, 3007, 3042, 3059, 3075, 3105, 3159, 3211, 3385, 3416, 3444, 3474, 3508, 3534, 3549)

47

evidence of an election law violation, discounting ballots is only one of several remedies authorized by law.

## <u>CONCLUSION</u>

For the reasons stated above, this Court should deny the petition for judicial review.

Electronically submitted this the 3rd day of February, 2025.

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
Email: tsteed@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
Email: mcbabb@ncdoj.gov

North Carolina Dept. of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6567

*Counsel for Respondent State Board*

48

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this day electronically filed the foregoing

document with the Wake County Clerk of Court using the NC eCourts efile and serve system,

which electronically mails a link to the same in PDF format using the following addresses:

Craig D. Schauer
cschauer@dowlingfirm.com
Troy D. Shelton
tshelton@dowlingfirm.com
W. Michael Dowling
mike@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
Raleigh, North Carolina 27607

Philip R. Thomas
pthomas@chalmersadams.com
CHALMERS, ADAMS, BACKER & KAUFMAN, PLLC
204 N Person St.
Raleigh, North Carolina 27601

*Counsel for Petitioner*

This the 3rd day of February, 2025.

<u>/s/ Terence Steed</u>
Terence Steed
Special Deputy Attorney General

49

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV040620-910

)
)
)
JEFFERSON GRIFFIN,                    )
)
            Petitioner,               )            **AFFIDAVIT OF**
)            **PAUL COX**
    v.                                )
)
NORTH CAROLINA STATE BOARD OF         )
ELECTIONS,                            )
)
            Respondent.               )
)

I, Paul Cox, swear under penalty of perjury that the following information is true to the best of my knowledge and state as follows:

1.      I am over 18 years old. I am competent to give this declaration and have personal knowledge of the facts set forth herein.

2.      I am general counsel for the North Carolina State Board of Elections ("State Board"), a position I have held since September 1, 2022. Prior to that, I served as an associate general counsel to the State Board from September 2021 to August 2022. In my role, I provide legal advice to the State Board and its staff on all matters of election administration. I also provide advice to the county boards of elections. I also regularly confer with subject-matter experts on State Board staff and with county directors of elections regarding the operation of the State Election Information Management System (SEIMS), which is the suite of software and databases maintained by the State Board and used by both State and county election officials to manage nearly all elections-related processes, including voter registration and voter list maintenance. I also regularly confer with these election professionals regarding operational practices for voter registration and voter list maintenance.

3.     As general counsel to the State Board, I have access to documents in the care and custody of that state agency and can verify that true and accurate copies of those documents are attached hereto. These are documents created by State Board staff, made by persons with knowledge of the contents therein, kept in the course of the regularly conducted business of the State Board, and are considered public records under North Carolina law.

4.     As general counsel to the State Board, I also have access to information stored in North Carolina's current voter registration database, as well as information kept in archived voter registration processing databases. I am familiar with the functioning of the current database, including how it stores and verifies information entered into the database. The State Board is responsible for the development, enhancement, maintenance, and management of the current voter registration database, and retains custody of archived databases. Through my personal knowledge, I am aware that information maintained in these databases was originally entered by county board of elections staff members (or, in rare occasions, State Board staff members), who had knowledge of that information at the time it was entered.

5.     I requested that the State Board's information technology (IT) staff retrieve data from the current and archived voter registration databases that provides the basis for the information discussed in this affidavit. I can verify that the information in this affidavit derived from data in those databases is true and accurate, to the extent it was originally inputted correctly, and is of public record.

6.     The Petitioner in this matter included an affidavit from an employee of a political consulting firm, Ryan Bonifay. Mr. Bonifay stated that he conducted a data query of a list provided to the North Carolina Republican Party from the State Board containing all currently registered voters in active, inactive, or temporary status that do not contain data in one or more

2

of the following data fields in their registration record: driver's license number or last four digits of social security number. He states that he then matched this list against the absentee voter list to produce a final list which, according to him, contains "a list of people who (1) attempted to vote in the 2024 General Election before November 5, 2024 (via early vote, absentee by mail, etc.), (2) had their vote accepted by their applicable county board of elections, and (3) never provided a North Carolina driver's license number nor the last 4 digits of their Social Security Number to their county board of elections."

7.    Mr. Bonifay's conclusion that the results of this database matching would definitively show whether a registrant "provided" one of these numbers "to their county board of elections" is based on incorrect assumptions. It assumes that numbers provided on a voter registration form to a county board of elections necessarily and always appear in a voter's registration record in the electronic database used to produce the list that the Republican Party obtained from the State Board. It is a conclusion that, in a very large number of cases, proves to be incorrect.

8.    In response to arguments made in the various post-election litigation brought by the Petitioner, I requested that our IT staff run a database query on January 24, 2025, to replicate the analysis that Mr. Bonifay says he conducted. We matched the list of individuals whose electronic voter registration database record contains neither a driver's license nor the last four digits of a social security number, against the list of voters who cast an early or absentee ballot in the 2024 general election that was accepted by their county board of elections. The result was a list of 62,027 voter records: 60,666 early voters and 1,361 absentee voters.

9.    Our IT staff did further analysis, however, using voter registration archive databases to identify whether any of these voters had one of these numbers in their voter

3

registration application record—the record created when the county board of elections initially enters data from the voter registration application into the voter registration database. These archive databases are distinct from the current database of voter registrations queried for Mr. Bonifay's analysis. Under the data processing rules that operate within SEIMS, when a county user inputs a new registration application or updated application record with a driver's license or the last four digits of a social security number in the appropriate database field, the system automatically attempts to validate that number against the North Carolina DMV database, for driver's license numbers, and the federal Social Security Administration database, for social security numbers. To validate, the applicant's first and last name, date of birth, and the driver's license or last four of their social security number must all match exactly, between the voter registration database and the other government database. If there is any discrepancy preventing an exact match on any of these fields, that prevents the identification number from being validated, and the driver's license or social security number is removed from the registrant's voter record. That number is retained, however, in an archive database associated with the processing of voter registration applications. Such voters are permitted to register and vote upon providing another form of identification, which we refer to as HAVA ID. *See* N.C.G.S. § 163-166.12(d).

10. After querying this archive database for any of the 62,027 voter records, our data shows that 28,803 of these voters' records contained a driver's license number or last four digits of a social security number during the registration application processing phase. In all likelihood, based on the processes outlined above, these identification numbers were removed from these voters' records when the automatic matching between the elections database and the DMV or Social Security databases did not result in an exact match.

4

11. Next, our IT staff ran a query to determine whether any of the 62,027 voters have another voter registration record on file that contains a driver's license or last four digits of a social security number. This can occur, for example, if a person registers in one county and then re-registers in another county. When this occurs, in some instances, the county user fails to match and populate the new record with the identification information from the previous record. To identify such records, our IT staff searched for other registration records associated with the same unique voter identification number (which we call NCID) of any of the 62,027 voters. We determined that 2,200 of these voters had an earlier registration that contained a driver's license or social security number, 1,168 of which are unique from the list of 28,803 voters whose initial processing record contained one of these numbers.

12. Next, our IT staff ran a query to determine whether any of the 62,027 voters have a record in the database showing that they indicated on their initial voter registration application that they "do not have a driver's license/DMV ID or Social Security number." Such voters are permitted to register and, in lieu of an identification number that the voter does not have, SEIMS automatically assigns that voter a unique identification number (again, an NCID number). *See* 52 U.S.C. § 21083(a)(5)(A)(ii). SEIMS did not have a field for this entry until July 2024, when our software developers added it to the software application the county boards use to enter voter registration applications into the system. Accordingly, any query of "I do not have" voters would necessarily be underinclusive because it would capture only those voters who selected this option on the voter registration application from July 2024 onward, and no such voters from before that time. From this query, we determined that 1,266 of the 62,027 voters have an indication in their record that they informed their county board of elections that they have neither a driver's license number nor social security number, 1,196 of which are unique from the earlier two queries.

5

13.     Accordingly, when combining the first two queries, we can determine that among

the voters who, according to Mr. Bonifay's analysis, "never provided" a driver's license or last

four digits of a social security number, 29,971 of them actually did provide one of these

numbers. And drawing on the third query, 1,196 additional voters included in Mr. Bonifay's

analysis, and likely many more, were properly registered pursuant to federal law when they

indicated that they lacked these numbers, for a total of 31,167 of the 62,027.

14.     If the election protests at issue were determined to be legally valid and should

advance to an evidentiary hearing, which did not occur at the agency level, this type of data

analysis by State Board staff of public records in its possession would be the first step. Next, the

county boards of elections would have to investigate all of the remaining voter registrations

identified by Mr. Bonifay. That is because there are a variety of fact-specific circumstances that

would establish that a voter either provided one of the identification numbers at issue, contrary to

Mr. Bonifay's conclusion, or that they were exempt from providing one. My colleagues at the

State Board and I have conferred with multiple staff members from county boards of elections

who have been reviewing the records of voters identified in Mr. Bonifay's list, and the following

is a list of some of these circumstances:

        a.  Some voters registered before the digitization of registration records in the late
            1990s/early 2000s and then submitted a new registration form, but the system was
            unable to link the older form to the new one, so the current data, erroneously,
            appears to show that the person first registered after HAVA became effective.

        b.  Some voters registered and provided a driver's license or last four digits of social
            security number or indicated they lacked these numbers and then re-registered, or
            they registered prior to HAVA. But because of a discrepancy in how they filled
            out the later registration form (or a data entry error by county staff), the two

6

records were not linked. So, the later registration appears in the database, erroneously, as a first-time registration.

c. Some voters were removed from the rolls due to inactivity but later voted after attesting that they maintained residency in the county, which requires a county to "reinstate[]" that voter's registration. N.C.G.S. § 163-82.14(d)(3). However, the county may have created a new registration record rather than reactivating a removed record due to various processing practices at the county level. If the original registration was either exempt from the HAVA identification requirement or the voter supplied an identification number on the original record, the new record would not show that in the current record in the database.

d. Some voters provided a driver's license or last four digits of their social security number with their initial registration application, which a county worker can verify by pulling up the scanned copy of that form, but a county worker simply failed to key that information into the database when they originally processed the registration.

e. As noted above, some voters selected "I do not have" a driver's license or social security number, but they registered before July 2024, so the county board could only identify this scenario by pulling up and reviewing the scanned copy of the voter registration application.

f. It is also possible that some voters had to vote provisionally for the first time, because there was no record of registration. But county staff were able to determine that the voter attempted to timely register before the election through the DMV, for example, but the registration did not get processed for some reason, which makes their provisional ballot eligible to count. *See* N.C.G.S. § 163-82.19(a). But because the DMV record did not come through, their provisional application served as their initial registration form, and that form may not have included their driver's license, unlike if the record had come through from the DMV as originally intended.

7

15.    As these examples demonstrate, it would require individualized, one-by-one, manual review of records by the county boards to determine if any voter on the challenged list falls into one of these categories, or possibly others. And for the issue of a prior registration not linking to a new registration, it would require fairly complex data analysis to attempt to identify potential older registrations for challenged voters that have not been linked to the current, active registration in the database due to slight data mismatches. Then, it would require manual review of any such older registrations to see if any challenged voter actually registered prior to HAVA's effective date or registered after HAVA became effective but included a driver's license or the last four digits of a social security number, or indicated they lacked these numbers, on that initial registration application. This sort of effort would be required to ensure that no voter was erroneously identified as having registered after the effective date of HAVA without providing the identification information at issue or stating that they lacked it.

16.    As general counsel to the State Board, I am also familiar with the history of the voter registration application form created by the agency over the years, and I have access to records of historical versions of these forms, all of which are public records. Attached as Exhibit A to this affidavit is a demonstrative table showing the fields on the application and the instructions on the application, version by version, since 2003.

This concludes my affidavit.

This the 3rd day of February, 2025.

Paul Cox
General Counsel
N.C. State Board of Elections

8

Sworn to and subscribed before me this the 3rd day of February, 2025.



Karla D. Garcia

(Notary Public)

My commission expires: 6|30|2029

9

# EXHIBIT A

| Year | HAVA Fields | HAVA Instructions (typically on the reverse page) |
|---|---|---|
| 2003 | **Drivers License Number:**<br>**If you do not have a Driver's license, then list the last four digits of your Social Security Number:** | **IDENTIFICATION REQUIREMENT**<br>If you do not have a driver's license or social security number, and this form is submitted by mail, and you have never registered to vote in the county you are now registering in, you must send, with this application, either a.) a copy of current and valid photo identification, or b.) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. If you do not provide the information requested above, you will be required to provide to election officials either a. or b. above the first time you vote at a voting place or by absentee ballot. |
| 2004 | **ID Number**<br>If you have a NC driver's license, check here and print the number where indicated below.<br>☐ License No.<br>If you have no NC driver's license, check here and print your Social Security No. where indicated below.<br>☐ SSN (Last 4 Digits)<br>If you have no NC driver's license or SSN, check here<br>☐ I have no NC driver's license or SSN | **IDENTIFICATION REQUIREMENT**<br>If you do not have a driver's license or social security number, are submitting this form by mail, and have never registered to vote in the county in which you are now registering, you must send, with this application, either a copy of current and valid photo identification, OR a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address. If you do not provide the information requested above, you will be required to provide ID to election officials when you vote for the first time. |
| 2005 | **ID Number**<br>If you have a NC driver's license, check here and print the number where indicated below.<br>☐ License No.<br>If you have no NC driver's license, check here and print your Social Security No. where indicated below.<br>☐ SSN (Last 4 Digits)<br>If you have no NC driver's license or SSN, check here<br>☐ I have no NC driver's license or SSN | **IDENTIFICATION REQUIREMENT**<br>If you do not have a driver's license or social security number, are submitting this form by mail and have never registered to vote in the county in which you are now registering, you must send, with this application, either a copy of current and valid photo identification, OR a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address. If you do not provide the information requested above, you will be required to provide ID to election officials when you vote for the first time. |
| 2006 | **Section 2 ▶**<br>**Personal Identification Number (Required)**<br>Do you have a NC driver's license or NC identification card? ☐ Yes ☐ No Or<br>NC Driver License or Identification Number<br>Do you have a U.S. issued Social Security Number? ☐ Yes ☐ No<br>Social Security Number (Last Four Digits Are Required)<br>Have you been assigned a NC State Voter Number? ☐ Yes ☐ No<br>NC State Voter Registration Number | **Requirements:  PLEASE READ**<br>• To be eligible to vote in the county you are registering in, you must have resided in that county for at least 30 days before the day of the election.<br>• If you are registering by mail, and cannot provide a valid ID number in Section 2, you must submit a **copy** of one of the following forms of **current and valid** identification with this application.  If you do not provide this information, you will be required to provide one of these forms of ID to an election official when you vote for the first time in this county.<br> • A current and valid photo identification<br> • A current utility bill, or bank statement, government check or paycheck, or a government document that shows your name and address as it appears on this application |
| 2007 | **Section 2 ▶**<br>**Personal Identification Number (Required)**<br>Do you have a NC driver's license or NC identification card issued by DMV? If yes, provide the number. ☐ Yes ☐ No<br>NC Driver License or Identification Number<br>If you don't have a DMV-issued card, do you have a U.S.-issued Social Security Number? If yes, provide last 4 digits. ☐ Yes ☐ No  X X X X X<br>Social Security Number (Last Four Digits)<br>Have you been assigned a NC State Voter Registration Number? If yes, provide unless you provided one of the numbers above. ☐ Yes ☐ No<br>NC State Voter Registration Number | **Requirements:   PLEASE READ**<br>• To be eligible to vote in the county you are registering in, you must have resided in that county for at least 30 days before the day of the election.<br>• If you are registering by mail, and cannot provide a valid ID number in Section 2, you must submit a copy of one of the following forms  of current and valid identification with this application. If you do not provide this information, you will be required to provide one of these  forms of ID to an election official when you vote for the first time in this county.<br> • A current and valid photo identification<br> • A current utility bill, or bank statement, government check or paycheck, or a government document that shows your name and address as it appears on this application. |

| | | |
|---|---|---|
| 2008 | **Section 2**<br>Identification<br>(Required) | Do you have a NC driver's license or NC identification card issued by DMV? If yes, provide the number. ☐ Yes ☐ No<br>If you do not have a DMV-issued card, do you have a U.S.-issued Social Security Number? If yes, provide last 4 digits. ☐ Yes ☐ No  X X X - X X - | **Requirements: PLEASE READ**<br>• To be eligible to vote in the county you are registering in, you must have resided in that county for at least **30 days** before the day of the election.<br>• If you are registering by mail, and cannot provide a valid ID number in Section 2, you must submit a copy of one of the following forms of current and valid identification with this application. If you do not provide this information, you will be required to provide one of these forms of ID to an election official when you vote for the first time in this county:<br>  - A current and valid photo identification<br>  - A current utility bill, or bank statement, government check or paycheck, or a government document that shows your name and address as it appears on this application. |
| 2009 | **3** | Do you have a NC Driver's License or DMV-issued identification card? If yes, provide the number. ☐ Yes ☐ No<br>If you do not have a NC DMV-issued license or ID card, do you have a Social Security Number? If yes, provide the last 4 digits. ☐ Yes ☐ No  X X X - X X - | **Requirements:**<br>• To be eligible to vote in the county you are registering in, you must have resided in that county for at least 30 days before the day of the election.<br>• If you are registering by mail, and cannot provide a valid ID number in Section 3, you must submit a copy of one of the following forms of current and valid identification with this application. If you do not provide this information, you will be required to provide one of these forms of ID to an election official when you vote for the first time in this county:<br>  - A current and valid photo identification<br>  - A current utility bill, or bank statement, government check or paycheck, or a government document that shows your name and address as it appears on this application. |
| 2010 | No record of changes | | No record of changes |
| 2011 | No record of changes | | No record of changes |
| 2012 | **3** | Do you have a NC Driver's License or DMV-issued identification card? If yes, provide the number. ☐ Yes ☐ No<br>If you do not have a NC DMV-issued license or ID card, do you have a Social Security Number? If yes, provide the last 4 digits. ☐ Yes ☐ No  X X X - X X - | No record of changes |
| 2013 | **3** | Date of Birth MMDDYYYY (Required)    State of Birth/Country of Birth<br>If you know your NC Voter Registration number, enter it below.<br>If you have a NC drivers license or non-operators ID card, enter the number below.<br>Enter the last 4 digits of your SSN.    ☐ Check here if you do not have a NC drivers license, ID card, or a SSN. | **Voter Identification (ID) Requirements:**<br>*Help America Vote Act ID Requirements* — Under federal and state law, if you are registering and cannot provide a valid ID number in Section 3, you should include with this application a copy of one of the documents below:<br>• A current and valid photo ID.<br>• A current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address.<br>If you do not provide a valid ID number on your application or submit a copy of one of the documents noted above, you must show ID the first time you vote. |
| 2014 | No record of changes | | No record of changes |

| | | |
|---|---|---|
| 2015 | **3** Date of Birth MMDDYYYY (Required)  State of Birth/Country of Birth<br><br>If you know your NC Voter Registration Number, enter it below.<br><br>If you have a NC drivers license or non-operators ID card, enter the number below.<br><br>Enter the last 4 digits of your SSN.  ☐ Check here if you do not have a NC drivers license, ID card, or a SSN. | **Identification Requirements:**<br><br>*Registration ID* — Under federal and state law, if you register to vote by mail and do not provide a valid identification number in Section 3, you must include a copy of one of the following documents with this application:<br><br>• A current and valid photo ID.<br>• A current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address.<br><br>If you do not provide a valid identification number in Section 3 or submit a copy of one of the above identification documents, you must present one of the above identification documents the first time you appear to vote. |
| 2016 | **3** Date of Birth MMDDYYYY (Required)  State of Birth/Country of Birth<br><br>If you know your NC Voter Registration Number, enter it below.<br><br>If you have a NC drivers license or non-operators ID card, enter the number below.<br><br>Enter the last 4 digits of your SSN.  ☐ Check here if you do not have a NC drivers license, ID card, or a SSN. | **Identification Requirements:**<br><br>*Registration ID* — Under federal and state law, if you register to vote by mail and do not provide a valid identification number in Section 3 on this form, you must enclose a copy of one of the following documents with this application:<br><br>• A current and valid photo ID.<br>• A current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address.<br><br>If you do not provide the identification information listed above, you will be asked to show ID the first time you present to vote. |
| 2017 | No record of changes | No record of changes |
| 2018 | **NORTH CAROLINA VOTER REGISTRATION APPLICATION** (fields in red text are required)<br><br>. . .<br><br>**3** Provide your date of birth and identification information.<br><br>Date of Birth (MM/DD/YYYY)  State or Country of Birth<br><br>NC Driver License or NC DMV ID Number  Last Four Digits of Social Security Number<br><br>☐ Check if you do not have a driver license or Social Security number.  State Voter Registration Number - Optional *(To locate, check "Voter Lookup" at www.NCSBE.gov.)* | **Identification Requirements**<br><br>Registration ID — Under federal and state law, if you apply to register to vote and do not provide a valid identification number in Section 3 on this form, you must enclose a copy of one of the following documents with this application:<br><br>• A current and valid photo ID<br>• A current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address<br><br>If you do not provide a valid form of identification, you will be asked to show ID the first time you present to vote. |

3

**2019**

## NORTH CAROLINA VOTER REGISTRATION APPLICATION (fields in red text are required)

. . .

**3** Provide your date of birth and identification information.

Date of Birth (MM/DD/YYYY)          State or Country of Birth

NC Driver License or NC DMV ID Number          Last 4 Digits of Social Security Number

☐ Check if you do not have a driver license or Social Security number.          State Voter Registration Number - Optional (To locate, check "Voter Lookup" at www.NCSBE.gov.)

**3** You are required to provide your date of birth. If you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number. If you have neither a NC driver license, NC DMV ID card or a social security number and you are registering to vote for the first time in North Carolina, attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address to this application.

---

**2020**

## NORTH CAROLINA VOTER REGISTRATION APPLICATION (fields in red text are required)

. . .

**3** Provide your date of birth and identification information.

Date of Birth (MM/DD/YYYY)          State or Country of Birth

NC Driver License or NC DMV ID Number          Last 4 Digits of Social Security Number

☐ Check if you do not have a driver license or Social Security number.          State Voter Registration Number (Optional: To locate, check "Voter Lookup" at www.NCSBE.gov.)

**3** You are required to provide your date of birth. If you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number. If you have neither a NC driver license, NC DMV ID card or a social security number and you are registering to vote for the first time in North Carolina, attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address to this application.

---

**2021**

## NORTH CAROLINA VOTER REGISTRATION APPLICATION (fields in red text are required)

. . .

**3** Provide your date of birth and identification information.

Date of Birth (MM/DD/YYYY)          State or Country of Birth

NC Driver License or NC DMV ID Number          Last 4 Digits of Social Security Number

☐ Check if you do not have a driver license or Social Security number.          State Voter Registration Number (Optional: To locate, check "Voter Lookup" at www.NCSBE.gov.)

3. You are required to provide your date of birth. If you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number. If you have neither a NC driver license, NC DMV ID card or a social security number and you are registering to vote for the first time in North Carolina, attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address to this application.

**2022**

### NORTH CAROLINA VOTER REGISTRATION APPLICATION *(fields in red text are required)*

. . .

**3** Provide your date of birth and identification information.

Date of Birth (MM/DD/YYYY)    State or Country of Birth

NC Driver License or NC DMV ID Number    Last 4 Digits of Social Security Number

☐ Check if you do not have a driver license or Social Security number.    State Voter Registration Number *(Optional: To locate, check "Voter Lookup" at www.NCSBE.gov.)*

---

**3** You are required to provide your date of birth. If you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number. If you have neither a NC driver license, NC DMV ID card or a social security number and you are registering to vote for the first time in North Carolina, attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address to this application.

---

**2023**

### NORTH CAROLINA VOTER REGISTRATION APPLICATION *(fields in red text are required)*

. . .

**3** Provide your date of birth and identification information.

Date of Birth (MM/DD/YYYY)    State or Country of Birth

NC Driver License or NC DMV ID Number    Last 4 Digits of Social Security Number

☐ Check if you do not have a driver license or Social Security number.    State Voter Registration Number *(Optional: To locate, check "Voter Lookup" at www.NCSBE.gov.)*

---

3. You are required to provide your date of birth. If you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number. If you have neither a NC driver license, NC DMV ID card or a social security number and you are registering to vote for the first time in North Carolina, attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address to this application.

---

**2024**

### North Carolina Voter Registration Application *(Sections in red are required.)*

. . .

Identification information
Required.

**3**    Date of birth (mm/dd/yyyy)    AND    NC Driver's License/DMV ID number
OR, if you do not have one
Last 4 digits of your Social Security number
OR
☐ I do not have a driver's license/DMV ID or Social Security number.

---

3. Provide your date of birth. If you have an NC driver's license or NCDMV ID number, you must provide this number. If not, you must provide the last four digits of your social security number. If you have none of these ID numbers and you are registering to vote for the first time in North Carolina, you must check the box indicating that you do not have these forms of identification. If you check that box, you may attach to this application a copy of a current and valid photo identification, utility bill, bank statement, government check, paycheck, or other government document that shows your name and address.