# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS; SAM HAYES, in his official
capacity as Executive Director of the North
Carolina State Board of Elections; FRANCIS
X. DE LUCA, JEFF CARMON, STACY
EGGERS IV, SIOBHAN O'DUFFY MILLEN,
and ROBERT RUCHO, in their official
capacities as Members of the North Carolina
State Board of Elections; and STATE OF
NORTH CAROLINA,

        Defendants.

Case No. 5:25-cv-00283

# MEMORANDUM BRIEF IN SUPPORT OF THE NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS' MOTION TO INTERVENE AS DEFENDANT

i

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.      North Carolina enacted legislation to bring the State into compliance with HAVA. ......... 3

II.     North Carolina's voter registration rolls are secure, notwithstanding recent challenges seeking to cast doubt upon them. ........................................................................... 5

III.    The federal government files a lawsuit that threatens to disenfranchise thousands of lawful North Carolina voters through no fault of their own. ............................................... 8

IV.     The Alliance and its respective members will be harmed by the federal government's effort to purge North Carolina's voter rolls. ..................................................................... 10

ARGUMENT........................................................................................................... 13

I.      The Alliance is entitled to intervene as of right under Rule 24(a)................................... 13

        A.      The motion is timely. ............................................................................. 14

        B.      The disposition of this case threatens to impair the Alliance's significantly protectable interests. ........................................................................... 14

        C.      The Alliance's interests are not adequately represented by the existing parties in this case................................................................................................ 18

II.     Alternatively, the Alliance should be granted permissive intervention under Rule 24(b). ..........................................................................................................21

CONCLUSION........................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1789 Found. Inc. v. Fontes*,
No. CV-24-0298-PHX-SPL, 2025 WL 834919 (D. Ariz. Mar. 17, 2025) ................... 19, 21

*Berger v. N.C. State Conf. of the NAACP*,
597 U.S. 179 (2022) ............................................................................................. 18, 19, 21

*Bost v. Ill. State Bd. of Elections*,
75 F.4th 682 (7th Cir. 2023) ............................................................................................ 21

*Carcaño v. McCrory*,
315 F.R.D. 176 (M.D.N.C. 2016) .................................................................................... 14

*City of Chicago v. Fed. Emergency Mgmt. Agency*,
660 F.3d 980 (7th Cir. 2011) ........................................................................................... 20

*Commonwealth of Virginia v. Westinghouse Elec. Corp.*,
542 F.2d 214 (4th Cir. 1976) ........................................................................................... 21

*County of San Miguel v. MacDonald*,
244 F.R.D. 36 (D.D.C. 2007) ........................................................................................... 17

*Democracy N.C. v. N.C. State Bd. of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020) ....................................................................... 15, 17

*Dowdy v. City of Durham*,
689 F. Supp. 3d 143 (M.D.N.C. 2023) ............................................................................ 14

*Feller v. Brock*,
802 F.2d 722 (4th Cir. 1986) ...................................................................................... 13, 22

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003) ......................................................................................... 19

*Griffin v. N.C. State Bd. of Elections*,
No. 5:24-CV-00699-M, 2025 WL 1292530 (E.D.N.C. May 5, 2025) .............................. 23

*Griffin v. N.C. State Bd. of Elections*,
913 S.E.2d 894 (N.C. 2025) ............................................................................................... 7

*Griffin v. N.C. State Bd. of Elections*,
No. 5:24-CV-00731-M (E.D.N.C. 2024) ................................................................ 1, 7, 14

Case 5:25-cv-00283-FL    Document 8    Filed 06/02/25    Page 3 of 30

*Hengle v. Curry*,
No. 3:18-CV-100, 2018 WL 3016289 (E.D. Va. June 15, 2018) ........................................ 22

*Ill. State Bd. of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979) ........................................................................................................ 15

*In re Sierra Club*,
945 F.2d 776 (4th Cir. 1991) ............................................................................................ 2

*Judicial Watch, Inc. v. Ill State Bd. of Elections*,
No. 24 C 1867, 2024 WL 3454706 (N.D. Ill. July 18, 2024) .............................................. 20

*Kleissler v. U.S. Forest Serv.*,
157 F.3d 964 (3d Cir. 1998) ........................................................................................ 19, 20

*League of United Latin Am. Citizens v. Executive Office of the President*,
No. CV 25-0946 (CKK), 2025 WL 1187730 (D.D.C. Apr. 24, 2025) .................................. 9

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
659 F.3d 421 (5th Cir. 2011) ............................................................................................ 15

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ............................................................................................ 18

*Moore v. Circosta*,
No. 1:20CV911, 2020 WL 6597291 (M.D.N.C. Oct. 8, 2020) .................................... 14, 23

*N.C. Green Party v. N.C. State Bd. of Elections*,
619 F. Supp. 3d 547 (E.D.N.C. 2022) ............................................................................... 15

*Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*,
646 F.2d 117 (4th Cir. 1981) ...................................................................................... 15, 17

*Paher v. Cegavske*,
No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365 (D. Nev. Apr. 28, 2020) ................ 16

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) .................................................................................. 1, 3, 6, 7

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
No. 5:24-CV-00547-M, 2024 WL 4349904 (E.D.N.C. Sept. 30, 2024) ............................. 16

*Reynolds v. Sims*,
377 U.S. 533 (1964) ........................................................................................................ 18

*Sandusky Cnty. Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) ........................................................... 16

*Stein v. Berger*,
    No. 114P25, 2025 WL 1486969 (N.C. May 21, 2025)............................... 20

*Stuart v. Huff*,
    706 F.3d 345 (4th Cir. 2013) ........................................................... 22

*Students for Fair Admissions Inc. v. Univ. of N.C.*,
    319 F.R.D. 490 (M.D.N.C. 2017) ...................................................... 22

*Teague v. Bakker*,
    931 F.2d 259 (4th Cir. 1991) ........................................... 13, 14, 15, 18

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972)..................................................................... 18, 19

*Voto Latino v. Hirsch*,
    712 F. Supp. 3d 637 (M.D.N.C. 2024) ............................................... 16

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886).......................................................................... 15

**Statutes and Rules**

52 U.S.C. § 21083.............................................................. 1, 4, 5, 19

N.C. Gen. Stat. § 163-82.3.......................................................... 5

N.C. Gen. Stat. § 163-82.4....................................................... 4, 16

N.C. Gen. Stat. § 163-166.12.................................................... 4, 5

Pub. L. No. 107-252, 116 Stat. 1666 (2002).................................. 3

Fed. R. Civ. P. 24 ............................................................... *passim*

**Other Authorities**

Andy Jackson, *Federal voter registration lawsuit is important but likely premature*, Locke
    (May 28, 2025), https://perma.cc/QK2E-BH6Z .................................. 20

N.C. State Bd. of Elections, N.C. Voter Registration Application (Feb. 2025),
    perma.cc/L5ZV-49WG ..................................................................... 6

Pursuant to Rule 24(a), the North Carolina Alliance for Retired Americans ("the Alliance") moves to intervene as a matter of right. Alternatively, the Alliance moves to intervene permissively under Rule 24(b). The motion should be granted for the reasons below.

## <u>INTRODUCTION</u>

In both the run up to—and fallout from—the November 2024 general election, various partisan actors filed litigation seeking to cast a shadow over North Carolina's voter rolls. The Republican National Committee, for example, filed suit just a few months before the election, seeking to have hundreds of thousands of people removed from the voter rolls because the North Carolina's statewide voter file did not contain either a driver's license or social security number for them. *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Similarly, in the wake of the 2024 election, Judge Jefferson Griffin—a losing candidate for a state Supreme Court seat—sought to have tens of thousands of ballots invalidated for a similar reason. *Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-00724-M (E.D.N.C. Dec. 19, 2024); *Griffin v. N.C. State Bd. of Elections*, No. 5:24-CV-00731-M (E.D.N.C. Dec. 20, 2024). Despite searching high and low, however, neither of these cases turned up a *scrap* of evidence that North Carolina's voter rolls are not secure or contain ineligible voters.

Now the federal government has joined the fray, echoing the alarmist tone of these past suits. It alleges that North Carolina is not complying with the Help America Vote Act (HAVA), which requires state election officials to collect certain identification numbers from applicants who have them. *See* 52 U.S.C. § 21083(a)(5)(A). The federal government concedes that North Carolina's current voter registration form requires applicants to provide this information, but it alleges that it did not previously, and as a result many long-time voters registered without providing that information. But, like the prior suits, the federal government has wholly failed to

1

concretely identify *any* specific voter who was registered contrary to HAVA, and instead simply assumes as much based on imperfect statewide records. As North Carolina election officials have repeatedly explained, there are many commonsense reasons why a voter's registration file may lack certain ID information—including matching errors, transcription mistakes, and digitization procedures—even where the voter supplied that information when they applied to register to vote. Further still, many North Carolinians registered to vote *before* HAVA and its state analog existed; they never had any obligation to provide HAVA ID information to begin with, so it is unremarkable that their files lack such data.

Despite its paltry allegations, the federal government asks this Court to force North Carolina to engage in a herculean data-collection process, contacting every single voter in the state whose registration file appears to be missing information and then collecting that information. The inevitable consequence of the federal government's lawsuit is clear: voters who cannot be contacted stand to be kicked off the rolls, even if they complied with HAVA when they registered or never had to comply with HAVA at all. The federal government's paper-thin allegations do not warrant the heavy-handed relief it seeks, which will invariably lead to thousands of eligible North Carolinians losing their registration status.

Among the voters upon whom that harm will fall hardest are those North Carolina voters represented by Proposed Intervenor—the North Carolina Alliance for Retired Americans ("Alliance"). Many of the Alliance's 58,000 members in North Carolina are retirees who registered to vote decades ago, long before North Carolina required the information the federal government now insists must be on file. These voters have cast ballots without issue for years, and as seniors who are particularly protective of their sensitive personal data—lest they become the victims of one of the many scams that Americans in this age group are often the target of—many will be

reluctant to respond to requests that they now provide extremely personal information (particularly social security numbers). These are precisely the voters who are most likely to be disenfranchised if the Court grants the relief the federal government seeks. The Alliance will have to divert its limited resources to redress this harm, at the expense of its other programming.

The Alliance therefore moves to intervene to protect its members, safeguard its mission, and ensure that the voters most at risk of wrongful removal have a voice in this case. Rule 24 of the Federal Rules of Civil Procedure provides for intervention as of right where the applicant has a direct interest that may be impaired by the litigation and is not adequately represented by the existing parties. That standard is clearly met here. Both the Alliance's organizational interests and the individual interests of its members are urgent and substantial. And, given recent changes in the composition and leadership of the North Carolina State Board of Elections, there is no assurance that Defendants will fully protect them. Indeed, there is substantial reason to believe the State Board may *agree* with the federal government in this case, or at least take a conciliatory posture towards the relief it seeks. The Alliance thus respectfully requests leave to intervene to defend the rights of its members, its own interests, and the integrity of North Carolina's elections.

## BACKGROUND

### I.     North Carolina enacted legislation to bring the State into compliance with HAVA.

Congress enacted HAVA in 2002 to, among other things, "provide assistance with the administration of certain Federal election laws and programs" and "to establish minimum election administration standards for States." Pub. L. No. 107-252, 116 Stat. 1666 (2002); *see also Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024) ("*RNC*") (noting HAVA "was intended to improve voting systems and voter access"). To that end, HAVA requires that certain voters provide either a driver's license number or the last four digits of their social security number when submitting an application to register to vote in federal elections,

3

though it excuses applicants who lack either such number. *See* 52 U.S.C. § 21083(a)(5)(A). Under HAVA, state officials must establish a system to attempt to "match" the identification number provided in an application with existing government records, *id.* § 21083(a)(5)(B)(i), and to establish state-law procedures to address registrations that do not match with such records, *see id.* § 21083(a)(5)(A)(iii). HAVA, however, does not make a match a prerequisite to accepting an application. *See id.* § 21083(a)(5)(A), (b); N.C. Gen. Stat. § 163-166.12(d) (allowing registrants with non-matching numbers to vote by first showing HAVA ID). And under HAVA, voters who do not provide a driver's license number or the last four digits of their social security number can still register: the state must simply "assign the applicant a number which will serve to identify the applicant for voter registration purposes." 52 U.S.C. § 21083(a)(5)(A)(ii).

Prior to 2004, North Carolina law did not require voter registration applicants to supply the information required by HAVA to register. Accordingly, many current and long-registered North Carolina voters registered at a time when they had no obligation to provide either their driver's license or social security numbers. *See* Ex. 3 (State Board's Resp. Br., *Griffin v. N.C State Bd. of Elections*, No. 24CV040620-910 (Wake Cnty. Super. Court), Cox Aff. ¶ 14). In 2004, the North Carolina General Assembly passed legislation implementing HAVA's requirements. As a result, the State's voter registration form must be designed to require applicants to provide their "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number[.]" N.C. Gen. Stat. § 163-82.4(a)(11). If an applicant has neither identification number, the applicant can still register, and election officials must assign the applicant a "unique identifier number" which "shall serve to identify that applicant for voter registration purposes." *Id.* § 163-82.4(b). Both HAVA and North Carolina law provide another backstop as well: voters who register by mail and who have not had their driver's license or social

security number validated must present proof of identification when they vote for the first time. *See id.* § 163-166.12 (a)-(b), (f); 52 U.S.C § 21083(b)(1), (2).[1]

## II. North Carolina's voter registration rolls are secure, notwithstanding recent challenges seeking to cast doubt upon them.

North Carolina law tasks the State Board of Elections with developing and updating the State's voter registration application form. *See* N.C. Gen. Stat. § 163-82.3 The registration form has been updated numerous times since the State first implemented HAVA's requirements. *See* Ex. 3 (State Board's Resp. Br., *Griffin v. N.C. State Bd. of Elections*, No. 24CV040620-910 (Wake Cnty. Super. Ct.), Ex. A). Prior to at least 2013, North Carolina's voter registration form plainly required applicants to provide either their driver's license or social security numbers on their registration applications, so long as they had them. *See id.* Beginning with the State's 2003 registration application, the spaces requesting this information included red text, the word "required," or both—indicating that providing such information was mandatory. *Id.* Though the form has consistently requested such information since 2003, some versions of the form briefly omitted these features. *See id.* After an administrative complaint pointed this out to the State Board in 2023, the State Board revised its form in 2024 to clarify that this information—for those who had it—was in fact required by North Carolina law enacted in response to HAVA. *See id.* Accordingly, there is no dispute that North Carolina's current voter registration form clearly requires such information.

---

[1] All voters in North Carolina are also required to present current and valid photo identification before they can vote. N.C. Gen. Stat. §§ 163-166.16, 163-166.40(c)(3), 163-230.1(f1).

5



*See* N.C. State Bd. of Elections, N.C. Voter Registration Application (Feb. 2025), https://perma.cc/L5ZV-49WG.

The prospect that some individuals with valid driver's licenses or social security numbers registered to vote without providing one or both of those numbers spawned numerous lawsuits seeking to disenfranchise North Carolina voters. In August 2024, just months before the November general election, the Republican National Committee filed suit alleging that the form "previously used by the State Board was noncompliant with HAVA because it did not clearly indicate that at applicant—unless she lacked either number—was required to list her driver's license number of the last four digits of her social security number." *RNC*, 120 F.4th at 399. The RNC requested extraordinary relief: that the court order the State Board to "identify[] all ineligible registrants and remov[e] them from the state's voter registration lists" on the cusp of an election. *See* Complaint at 19, *Republican Nat'l Committee v. North Carolina State Board of Elections*, No. 5:24-CV-547-M (E.D.N.C. Sept. 23, 2024), ECF No. 1-3. On appeal of the district court's decision to remand the case to state court, the Fourth Circuit noted that it was "not convinced" that the State Board had ever "conceded to a violation of HAVA," though it did not conclusively resolve the issue.

*RNC*, 120 F.4th at 402 n.3. The Fourth Circuit reversed the remand to state court and the case now remains pending in federal district court. *See* No. 5:24-CV-547-M, ECF No. 80 (scheduling discovery and setting trial for February 2026).

Later in 2024, Judge Jefferson Griffin—a losing candidate for a seat on the Supreme Court of North Carolina—filed numerous lawsuits raising similar allegations about North Carolina's failure to comply with HAVA. *See generally Griffin v. N.C. State Bd. of Elections*, 913 S.E.2d 894, 895 (N.C. 2025). Judge Griffin sought to compel the State Board to invalidate 60,000 ballots cast by individuals whose voter files in the State Board's database allegedly lacked recorded driver's license or social security numbers. *See id.*; *Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-00724-M (E.D.N.C. Dec. 23, 2024), ECF No. 32. He presented no evidence, however, that *any* of these ballots were cast by people unqualified to vote in North Carolina. Accordingly, in rejecting that challenge, the Supreme Court of North Carolina emphasized that the record did not "provide[] grounds for believing that a significant number" of those ballots "were cast by individuals whose identity was not verified by voter identification or who were not otherwise qualified to vote." *Griffin*, 913 S.E.2d at 896.

That determination was well founded. It was based in part on an affidavit filed in the trial court by the State Board's General Counsel. That affidavit reported findings from an initial audit of the State Board's voter database which showed that roughly half of the approximately 60,000 challenged voters *did* provide driver's license numbers or social security information on their registration forms, notwithstanding the lack of such number in the State Board's database. Ex. 3, Cox Aff. ¶¶ 9–10. Those driver's license and social security numbers were removed from the voters' records when normal automatic matching with DMV and Social Security databases did not result in exact matches. *Id.* Harmless discrepancies could prevent "exact match[es]" when, for

7

example, a voter's last name and the name on file with a different government agency bore *any* discrepancies—even minor ones. *See id.* ¶ 9. Thousands of other voters were identified as having registered multiple times; their earlier registrations included identification numbers, but those numbers had not been transferred to their more recent registration files. *Id.* ¶ 11. The audit also revealed other circumstances that could otherwise explain why some voter registration records might not have contained the numbers or information contemplated by HAVA, including but not limited to registration before the digitization of records and when HAVA first became effective. *Id.* ¶¶ 14–15.

Despite repeated litigation, no challenger or court has ever identified any voters who were unlawfully registered to vote in North Carolina because of this issue. Nor has a court concluded that any of the State's voter files improperly lack unique identification numbers for voters who did not provide driver's license or social security numbers. In other words, despite the repeated efforts to disqualify thousands of eligible North Carolina voters based on the same theories raised in this case, not a scrap of evidence has emerged to support the idea that North Carolina's voter registration rolls are anything other than secure.

### III. The federal government files a lawsuit that threatens to disenfranchise thousands of lawful North Carolina voters through no fault of their own.

On May 27, 2025, the U.S. Department of Justice filed this suit against the state of North Carolina, the State Board, and its officers and members, alleging a violation of Section 303(a) of HAVA "with respect to the conduct of elections for Federal office in the State of North Carolina." ECF. No. 1 ¶¶ 1, 23-30 ("Compl."). Citing President Trump's Executive Order 14248 entitled "Preserving and Protecting the Integrity of American Elections" (now partially enjoined in federal

court),[2] the Complaint alleges that Defendants have "failed to maintain accurate lists in North Carolina's computerized statewide voter registration" in violation of HAVA. *Id*. ¶¶ 2, 5. "Upon information and belief," the Government alleges that a "significant number" of North Carolina voters (1) were registered without having provided driver's license or social security numbers on their voter registration forms, *id.* ¶ 16, and (2) have voter files that do not include a driver's license, social security, or any "other identifying number," *id.* ¶ 19.

The Complaint cites no underlying source for those beliefs. Indeed, it even admits that the State Board *refused* to confirm speculative allegations that over 200,000 voter records lacked identification numbers and instead explained that "spot checking" of some voter records showed many "actually did include" identification numbers but were not "populated into the state-wide computerized database." *Id.* ¶ 39(e). As the Complaint acknowledges, the State Board already plans to ask county election officials to "update the statewide voter registration list" with any missing information as individual voters appear at polling places and present requested identification. *Id.* ¶ 42. Further still, the Complaint acknowledges that North Carolina's *current* registration form clearly "require[s] applicants to provide their driver's license or last four digits of their social security number, if they ha[ve] one of those forms of identification." *Id.* ¶ 18.

Despite all of this, the federal government requests a broad array of relief. For instance, it seeks to enjoin Defendants from "failing or refusing to use a voter registration form" that complies with HAVA, *id.* at 17, Prayer for Relief § C, even though the Complaint concedes that North Carolina now uses such a form, *see id.* ¶¶ 18, 35, 39(g), 40. More notably, the federal government seeks to compel the State Board to perform a mass-statewide data collection effort aimed at

---

[2] *See League of United Latin Am. Citizens v. Executive Office of the President*, No. CV 25-0946 (CKK), 2025 WL 1187730 (D.D.C. Apr. 24, 2025).

contacting "all" voters registered in North Carolina who allegedly "do not meet the requirements" of HAVA so the State Board can obtain these individuals' driver's license or social security numbers. *Id.* at 17, Prayer for Relief § D(1). The Complaint demands that North Carolina officials submit its plan in just 30 days—a hasty timeframe for developing a plan to contact potentially hundreds of thousands of people. *Id.* at 17, § D.

Left unsaid in the federal government's requested relief is what will happen to registered voters who the State Board does not successfully contact. But the implication is clear: removal of those individuals from the State's voter rolls so that the State Board can make the demanded certification that "all records in the statewide voter registration list" are "in compliance" with the Government's reading of HAVA. *Id.* at 17, § D(3). The federal government's requested relief offers no safe harbor for voters who are eligible to vote in North Carolina elections but are not successfully reached by the State Board. Indeed, it does not even guarantee them notice before their voter registrations are canceled.

## IV.    The Alliance and its respective members will be harmed by the federal government's effort to purge North Carolina's voter rolls.

The relief the federal government seeks bears a serious risk of widespread disenfranchisement, particularly among North Carolina communities that are least well equipped to comply with the federal government's demand for a hurried data collection process. Proposed Intervenor's members—older, retired North Carolinians—are at acute risk of being wrongfully removed from the voter rolls.

The Alliance is a 501(c)(4) nonprofit social welfare organization incorporated in North Carolina. *See* Ex. 2, Decl. of William Dworkin ¶ 2 ("Dworkin Decl."). It is a chartered state affiliate of the Alliance for Retired Americans, a nationwide grassroots organization with more than 4.3 million members. *Id.* The Alliance has approximately 58,000 members across North Carolina,

most of whom are retirees above the age of 60. *Id.* ¶¶ 2, 8. The Alliance's mission is to ensure social and economic justice and full civil rights for retirees. *Id.* ¶ 3. To further that goal, the Alliance works to protect the rights of its members to vote and to have their votes counted. *Id.* The Alliance has strong interests in ensuring that the greatest number of its members are allowed to vote and have their votes counted, and thus supports policies that make voting safe, easy, and reliable for its members. *Id.*

The Alliance undertakes a broad range of initiatives to protect its members' voting rights. *Id.* ¶ 4. As the Alliance engages members and the larger community of retired North Carolinians, it regularly answers questions regarding voting requirements and procedures. *Id.* ¶ 5. During Alliance meetings, members discuss key issues affecting retirees—such as Social Security and Medicare—as well as candidates' positions on those issues. *Id.* The Alliance also develops and circulates a newsletter to educate its members on key issues, including changes to the voting process and how older and retired Americans might be affected by such changes. *Id.* ¶ 6.

The federal government's lawsuit threatens the Alliance's core mission of registering voters and ensuring those voters stay registered. *Id.* ¶ 7. In particular, the requested relief requires election officials to contact up to hundreds of thousands of voters who allegedly lack certain identifying numbers in their voter registration records and puts the onus on those voters to supply those numbers. *Id.* Compliance with this relief is required even if the voter supplied election officials with the necessary information when they registered but, for reasons beyond the voter's control, did not have that information stored in the State's database. *Id.*; *see* Ex. 3, Cox Aff. ¶¶ 9-10, 14 (explaining that many voters who provided this information do not have it reflected in the database). It also includes many voters—including Alliance members—who registered to vote before the requirement to provide such information even existed. Dworkin Decl. ¶ 8. As a result,

many voters who did everything right are at risk of having their registrations cancelled if they cannot satisfy whatever remedial steps the Court orders or the State Board requires. *Id.*

It is near certain that this relief will disproportionately harm the Alliance and its members. *Id*. Because the Alliance is an organization of retirees, its members are generally older. *Id*. As such, many of the Alliance's members have been registered to vote for decades and are disproportionately likely to have registered before HAVA or North Carolina imposed any obligation to provide their driver's license number or social security information when they registered. *Id.* Many of these Alliance members have also voted without issue for years and thus will be wary of requests to disclose personal identifying information such as social security numbers and driver's license numbers to someone they do not know engaging in unsolicited outreach. *Id.* This is an especially relevant concern because elderly individuals are the target of many different types of scams over the phone, mail, or email that make them hesitant to reveal personal information and particularly social security numbers. *Id.* ¶ 9. As a result, these voters now face the threat of removal from the rolls despite being lawful, eligible voters. *Id.*

Unfortunately, this is not the first time the Alliance's members have had to defend against attacks on existing voter registrations because of an alleged issue with the completeness of a voter's registration record. *Id.* ¶ 13. During the recent contested North Carolina Supreme Court election, Judge Griffin challenged over 60,000 voters' ballots on effectively the same basis as the federal government's lawsuit here. *Id.* During that litigation, the Alliance identified dozens of its members who were on Griffin's challenge list and at risk of disenfranchisement. *Id.* ¶ 11. Ultimately, the Alliance intervened in that litigation and helped defeat Judge Griffin's challenges, preserving the ballots and voter registration status of its challenged members. *Id.* ¶ 14.

The federal government's similar lawsuit, however, once more raises the possibility that hundreds of Alliance members will have their voter registration status placed in jeopardy. Whereas Judge Griffin challenged only a subset of early and mail voters who participated in a particular election, the federal government is now putting at issue the registration status of *every single* North Carolina voter who may be missing identifying numbers in the state's registration system. *Id.* ¶ 12. A significantly larger number of Alliance members will be impacted if the federal government's requested relief is granted. *Id.* And in response to this lawsuit, the Alliance itself will have to undertake burdensome and costly efforts to protect its members from disenfranchisement, which will place strains on the organization's limited resources and hinder the Alliance's ability to engage in other mission-critical activities. *Id.* ¶ 13.

## **ARGUMENT**

### I. **The Alliance is entitled to intervene as of right under Rule 24(a).**

Rule 24(a) permits a party, upon timely motion, to intervene as of right when they show "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991); *see also* Fed R. Civ. P. 24(a). Within the Fourth Circuit, "liberal intervention is desirable to dispose of as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (citation omitted). Proposed Intervenors satisfy each requirement for intervention as of right.[3]

---

[3] Pursuant to Rule 24(c), accompanied with this motion is a Proposed Answer to the Plaintiff's Complaint for Declaratory and Injunctive Relief. The Alliance respectfully reserves the right to file a Rule 12 motion at an appropriate date, including any date set by the Court.

13

### A.    The motion is timely.

This motion is timely. The federal government filed its Complaint on May 27; this motion follows less than a week later and before any other significant developments have occurred in the case. Furthermore, the Alliance agrees to abide by any case schedule set by the Court or agreed to by the existing parties. Given that these proceedings are at the outset, and because there is no possible risk of prejudice to the other parties, the Alliance has met the timeliness requirement. *See Moore v. Circosta*, No. 1:20CV911, 2020 WL 6597291 at *1 (M.D.N.C. Oct. 8, 2020) (permitting the Alliance to intervene in similar circumstances); *see also Dowdy v. City of Durham*, 689 F. Supp. 3d 143, 146 (M.D.N.C. 2023) (similar); *Carcaño v. McCrory*, 315 F.R.D. 176, 178 (M.D.N.C. 2016) (similar); Text Order, *Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-00724-M-RN (Dec. 26, 2024) (granting Alliance intervention where motion was filed seven days after action was removed to federal court).

### B.    The disposition of this case threatens to impair the Alliance's significantly protectable interests.

The federal government's request for relief threatens to disenfranchise members of the Alliance. These voters face a serious risk that their registrations will be cancelled, possibly without notice, depriving them of the ability to vote in North Carolina. Beyond the obvious harm to these members of the Alliance, such a result would damage the Alliance's organizational interests, frustrating their ability to harness the political power of their members and constituencies and forcing them to expend their limited resources to assist their members. Dworkin Decl. ¶¶ 13, 15.

For a party to intervene as a matter of right, Rule 24 requires a "significantly protectable interest," *Teague*, 931 F.2d at 261 (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971) (cleaned up)), which exists where proposed intervenors "stand to gain or lose by the direct legal operation of the district court's judgment." *Id.* The Alliance's burden here is simply to show that

there is a "practical disadvantage or impediment" to their interests. *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 121 (4th Cir. 1981).

The right to vote is unquestionably a "significantly protectable interest" that satisfies Rule 24(a). *Teague*, 931 F.2d at 261. "[V]oting is of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("The political franchise of voting . . . is regarded as a fundamental political right" because it is "preservative of all rights"). Courts have therefore widely recognized that voters have a significantly protectable interest in preserving their constitutional right to vote. *See, e.g.*, *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434–35 (5th Cir. 2011) (collecting cases). Indeed, risk to such an interest suffices to establish Article III standing, a higher burden than Rule 24's interest requirement. *See, e.g.*, *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 180 (M.D.N.C. 2020) ("In the voting context, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue.'" (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)); *see also N.C. Green Party v. N.C. State Bd. of Elections*, 619 F. Supp. 3d 547, 562 (E.D.N.C. 2022) (observing that while "intervenors need not establish Article III standing to demonstrate they have a protectable interest" under Rule 24, "an interest sufficient to demonstrate injury-in-fact for standing purposes likely suffices to show a protectable interest under Rule 24(a)(2)"). Accordingly, there is no serious dispute that the Alliance's thousands of members—who may be forced to prove their eligibility to vote and stand to be removed from the voter rolls—have a significant interest in this action for purposes of Rule 24.

The same is true for the Alliance itself which, as an organization, has significantly protectable interests in ensuring that its members and the community the organization serves have

valid voter registrations to participate in the franchise. *E.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-CV-00547-M, 2024 WL 4349904, at *3 (E.D.N.C. Sept. 30, 2024) (concluding the voter organization had a significantly protectable interest in ensuring their members are not removed from voter rolls or required to cast provisional ballots because of allegedly incomplete voter registration files, and that interest would be impeded with disposition of plaintiffs' case); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *2 (D. Nev. Apr. 28, 2020) (concluding proposed intervenor-defendants met second prong for intervention because plaintiffs' lawsuit could disrupt the organizational intervenors' efforts to promote the franchise); *see also Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004) (similar as to standing); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 657–58 (M.D.N.C. 2024) (same).[4]

The Alliance's interests in protecting the voting rights of its membership are particularly strong here because the relief the federal government seeks will disproportionately burden the communities served. The federal government challenges registered voters who allegedly lack driver's license or social security number information in the statewide voter file—a requirement that was adopted in 2004 long after many of the Alliance's members had already registered to vote. *See* Dworkin Decl. ¶¶ 7-8; *see also* N.C. Sess. Law 2003-226, § 9 (amending N.C. Gen. Stat. § 163-82.4). For this reason, many long-registered Alliance members were never obligated to provide the allegedly missing information in the first place. Dworkin Decl. ¶ 8. Even if they registered after HAVA was enacted, many Alliance members registered at a time when voter records were not consistently digitized, meaning the state's records do not always fully reflect the

---

[4] Indeed, both federal and North Carolina courts—which apply an identical intervention standard—have previously found that the Alliance has established a sufficient organizational interest in other litigation imperiling voting rights. *See* Dworkin Decl. ¶ 14; n.1.

16

information a voter provided when they first registered. *Id.*; *see generally* Ex. 3, Cox Aff. Nevertheless, these voters now face the prospect of having to reestablish their qualifications to vote and the risk of having their registrations cancelled. *Id.* The Alliance's members are also less likely to respond to unexpected outreach from election officials regarding issues with their registration—they are primed to be wary of communications from strangers because of widespread scams targeting seniors, particularly when it comes to social security numbers. Dworkin Decl. ¶ 9. On top of that, older voters frequently have issues with mobility, memory, vision, and other age-related ailments that may limit their ability to respond to communications from election officials. *Id. ¶¶* 9-10.

Finally, beyond its interest in protecting its members, the Alliance has significant organizational interests in preserving its own resources. Specifically, if the federal government succeeds in its suit, the Alliance will have to commit resources to identify members and constituents who are at risk of disenfranchisement and then undertake efforts to help those individuals ensure they stay registered. *See id.* ¶¶ 11-13. The Alliance therefore has yet a further significant protectable interest in ensuring that it is not forced to expend resources on efforts to assist voters in protecting their registration status and ability to vote. *See County of San Miguel v. MacDonald*, 244 F.R.D. 36, 47 (D.D.C. 2007) (granting intervention where plaintiffs' requested relief would require "the expenditure of additional time and resources" by intervenors) (internal citation omitted); *cf. Democracy N.C.*, 476 F. Supp. 3d at 182–83 (finding an organization had standing where it had to divert resources to help voters in similar circumstances).

The significant interests above are at serious risk of being "impair[ed]" by this case. Fed. R. Civ. P. 24(a). The Alliance must simply demonstrate that there will be a "practical disadvantage or impediment" to their interests, which is plainly the case here. *Newport News Shipbuilding &*

*Drydock Co.*, 646 F.2d at 120. If the federal government succeeds, many of the Alliance's members and constituents will be subject to any subsequent data collection scheme imposed by the Court or the State Board, with the attendant risk that their registrations will be cancelled, despite the fact that these voters did nothing wrong. *Cf. League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury." (collecting cases)). And because "[t]he right to vote . . . is of the essence of a democratic society," such an outcome "strike[s] at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). And as this case threatens the Alliance's missions and resources, they each further "stand to gain or lose by the direct legal operation of the district court's judgment on [Plaintiff's] complaint." *Teague*, 931 F.2d at 261; *see also* Dworkin Decl. ¶¶ 13, 15.

### C. The Alliance's interests are not adequately represented by the existing parties in this case.

The Alliance cannot rely on the named Defendants to adequately represent its significant interests at stake in this litigation. Demonstrating inadequate representation generally "present[s] proposed intervenors with only a minimal challenge." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 195–96 (2022). All that is required is the "minimal" burden of showing that the representation by existing parties "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Courts are "liberal in finding" this requirement met because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1909 (3d ed. 2024). The Alliance readily make that showing here.

In contrast to the Alliance, each of the existing Defendants is a public entity or official. These election officials must "bear in mind broader public-policy implications," whereas private litigants—like the Alliance—seek to vindicate their own rights "full stop." *Berger*, 597 U.S. at 196

18

(citing *Trbovich*, 404 U.S. at 538–39). Accordingly, courts have "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors," *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003), because their interests are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it," *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) (explaining that the burden in these circumstances is "comparatively light"). That is precisely the case here, where the Alliance exclusively seeks to preserve its organizational interests and the rights of its members.

The context of this case illustrates the point. HAVA imposes a host of obligations and duties on state election officials, including Defendants. *See, e.g.*, 52 U.S.C. § 21083(a)(5)(a)(iii) (requiring state officials to "determine whether [] information provided by an individual is sufficient to meet" HAVA's requirements); *see also id.* § 21083(a)(2) (requiring election officials to "perform list maintenance"). Defendants are thus constrained by those statutory and public duties, whereas the Alliance has a singular focus in protecting the registration statutes of their members and constituents, who are lawfully eligible and registered to vote. Courts have repeatedly recognized that competing interests like these are not "identical" and may be in tension with one another. *Berger*, 597 U.S. at 197–98. The potential for conflict is particularly high in lawsuits affecting a state's voter-roll maintenance, where public officials have duties that can conflict with voters and voter advocacy organizations. *See 1789 Found. Inc. v. Fontes*, No. CV-24-02987-PHX-SPL, 2025 WL 834919, at *3 (D. Ariz. Mar. 17, 2025) (granting intervention as-of-right to organization in voter-roll maintenance case); *Judicial Watch, Inc. v. Ill. State Bd. of Elections*, No. 24 C 1867, 2024 WL 3454706, at *4 (N.D. Ill. July 18, 2024) (same).

19

This mismatch of interests is particularly acute here given recent developments with the State Board. The composition of the State Board—including its membership, partisan breakdown, and executive leadership—changed just weeks ago. *See Stein v. Berger*, No. 114P25, 2025 WL 1486969, at *3 (N.C. May 21, 2025). And it is already unclear whether the newly-constituted State Board will even oppose the relief sought by the federal government at all; recent remarks from the State Board's new executive director suggest the opposite. In a comment responding to the filing of this lawsuit, the State Board's new executive director stated that he was "reviewing the complaint" and is "committed to bringing" the State into "compliance with federal law" over the "failure to collect [] information required by HAVA." Andy Jackson, *Federal voter registration lawsuit is important but likely premature*, Locke (May 28, 2025), https://perma.cc/QK2E-BH6Z. Those comments suggest the new executive director may be conciliatory towards the relief the federal government seeks. Citing that and other comments by the State Board, the Director of the Civitas Center for Public Policy—a prominent conservative think tank that comments on election topics—predicted that this lawsuit "will almost certainly result in a settlement because [North Carolina] election officials agree" with the federal government's position. *See id.*

This real prospect that the State Board might "choose to enter settlement negotiations," further illustrates that the "State Board does not adequately represent [the Alliance's] interests." *Judicial Watch*, 2024 WL 3454706, at *5. Intervention is warranted where existing parties "face the irresistible temptation to work out settlements that benefit themselves and not [] other" interested parties, like Proposed Intervenors here. *Kleissler*, 157 F.3d at 974; *see also City of Chicago v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 986 (7th Cir. 2011) (explaining that a possible "conflict of interest . . . when it comes to settlement possibilities" favors intervention). The Alliance, as "the *only part[y]* seeking to unequivocally protect the voters at risk of wrongful

removal, at every stage of this lawsuit, without the need to balance other duties or considerations," cannot protect its interests from harm during settlement talks without being a party. *1789 Found.*, 2025 WL 834919, at *3 (emphasis in original).

Finally, while the Fourth Circuit has suggested that a presumption of adequacy may arise "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit," *Commonwealth of Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976), this is not such a case. Even assuming the existing Defendants might oppose the federal government's suit—and there is good reason to think they will not—that does not mean they share the objectives of the Alliance. For a "potential intervenor and the named party to have 'the same goal,' it is not enough that they seek the same outcome in the case." *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 688 (7th Cir. 2023). After all, "a prospective intervenor must intervene on one side of the 'v.' or the other and will have the same general goal as the party on that side. If that's all it takes to defeat intervention, then intervention as of right will almost always fail." *Id.* (citation omitted). Instead, such a presumption of adequacy should apply "only when interests fully overlap." *Berger*, 597 U.S. at 197 (cleaned up); *accord* Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1909 (3d ed. 2024). That is not the case here; the Alliance has a singular focus in defending its members' voting registration statuses, serving its specific missions, and preserving its resources—interests the existing Defendants plainly do not share.

## II. Alternatively, the Alliance should be granted permissive intervention under Rule 24(b).

The Alliance also satisfies the requirements for permissive intervention. Rule 24(b) affords permissive intervention upon timely application when the "applicant's . . . defense and the main action have a question of law or fact in common." *In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) (quoting Fed. R. Civ. P. 24(b)). In exercising their discretion to permit permissive

intervention, courts consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (quoting Fed. R. Civ. P. 24(b)(3)). And "the Fourth Circuit generally takes a liberal approach towards permissive intervention," *Hengle v. Curry*, No. 3:18-CV-100, 2018 WL 3016289, at *4 (E.D. Va. June 15, 2018) (quoting *Feller*, 802 F.2d at 729), as "[p]ermissive intervention is desirable and in line with the Fourth Circuit's policy of favoring liberal intervention," *Students for Fair Admissions Inc. v. Univ. of N.C.*, 319 F.R.D. 490, 497 (M.D.N.C. 2017).

Each relevant consideration weighs in favor of granting permissive intervention here. The Alliance's defenses in this case concern common questions of law to those presented by the Department of Justice's lawsuit. *See generally* Ex. 1 (Proposed Answer). Its timely motion to intervene will result in no conceivable prejudice to any existing party, nor will it cause delay, particularly as the Alliance agrees to be bound by any case schedule set by the Court. And the stakes of this lawsuit illustrate precisely why the Fourth Circuit has long found "liberal intervention" rules to be "desirable." *Feller*, 802 F.2d at 729. The federal government seeks to compel election officials to review and contact potentially hundreds of thousands of voters who allegedly have incomplete registrations and then require those voters "remedy" their registration by providing a driver's license number or social security information. But if election officials are not able to reach certain voters, including the Alliance's members and constituents, their registrations may be nullified. Such relief weighs strongly in favor of ensuring that the voters and communities at risk of disenfranchisement have their voices heard in this suit. Indeed, courts often recognize that organizations like the Alliance bring a valuable perspective to cases like this one, and thus routinely grant permissive intervention. *See, e.g.*, *Griffin v. N.C. State Bd. of Elections*, No. 5:24-CV-00699-M, 2025 WL 1292530, at *7, *35 (E.D.N.C. May 5, 2025) (granting judgment

22

to the Intervenor-Defendant the Alliance and recognizing the "thoughtful and comprehensive arguments" raised by the parties that "significantly aided the court's decisional process"); *Moore v. Circosta*, Nos. 1:20CV911 & 1:20CV912, 2020 WL 6597291, at *2 (M.D.N.C. Oct. 8, 2020) (permitting the Alliance to permissively intervene in litigation involving absentee ballot and in-person voting rules).

## **CONCLUSION**

For the reasons stated above, the Alliance respectfully requests that the Court grant its motion to intervene as a matter of right under Rule 24(a)(2) or, in the alternative, permit it to intervene under Rule 24(b).

Dated: June 2, 2025                    Respectfully submitted,

/s/ *Narendra K. Ghosh*
Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

Lalitha D. Madduri*
Christopher D. Dodge*
Tina Meng Morrison*
James J. Pinchak*
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
jpinchak@elias.law

*Notice of Special Appearance Forthcoming*

*Counsel for Proposed Intervenor the North Carolina Alliance for Retired Americans*

23

**CERTIFICATE OF WORD COUNT PURSUANT TO LOCAL RULE 7.2(f)**

Undersigned counsel certifies that this Memorandum complies with Local Rule 7.2(f), in that the word count function of Microsoft Word shows the brief to contain 7,032 words, excluding those portions of the brief permitted to be excluded by the Rule.

This 2nd day of June, 2025

/s/ *Narendra K. Ghosh*
Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*Counsel for Proposed Intervenor the North Carolina Alliance for Retired Americans*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served on Plaintiff via

CM/ECF, and was served via mail to defendants at the following addresses:

Paul Cox
General Counsel
NC State Board of Elections
6400 Mail Service Center
Raleigh, NC 27699-6400


Jeff Jackson
Attorney Geneal
P.O. Box 629
Raleigh, NC 27602

Dated: June 2, 2025.

/s/ *Narendra K. Ghosh*
Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*Counsel for Proposed Intervenor the North Carolina Alliance for Retired Americans*

25