IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:25-CV-283-FL

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. NORTH CAROLINA STATE BOARD OF ELECTIONS; SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections; FRANCIS X. DE LUCA, JEFF CARMON, STACY EGGERS IV, SIOBHAN O'DUFFY MILLEN, and ROBERT RUCHO, in their official capacities as Members of the North Carolina State Board of Elections; and STATE OF NORTH CAROLINA, *Defendants*. | **THE DEMOCRATIC NATIONAL COMMITTEE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO INTERVENE** |

The Democratic National Committee ("DNC"), through counsel and pursuant to Rule 24 of the Federal Rules of Civil Procedure, respectfully submits the following memorandum of law in support of its motion to intervene in this action.

## INTRODUCTION

This is the latest in a series of cases that have baselessly alleged that North Carolina's voter list maintenance practices violated the Help America Vote Act of 2002 ("HAVA"). Like the others, this case rests on the threadbare allegation that the State's voter list maintenance practices were defective because the State accepted voter-registration forms from voters who had driver's license numbers or social security numbers but failed to list them on the form. But even assuming *arguendo* that the federal government's speculative allegations are well-founded, HAVA specifies

what a state must do if a voter does not provide their driver's license number or social security number when they register: (1) the voter must be assigned a unique identifying number, and (2) the voter must provide photo identification or a document establishing residency when they vote in their first federal election. 52 U.S.C. §21083(a)(5)(A)(ii), (b)(1)-(3). The federal government has not alleged any well-pleaded facts which show North Carolina failed to follow these two steps. More importantly, the federal government's prayer for relief—seeking to compel the State to collect driver's license numbers or social security numbers from some unspecified number of voters—finds no statutory support from HAVA.

The DNC, on behalf of itself and its members in North Carolina, thus moves to intervene in this matter to protect its unique interest in preventing inconsistent adjudications in this case and other cases in which it has already intervened to defend North Carolina voters against the same baseless allegations that the federal government makes here. Most notably, the DNC has already intervened in *Republican National Committee v. North Carolina State Board of Elections*, Case No. 24-cv-547-M, (E.D.N.C. 2024), to protect lawfully registered Democratic voters from being purged from the voter rolls based upon the same nonexistent violations of the Help America Vote Act of 2002 ("HAVA") that the federal government alleges in this case. If the DNC is not allowed to intervene in this action and the federal government obtains its requested relief—by consent or otherwise—the DNC's ability to protect its members' right to vote will be significantly impaired.

This case will not just impose a significant administrative burden on the State of North Carolina; it will harm the interests of the DNC and the Democratic voters it represents. It is a near certainty that the federal government's actions, if successful, will require Democratic voters who are unrepresented in this action to provide additional personal information to the State of North Carolina in order to maintain their registered status, when federal law does not impose such a

requirement. The DNC will have to divert resources from mobilizing voters in North Carolina to engaging in an unnecessary cure process. Additionally, the cure process sought by the federal government will unduly burden the right of the DNC's members to vote. For all these reasons, the DNC seeks leave to intervene.

**BACKGROUND**

The federal government's complaint is the most recent in a string of lawsuits attempting to disenfranchise tens of thousands of North Carolina voters under the guise of enforcing compliance with HAVA. The DNC summarizes for the Court the relevant procedural history and its defense against parallel pending proceedings.

**A. Summary Of The DNC's Interest In North Carolina Elections.**

The DNC—the oldest continuing party committee in the United States—is the Democratic Party's national committee as defined by 52 U.S.C. §30101(14). The DNC's organizational purposes and functions are to communicate the Democratic Party's position and messages on issues; protect voters' rights; and aid and encourage the election of Democratic candidates at the national, state, and local levels, including by persuading and organizing citizens not only to register to vote as Democrats but also to cast their ballots for Democratic nominees and candidates. The DNC's leadership is composed of the chair, vice chairs, and over 200 members elected by Democrats in every U.S. state and territory and the District of Columbia, including North Carolina.

The DNC has dedicated significant resources to encouraging its supporters and constituents in North Carolina to register and to vote, including through door knocking, text messaging, phone banking, mailed advertising, and digital advertising targeting counties across North Carolina. The DNC has a substantial interest in protecting the right of its members who do choose to vote (and of others who will support Democratic candidates) to have those votes counted in accordance with

federal and North Carolina law. These members include individuals qualified to vote in (and candidates for offices in) every county in North Carolina. As explained more fully below, this matter will impair the DNC's unique interests in election administration in North Carolina.

**B. Registration And First-Time Voting Requirements.**

Under the Help America Vote Act, or HAVA, an application to register to vote in federal elections cannot "be accepted or processed by a State unless" it includes "the applicant's driver's license number" or (if the applicant lacks a valid driver's license) "the last 4 digits of the applicant's social security number." 52 U.S.C. §21083(a)(5)(A)(i). If an applicant provides neither number, then "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes." *Id.* §21083(a)(5)(A)(ii). Once an applicant completes a registration form, "[t]he State shall determine whether the information provided by" the applicant "is sufficient to meet the requirements" outlined in HAVA, "in accordance with State law." *Id.* §21083(a)(5)(A)(iii). HAVA does not require that a driver's license number or social security number be matched against the state's records to accept a voter's application. *See id.* §21083(a)(5)(A), (b); N.C. Gen. Stat. §163-166.12(d).

HAVA imposes additional requirements on applicants who register *by mail* without providing either their driver's license numbers or the last four digits of their social security numbers. Such a registrant must either present a photo ID or another identifying document to vote in person in their first federal election or submit a copy of their photo ID or identifying document to vote in their first federal election by mail. 52 U.S.C. §21083(b)(1)-(3). Voters who do not do so

4

may cast only provisional ballots, *id.* §21083(b)(2)(B), which are not counted unless election officials later determine the voters are "eligible under State law to vote," *id.* §21082(a)(4).[1]

Once an eligible voter is registered, HAVA forbids the state from removing those voters from the computerized voter-registration list except in accordance with the National Voter Registration Act of 1993 ("NVRA"). 52 U.S.C. §21083(b)(2)(A)(i), (B)(ii). The NVRA in turn specifies the circumstances in which registered voters may be removed from the rolls. *See id.* §20507(a)(3), (4).

**C. Administrative Proceedings Over North Carolina's Prior Voter-Registration Form.**

On October 6, 2023, a self-proclaimed "concerned citizen" named Carol Snow filed an administrative complaint (the "Administrative Complaint") with the North Carolina State Board of Elections (the "State Board"). Mot. Ex. 3. The Administrative Complaint challenged a prior version of North Carolina's voter-registration form, alleging that that version did "not clearly indicate[]" that "the applicant's driver's license number or last 4 digits of the applicant's social security number[] are [sic] required if one or the other ha[s] been issued to the applicant." Mot. Ex. 3; *see* Mot. Ex. B (prior registration form).

After holding a public meeting in November 2023, during which the Administrative Complaint was discussed, *see* Compl. ¶ 39, the State Board issued a written order in December 2023 resolving Snow's complaint. *Id.* ¶ 40; Mot. Ex. 4. The board addressed the substance of the complaint by updating North Carolina's voter-registration form to make even clearer that an applicant with a North Carolina driver's license or DMV ID number must provide that number, that an applicant without a number from the DMV must provide the last four digits of her social

---

[1] North Carolina law mirrors many of the HAVA requirements just discussed. *E.g.*, N.C. Gen. Stat. §163-166.12.

security number, and that an applicant without any of those numbers must indicate that fact on the form. Mot. Ex. 2 (January 2024 registration form).

**D. The DNC Intervenes In A Lawsuit Initiated By The Republican Party Alleging Identical HAVA Violations.**

On August 23, 2024, the Republican National Committee and North Carolina Republican Party (the "GOP Plaintiffs") sued the State Board, asserting claims relating to the same (non-current) version of North Carolina's voter-registration form that was challenged in the Administrative Complaint. Specifically, the GOP Plaintiffs alleged that, for an unspecified period of time "[p]rior to December 2023," the State Board "used voter registration forms that failed to collect" driver's license and social security numbers. GOP Compl., *RNC v. NCSBE*, Case No. 24-cv-547-M, D.E. 1-3, ¶ 42 (E.D.N.C. 2024). As the prior version of the form itself shows, however, item #3 contained fields for that information:

[Image: North Carolina Voter Registration Application form showing fields for citizenship, age, name, date of birth, and identification information with NC Driver License or NC DMV ID Number and Last 4 Digits of Social Security Number fields highlighted in yellow.]

Mot. Ex. B (yellow highlighting added). The instructions for the prior version of the form, moreover, directed registrants to provide either a driver's license number or the last four digits of a social security number:

[Image: Instructions for item 3 stating: "You are required to provide your date of birth. If you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number. If you have neither a NC driver license, NC DMV ID card or a social security number and you are registering to vote for the first time in North Carolina, attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address to this application." with portions highlighted in yellow.]

Mot. Ex. B (yellow highlighting added). The GOP Plaintiffs speculated that, based on the *layout* of the form, North Carolina county boards of elections registered unspecified voters without collecting driver's license or social security numbers. The GOP Plaintiffs demanded the Court find a HAVA violation and remove voters from the rolls if they did not provide a driver's license number or social security number on their voter-registration forms.

In September 2024, the DNC intervened in the GOP Plaintiffs' case. *RNC v. NCSBE*, Case No. 24-cv-547-M, D.E. 1-16 (E.D.N.C. 2024) (motion), *Id.* at D.E. 1-18 (order). Shortly thereafter, the case was removed to this Court. *Id.* at D.E. 1. The Court dismissed the first of the GOP Plaintiffs' claims under HAVA. *RNC v. NCSBE*, 754 F. Supp. 3d 664, 696–99 (E.D.N.C.), *rev'd and remanded on other grounds*, 120 F.4th 390 (4th Cir. 2024). The Court allowed the GOP Plaintiffs' state constitutional claim grounded upon the same alleged HAVA violation to proceed. *Id.*, D.E. 73 (Nov. 22, 2024). Discovery in that case is scheduled to be completed October 13, 2025; dispositive motions are due November 12, 2025; and trial is scheduled for February 24, 2026. *Id.*, D.E. 80 (Feb. 14, 2025).

On June 9, 2025, the DNC filed a notice that *RNC* and this case are related. *Id.*, D.E. 85 (June 9, 2025).

E.  **The DNC Intervenes In A Duplicative Lawsuit By The GOP Plaintiffs.**

On December 31, 2024, the GOP Plaintiffs filed a lawsuit duplicative of *RNC*. Based on the same alleged HAVA violations, the GOP Plaintiffs asked the Wake County Superior Court to disenfranchise every alleged voter who did not provide a driver's license number or last four digits of their social security number when they first registered to vote. That case was removed to federal court. *Telia Kivett et al. v. North Carolina State Board of Elections*, Case No. 5:25-CV-3-M (E.D.N.C. Jan. 2, 2025). Shortly thereafter, the Court remanded the case. *Id.*, D.E. 6 (Jan. 6, 2025). The State Board appealed from the remand order. That appeal remains pending.

Following the remand, the GOP Plaintiffs sought preliminary injunctive relief in state court. The DNC moved to intervene in *Kivett* and was allowed to do so by the Wake County Superior Court. Ex. C, Order on Motion to Intervene, *Telia Kivett et al. v. North Carolina State Board of Elections*, Case No. 24CV041789-910 (Wake Super. Ct. Jan. 14, 2025). The DNC defended against the GOP Plaintiffs' motion, and the state court denied the GOP Plaintiffs' motion. Since that time, the North Carolina Supreme Court held that, as a matter of state law, county boards of elections registering a voter without a driver's license or social security number could not deprive those voters of their right to vote. *Griffin v. NCSBE*, 913 S.E.2d 894, 895–96 (N.C. 2025). However, the *Kivett* case also purports to seek prospective relief. That case remains pending in state court as well, with the DNC defending the action.

### F. The United States Files This Lawsuit.

On May 27, 2025, the federal government filed this matter. The government's complaint parrots the allegations raised by the GOP Plaintiffs in *RNC* and *Kivett*. The government makes numerous threadbare, conclusory assertions that North Carolina is engaged in "ongoing violations" of HAVA warranting declaratory and injunctive relief.

## ARGUMENT

The DNC's motion to intervene should be granted as a matter of right because the DNC has legal interests which will be impaired if it is not allowed to defend against this action. In the alternative, the DNC should be permitted to intervene in this action because it seeks to assert defenses which raise common issues of law and fact.

### A. The Democratic National Committee Should Be Allowed To Intervene In This Action As Of Right.

Rule 24(a)(2) of the Federal Rules of Civil Procedure requires that certain parties be allowed to intervene in a civil action as of right. This right of intervention exists if a motion to

8

Case 5:25-cv-00283-FL    Document 35    Filed 06/17/25    Page 8 of 14

intervene is timely and the party seeking to intervene shows "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Teague v. Bakker,* 931 F.2d 259, 260–61 (4th Cir. 1991); *Scott v. Bond*, 734 F. App'x 188, 191 (4th Cir. 2018). The DNC meets all four criteria.

*First*, this motion, filed just 21 days after Plaintiff filed its Complaint and before the State Board Defendants have answered, is timely. *See, e.g.*, *Dowdy v. City of Durham*, 689 F. Supp. 3d 143, 146 (M.D.N.C. 2023) (finding a motion to intervene filed 90 days after the complaint and before the answer to be timely); *United States v. Virginia*, 282 F.R.D. 403, 405 (E.D. Va. 2012) ("Where a case has not progressed beyond the initial pleading stage, a motion to intervene is timely.").

*Second*, the DNC has a "significantly protectable interest" in this litigation. *Teague*, 931 F.2d at 261 (quoting *Donaldson v. United States,* 400 U.S. 517, 531 (1971) (cleaned up)). The Fourth Circuit has held that a proposed intervenor's "interest in preventing conflicting orders" is sufficient to warrant intervention. *Feller v. Brock*, 802 F.2d 722, 730 (4th Cir. 1986). Here, the DNC has that interest because it is already defending two parallel actions that seek to disenfranchise the same group of voters at issue in this matter. *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, Case No. 5:24-cv-00547-M-RJ (E.D.N.C.); *Kivett v. NCSBE*, Case No. 24CV041789-910 (Wake Cnty. Super. Ct.). A judgment in this action would bind the State Board, which would prejudice the DNC's ability to defend its interests in *RNC* and *Kivett*. *See Feller*, 802 F.2d at 730.

The DNC's interests that justified the DNC's intervention in *RNC* and *Kivett* are implicated here as well. First, the DNC has a substantial interest in protecting Democratic voters'

9

constitutional right to vote. *See, e.g.*, *Ill. State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Second, the DNC has already spent and will continue to spend significant resources counseling and defending Democratic voters in North Carolina from the exact allegations in this case. *See Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024). Third, the DNC has an interest in running successful campaigns to elect Democratic candidates to public office in North Carolina, including in federal elections to Congress. *E.g.*, *Paher v. Cegavske*, 2020 WL 2042365, at *4 (D. Nev. Apr. 28, 2020) (granting the DNC intervention in an election-law case brought by a conservative interest group); Order (ECF No. 35), *Donald J. Trump for President v. Bullock*, No. 6:20-cv-66 (D. Mont. Sept. 8, 2020) (granting the Democratic Congressional Campaign Committee ("DCCC"), the Democratic Senatorial Campaign Committee, and the Montana Democratic Party intervention in a lawsuit brought by four Republican party entities); *Donald J. Trump for President*, *Inc. v. Murphy*, 2020 WL 5229209, at *1 (D.N.J. Sept. 1, 2020) (granting the DCCC intervention in a lawsuit by a Republican candidate and party entities); Minute Entry (ECF No. 37), *Cook County Republican Party v. Pritzker*, No. 20-cv-4676 (N.D. Ill. Aug. 28, 2020) (granting the DCCC intervention in a lawsuit by a Republican party entity); *Issa v. Newsom*, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020) (granting the DCCC and the California Democratic Party intervention in a lawsuit by a Republican congressional candidate).

*Third*, the DNC's ability to protect its interests would be impaired because of this action. The Fourth Circuit held in one case that the "practical impairment of" a proposed "intervenor's interest" was "apparent" when the proposed intervenor had already obtained relief in a related case that would be "undermined" if the plaintiffs in the latter case obtained their requested relief. *Feller*,

802 F.2d 722, 730 (4th Cir. 1986); *see also Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 122 (4th Cir. 1981) ("[L]acking party status the Board had no right to seek review by appeal of any decision affecting its identified substantive interests."). The court explained that intervention, rather than amicus participation, was appropriate for a proposed intervenor that was also a party to a related case because "[a]micus participants are not able to make motions or to appeal the final judgment in the case." *Feller*, 802 F.2d at 730. Similarly, here, the DNC should be allowed to participate in this case as a party because the relief it would obtain if it succeeds in *RNC* case would be undermined if the United States prevails here. Specifically, if the DNC prevails in *RNC* case and shows that the State Board is already complying with HAVA, and thus no corrective action is necessary, that relief would be undermined by an order issued in this case directing the State Board to collect information from voters to ensure compliance with HAVA.

The DNC's ability to protect its interests would also be impaired if the United States obtains its requested relief because the DNC would be forced to divert resources away from activities that allow it fulfill its mission. "While [proposed] intervenors need not establish Article III standing to demonstrate they have a protectable interest in this action, an interest sufficient to demonstrate injury-in-fact for standing purposes likely suffices to show a protectable interest under Rule 24(a)(2)." *N.C. Green Party v. N.C. State Bd. of Elections*, 619 F. Supp. 3d 547, 562 (E.D.N.C. 2022). If the United States obtains its requested relief, the State Board will be forced to cure supposed "ongoing violations" of HAVA by contacting lawfully registered voters to obtain information that no law requires the State to gather. The DNC would be forced to expend and divert funds and resources that it would otherwise spend on voter outreach and mobilization efforts toward informing and educating voters about their rights under federal and North Carolina law, in

order to ensure that those voters' registrations (and in turn, their votes) are not erroneously canceled. *See Disability Rts. N. Carolina v. N. Carolina State Bd. of Elections*, 2022 WL 2678884, at *3 (E.D.N.C. July 11, 2022) ("Where an organization experiences a "perceptible" diversion of resources and frustration of purpose, it may seek redress in its own right through organizational standing."). To the extent that "cure" process results in the purging of lawfully registered Democratic voters, it will further injure the DNC by reducing the number of registered Democrats able to cast a ballot in North Carolina.

*Fourth*, the parties in this action do not adequately represent the DNC's interests in minimizing the burden on lawfully registered Democratic voters, preserving the DNC's resources for mobilizing and counseling its voters, and seeing Democratic candidates elected. "[T]he burden of making this showing should be treated as 'minimal,'" *United Guar. Residential Ins. Co. of Iowa v. Phila. Sav. Fund Soc.*, 819 F.2d 473, 475 (4th Cir. 1987) (quoting *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972)), particularly when, as here, "the existing party and proposed intervenor seek divergent objectives," *Stuart v. Huff*, 706 F.3d 345, 352 (4th Cir. 2013). Sam Hayes, the newly appointed director of the State Board of Elections, has stated that he is committed to "bringing North Carolina into compliance with federal law." U.S. DOJ Says NC Failed to Maintain Accurate Voter List in Lawsuit Against Board of Elections, Sean Coffey (ABC 11), https://abc11.com/post/nc-voter-list-north-carolina-state-board-elections-face-lawsuit-us-department-justice-citing-hava-violation/16567774/ (visited June 17, 2025). Hayes' statement presumes a HAVA violation in the absence of any showing that the state's voter list maintenance practices are out of compliance. (Although the DNC does not oppose bringing North Carolina's voter list maintenance into compliance with HAVA *should a violation be demonstrated*, no violation has been shown.) The statement also indicates the State Board's interests will not "always

dictate precisely the same approach to the conduct of the litigation" as the DNC's. *See United Guar.*, 819 F.2d at 475 (quoting *Trbovich,* 404 U.S. at 539). For example, the State Board's desire to cure supposed HAVA violations may motivate it to voluntarily consent to conduct a process to obtain social security and driver's license numbers from North Carolina voters who the DNC contends are already lawfully registered to vote. Moreover, the interests of the United States, the State Board Defendants, and the DNC may diverge for another reason: Plaintiff and Defendants are public officeholders focused on the administration of elections. *See, e.g.*, *Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 736 (D.C. Cir. 2003); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998). They do not share the DNC's particularized interest in Democratic candidates winning elections or its members' particularized interest in their voter-registrations and votes.

For the foregoing reasons, the DNC should be allowed to intervene in this matter as of right.

**B. The Democratic National Committee Should Be Permitted To Intervene In This Action.**

In the alternative, the DNC should be granted permissive intervention. Fed. R. Civ. P. 24(b)(2). A timely motion for permissive intervention may be granted when the intervenor's "defense and the main action have a question of law or fact in common." *In re Sierra Club,* 945 F.2d 776, 779 (4th Cir. 1991) (quoting Fed. R. Civ. P. 24(b)). The Court also must consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Stuart v. Huff,* 706 F.3d 345, 349 (4th Cir. 2013) (quoting Fed. R. Civ. P. 24(b)(3)). "[L]iberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *Feller,* 802 F.2d at 729 (citation omitted).

For the reasons stated above, the motion is timely. The DNC's defenses raise common questions of law and fact as those presently pending in this case. And the DNC will abide by whatever schedules and deadlines this Court sets for the original parties. Intervention therefore will not delay or prejudice the adjudication of the rights of those parties.

## CONCLUSION

The DNC's motion to intervene should be allowed.

Respectfully submitted, this 17th day of June, 2025.

| | |
|---|---|
| SETH P. WAXMAN* <br> DANIEL S. VOLCHOK* <br> CHRISTOPHER E. BABBITT* <br> WILMER CUTLER PICKERING <br>    HALE AND DORR LLP <br> 2100 Pennsylvania Avenue N.W. <br> Washington, D.C. 20037 <br> Phone: (202) 663-6000 <br> Fax: (202) 663-6363 <br> seth.waxman@wilmerhale.com <br> daniel.volchok@wilmerhale.com <br> christopher.babbitt@wilmerhale.com <br> (*Pro Hac Vice application forthcoming) | /s/ William A. Robertson <br> JIM W. PHILLIPS, JR. <br> N.C. BAR NO. 12516 <br> SHANA L. FULTON <br> N.C. BAR NO. 27836 <br> WILLIAM A. ROBERTSON <br> N.C. BAR NO. 53589 <br> JAMES W. WHALEN <br> N.C. Bar No. 58477 <br> BROOKS, PIERCE, MCLENDON <br>    HUMPHREY & LEONARD, LLP <br> 150 Fayetteville Street <br> 1700 Wells Fargo Capitol Center <br> Raleigh, N.C. 27601 <br> Phone: (919) 839-0300 <br> Fax: (919) 839-0304 <br> jphillips@brookspierce.com <br> sfulton@brookspierce.com <br> wrobertson@brookspierce.com <br> jwhalen@brookspierce.com |