|  |  |
|---|---|
| **United States of America,**<br><br>       Plaintiff,<br><br>   v.<br><br>**North Carolina State Board of Elections; Sam Hayes**, in his official capacity as Executive Director of the North Carolina State Board of Elections; **Francis X. De Luca, Jeff Carmon, Stacy Eggers IV, Siobhan O'Duffy Millen**, and **Robert Rucho**, in their official capacities as members of the North Carolina State Board of Elections; and **State of North Carolina,**<br><br>       Defendants. | No. 5:25-cv-00283 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS BY GABRIELA ADLER-ESPINO, RANI DASI, MARY KAY HELING, AUDREY MEIGS, LARRY REPANES, AMY GRACE BRYANT, RALIM ALLSTON, KEMEKA SIDBURY, THE NAACP NORTH CAROLINA STATE CONFERENCE, AND THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA**

TABLE OF CONTENTS

Page(s)

INTRODUCTION .......................................................................................................... 1

I.    BACKGROUND ................................................................................................. 3

      A.    The Impacted Voters Properly Registered to Vote. ............................ 4

      B.    The Impacted Groups Work to Protect the Rights of Voters in North Carolina. ........................................................................................ 9

      C.    Despite Properly Registering, the Impacted Voters Have Now Faced Several Near-Identical Attacks on Their Right to Vote. ............................... 11

      D.    The United States' Allegations. ....................................................... 14

II.   ARGUMENT ................................................................................................... 16

      A.    Proposed Intervenors Are Entitled to Intervene as of Right Under Rule 24(a). ........................................................................................ 16

            i.    The Motion to Intervene Is Timely ........................................ 16

            ii.   Proposed Intervenors Must Participate in This Case to Protect Against the Loss of Their Fundamental Right to Vote. ................... 18

            iii.  The Existing Parties and Other Potential Intervenors Do Not Adequately Represent the Proposed Intervenors' Fundamental Right to Vote. ........................................................................... 22

      B.    Alternatively, the Court Should Grant Permissive Intervention Because the Proposed Intervenors Present Common Questions and Will Not Prejudice the Existing Parties. ........................................................ 27

III.  CONCLUSION ................................................................................................. 29

Case 5:25-cv-00283-M-RJ    Document 40    Filed 06/17/25    Page 2 of 37

## Cases

*Alt v. U.S. E.P.A.*, 758 F.3d 588 (4th Cir. 2014) ............................................................16, 17

*Baker v. Carr*, 369 U.S. 186 (1962) .......................................................................................19

*Bellitto v. Snipes*, No.16-cv-61474-BLOOM/Valle, 2016 WL 5118568 (S.D. Fla. Sept. 21, 2016)................................................................................................................................21

*Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179 (2022) ..................................16, 23, 25

*Com. of Va. v. Westinghouse Elec. Corp.*, 542 F. 2d 214 (4th Cir. 1976) ...............................23

*Defs. of Wildlife v. N.C. Dep't of Transp.*, 281 F.R.D. 264 (E.D.N.C. 2012) (Flanagan, J.)...17, 29

*Democracy North Carolina v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158 (M.D.N.C. 2020)................................................................................................................................19

*Feller v. Brock*, 802 F.2d 722 (4th Cir. 1986) .........................................................................16

*Griffin v. N. Carolina State Bd. of Elec.*, --- F. Supp.3d ---, 2025 WL 1292530 (E.D.N.C. May 5, 2025)........................................................................................................................12, 28

*Griffin v. N.C. State Bd. of Elections*, 913 S.E.2d 894 (N.C. 2025)....................................4, 12

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) .....................................................18

*Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) ............................18

*In re Sierra Club*, 945 F.2d 776 (4th Cir. 1991) .....................................................................28

*Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24-cv-01867, 2024 WL 3454706 (N.D. Ill. July 18, 2024)..................................................................................................................24

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ...............19

*McHenry v. Comm'r*, 677 F.3d 214 (4th Cir. 2012) ................................................................27

*N.C. All. for Retired Ams. v. Hirsch*, No. 1:23-cv-00837, 2023 WL 9422596 (E.D.N.C. Dec. 15, 2023)..............................................................................................................................23

*N.C. Green Party v. N.C. State Bd. of Elections*, 619 F. Supp. 3d 547 (E.D.N.C. 2022)...18, 19

*NAACP v. Duplin Cnty.*, No. 7:88-cv-00005-FL, 2012 WL 360018 (E.D.N.C. Feb. 2, 2012) (Flanagan, J.)..............................................................................................................21, 26

*Ohio Valley Env't Coal., Inc. v. McCarthy*, 313 F.R.D. 10 (D.W.V. Dec. 14, 2015) ...............27

*People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md.*, 843 Fed. Appx. 493 (4th Cir. 2021) .......................................................................................22

*Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-00518-CDS-MDC, 2024 WL 3409860 (D. Nev. July 12, 2024) .......................................................................................................26

*Republican Nat'l Comm. v. N.C. State Bd. of Elections,* 120 F.4th 390 (4th Cir. 2024) ........22

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-547-M-RJ (E.D.N.C. 2024)......................................................................................................................12, 23

*Savannah Riverkeeper v. U.S. Army Corps of Eng'rs*, No. 9:12-cv-00610-RMG, 2012 WL 13008326 (D.S.C. Aug. 14, 2012) ...................................................................................27

*Scottsdale Ins. Co. v. Children's Home Soc'y of N.C., Inc.*, No. 5:12-cv-00081-FL, 2013 WL 749817 (E.D.N.C. Feb. 27, 2013) (Flanagan, J.) ............................................................17

*Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013)...........................................................................27

*Students for Fair Admissions Inc. v. Univ. of N.C.*, 319 F.R.D. 490 (M.D.N.C. 2017)..........29

*Trbovich v. Mine Workers*, 404 U.S. 528 (1972) .....................................................................25

*Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) .......................................................................18

## Statutes and Rules

Fed. R. Civ. P. 24 ...............................................................................................................passim

## Other Authorities

Bryan Anderson, "NCSBE Executive Director Supports Trump Admin Voter Roll Lawsuit, Also Wants Detailed State Audit," *Anderson Alerts* (June 3, 2025), https://andersonalerts.substack.com/p/sam-hayes-trump-lawsuit-reaction.................3, 24

Carol Snow, N.C. HAVA Administrative Complaint Form (Oct. 6, 2023) https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Snow%20Amended%20HAVA%20Complaint.pdf [https://perma.cc/GGG6-4H3L] .....11

Carol Snow, North Carolina State Board of Elections Next Request, Request 23-128 (Aug. 23, 2023), https://ncsbe-nc.nextrequest.com/requests/23-128 [https://perma.cc/F2KH-68HC] ................................................................................................................................13

Colin Campbell, "Q&A: State Auditor Dave Boliek on running elections, investigating DMV and Helene spending," WUNC (June 13, 2025, 12:37 PM), https://www.wunc.org/politics/2025-06-13/nc-state-auditor-dave-boliek-elections-helene-dmv [https://perma.cc/H7T5-2ZRC]...................................................................................24

- iii -

Order, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6, 2023), https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023% 20HAVA%20Complaint%20-%20Snow.pdf [https://perma.cc/YT6V-WRXX]. ............11, 25

Theresa Opeka, "Exclusive: Boliek discusses NC election-board changes," Carolina Journal (May 12, 2025), https://www.carolinajournal.com/exclusive-boliek-discusses-nc-election-board-changes/ [https://perma.cc/5PED-2RXY]...............................................................24

Proposed Intervenors Gabriela Adler-Espino, Rani Dasi, Mary Kay Heling, Audrey Meigs, Larry Repanes, Amy Grace Bryant, Ralim Allston, Kemeka Sidbury, ("the Impacted Voters"), NAACP North Carolina State Conference, and the League of Women Voters of North Carolina ("the Impacted Groups," and, collectively with the Impacted Voters, "Proposed Intervenors") move to intervene as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure, or, alternatively, move for permissive intervention under Rule 24(b).

## INTRODUCTION

Hundreds of thousands of North Carolina voters are once again facing the threat of losing their right to vote because of voter registration database issues that stem from the state's efforts to comply with the Help America Vote Act (HAVA). Over the last 18 months, these voters have experienced a seemingly endless loop of scrutiny, despite doing everything they can to confirm that they were (or currently are) properly registered. It happened first in an October 2023 administrative complaint, then again in an August 2024 lawsuit that is pending. It happened a third time after the 2024 state Supreme Court race, and now once more in this case. Each action targeted eligible voters—including the Impacted Voters—who followed all the rules for registration, but for whom the registration database does not have a record of a driver's license or social security number. Yet the voices of these voters are critically absent from this case. Accordingly, Proposed Intervenors seek to participate in this case as defendants to defend their own rights, and the rights of their members and constituents, to vote.

The allegations the United States makes in this case echo the previous administrative complaint and other lawsuits filed by private parties over the past 18

months. The Complaint alleges that the defendants are in violation of HAVA because a "significant number," Compl. ¶ 46, of North Carolina voter registration records— possibly over 200,000, *id.* ¶ 39(e)—lack a driver's license number or last four digits of their social security number ("SSN-4"), or, in the absence of these numbers, a unique identifier. *Id.* ¶¶ 46-47. The Complaint, however, does not allege that any voter whose voter registration record lacks these numbers is at fault for the missing information or is ineligible to vote.

Nevertheless, the relief requested threatens these voters' ability to remain registered. The United States frames this action as an extension of the President's Executive Order to "guard against illegal voting" and to "ensure the fairness and integrity of elections." *Id.* ¶¶ 2-5. It asks this Court to order that the North Carolina State Board of Elections ("NCSBE") contact every voter whose record is missing a driver's license number or SSN-4 to obtain that information and then file a "sworn certification that all records in the statewide voter registration list are in full compliance with Section 303(a) of HAVA." *Id.* at 17 ¶ D(3). Although the Complaint does not say it directly, the next logical step—with the case intended to prevent "illegal voting" and "voter fraud" and the NCSBE required to certify that its voter registration records are perfect—is that those voters who cannot be reached, who cannot timely confirm anew what was already provided at registration, or who encounter a subsequent administrative error, must be removed from the rolls. Even if this Court does not order the relief requested by the United States, something similar or even worse for voters could result from a settlement. Defendant Sam Hayes, the executive director of the NCSBE, has already stated that he supports the lawsuit and plans to

contact the Department of Justice to work toward a resolution, noting, "[W]e failed to collect this information over time, in violation of the law, and now we've got to fix it."[1] The NCSBE must balance many competing priorities, including maintaining accurate voter rolls and limiting resources spent on defending litigation against the federal government where they already conceded failing to follow federal law. The balance of these priorities may mean any out-of-court resolution comes at the expense of eligible voters, such as the Impacted Voters and the members and constituents of the Impacted Groups, who, through no fault of their own, may find themselves on the state's supposed "fix it" list.

Because there is still a threat to the Impacted Voters' right to vote despite them having gone above and beyond what is required and what any voter should have to do to secure their right to vote, they and the Impacted Groups have a significant stake in the outcome of this case. They should be granted a chance to litigate it.

## I. BACKGROUND

This case concerns nearly a quarter of a million eligible, properly registered North Carolina voters. Despite following the steps required of them to prove their eligibility to vote at the time of registration—and providing photo ID when voting in person—they are having their ability to remain registered, and therefore vote, challenged for at least the fourth time in two years.

---

[1] Bryan Anderson, "NCSBE Executive Director Supports Trump Admin Voter Roll Lawsuit, Also Wants Detailed State Audit," *Anderson Alerts* (June 3, 2025), https://andersonalerts.substack.com/p/sam-hayes-trump-lawsuit-reaction. A copy of this article is included at Exhibit 2.

## A. The Impacted Voters Properly Registered to Vote.

The Impacted Voters are all U.S. citizens and eligible to vote in North Carolina. *See generally* Ex. 3, Declaration of Rani Dasi ("Dasi Decl."); Ex. 4, Declaration of Audrey Meigs ("Meigs Decl."); Ex. 5, Declaration of Gabriela Adler-Espino ("Adler-Espino Decl."); Ex. 6, Declaration of Larry Repanes ("Repanes Decl."); Ex. 7, Declaration of Mary Kay Heling ("Heling Decl."); Ex. 10, Declaration of Amy Grace Bryant ("Bryant Decl."); Ex. 11, Declaration of Ralim Allston ("Allston Decl."); Ex. 12, Declaration of Kemeka Sidbury ("Sidbury Decl."). They all voted in the November 2024 election, then had their ballots challenged in election protests and litigation filed by NC Court of Appeals Judge Jefferson Griffin, allegedly for having incomplete voter registration records, meaning their registration records were missing a driver's license number and SSN-4. Ex. 3, Dasi Decl. ¶¶ 9-11; Ex. 4, Meigs Decl. ¶¶ 7-9; Ex. 5, Adler-Espino Decl. ¶¶ 12-17; Ex. 6, Repanes Decl. ¶¶ 6-8; Ex. 7, Heling Decl. ¶¶ 6-9; Ex. 10, Bryant Decl. ¶ 15; Ex. 11, Allston Decl. ¶ 8-9; Ex. 12, Sidbury Decl. ¶¶ 13, 15; *see also Griffin v. N.C. State Bd. of Elections*, 913 S.E.2d 894, 895–96 (N.C. 2025) (describing challenges). None of the Impacted Voters have ever been told by a county or state election official that their voter registration records were deficient. They live in five different counties and range in age from their twenties to their sixties. They reflect diverse racial, ethnic, family, and occupational backgrounds. But they share two things in common: a commitment to exercising their right to vote and a fear that their right is yet again under threat.

**Rani Dasi** is an elected member of the Chapel Hill-Carrboro City School Board. Ex. 3, Dasi Decl. ¶ 3. She was born in Chicago, moved to Chapel Hill in 2007, and has

lived there since then. *Id.* ¶¶ 1-2. Voting has always been an important part of her life, in part due to the racism her mother's family experienced in Alabama, including being denied life-saving medical care. *Id.* ¶ 19. She believes voting is an important tool to make life better for everyone in the community. *Id.* She registered to vote in 2007 and provided her SSN-4 on her voter registration form. *Id.* at Ex. A. Since then, she has voted in at least twenty elections in North Carolina. *Id.* ¶ 8. When she checked in to vote in the November 2024 election, she confirmed with election officials that there was nothing missing from her voter registration file; she was reassured that it was complete. *Id.* ¶ 10. When she learned she was challenged by Judge Griffin, she went in person to her county board of elections to confirm that she was properly registered; while there, she reviewed with the election official her voter registration form, showing her SSN-4. *Id.* ¶ 12. The election official guessed that Ms. Dasi may have been on the challenge list because she uses the name Rani in her voter registration but her name on her social security card is Radharani; this difference has never caused an issue in other areas such as with her credit cards, which also have the name Rani. *Id.* ¶¶ 12-13.

**Audrey Meigs** has been working on voting rights since high school, when she held voter registration drives in her hometown of Asheville, North Carolina. Ex. 4, Meigs Decl. ¶ 6. She is dedicated to voting rights work and serving the Asian American community because she feels they are often left out of the political process. *Id.* In 2017, at age 16, she pre-registered to vote in North Carolina when she obtained her driver's license. *Id.* ¶ 5. She now lives in Chapel Hill and voted in the November 2024 election. *Id.* ¶ 7. Shortly after that election, she learned that she was on a list of voters subject to a challenge by Judge Griffin, based on an allegedly "incomplete" voter file. *Id.* ¶ 8. She

contacted the Durham County Board of Elections and was told that she had provided all the necessary information when she registered, so no further action was needed on her part. *Id.* ¶ 10. No one from the county or state has ever told her that she needs to update her voter registration record. *Id.* ¶ 11.

**Gabriela Adler-Espino** works for the U.S. Air Force as a teacher in Japan, where her husband, who is active duty in the Navy, is stationed. Ex. 5, Adler-Espino Decl. ¶¶ 9-10. She was born in Puerto Rico and comes from a family with a long history of military service. *Id.* ¶¶ 3-4. She registered to vote at the DMV in New Bern, North Carolina, in June 2024, at the same time as she applied for a driver's license; she recalls that she provided her social security number when she registered. *Id.* ¶¶ 7, 8, 26. She moved to Japan with her husband in July 2024. *Id.* ¶ 9. She voted in the November 2024 election using the online portal available to service members and their families living abroad. *Id.* ¶ 12. When she learned her ballot had been challenged by Judge Griffin, she called the Craven County board of elections from Japan to ask what the problem was, but she did not receive a response. *Id.* ¶ 19. In April 2025, she received a letter dated April 14, 2025, from the Craven County Board of Elections titled, "Notice of Incomplete Application." The notice stated that the issue that prevented processing of her voter registration was "incomplete data: invalid ID." *Id.* 20. The same night she received this notice, she called the Craven County Board of Elections; the official who answered the phone said they would check her registration, but she never heard back from the County. *Id.* ¶ 21. She has checked her voter registration on the state's voter portal, but it does not indicate that anything, such as SSN-4 or a driver's license number, is missing. *Id.* ¶ 24.

**Larry Repanes**, is a 69-year-old voter who was born in New York and lives in Charlotte, North Carolina. Ex. 6, Repanes Decl. ¶¶ 1-2. He believes voting is a right and is key to democracy. *Id.* ¶ 15. Repanes voted in the November 5, 2024, election by showing his North Carolina driver's license to cast a ballot. *Id.* ¶ 6. After learning he was on the list of voters being challenged by Judge Griffin, Repanes contacted the Mecklenburg County Board of Elections, and the staff informed him that both his social security number and driver's license were present but not validated. *Id.* ¶¶ 9-10. Staff validated his social security information and assured him that no further action was required on his part. *Id.* ¶ 10. He has no proof that the alleged issue was fixed or that it will not be raised again the next time he votes. *Id.* ¶ 11.

**Mary Kay Heling** was born in Wisconsin but has lived in Raleigh, North Carolina since January 2016. Ex. 7, Heling Decl. ¶ 1. Heling believes that voting is not just a right, but a responsibility and requirement. *Id.* ¶15. Heling has been voting in North Carolina for 9 years and has not been informed of any requirement to update her registration record during that time. *Id.* ¶¶ 8, 14. She cast a ballot in the November 5, 2024, General Election by early voting, and presented her North Carolina driver's license as her photo ID. *Id.* ¶ 6. After learning that her vote was challenged due to an allegedly incomplete registration record, she confirmed with the Wake County Board of Elections that she provided a social security number at the time she registered. *Id.* ¶¶ 7-10. Heling is shocked and frustrated that her registration and vote may be still be at risk, despite doing all that was required of her; she thought these issues ended after the conclusion of Judge Griffin's protest. *Id.* ¶¶ 12, 16.

**Amy Grace Bryant** is a 52-year old physician and educator who has lived in Durham since 2011. Ex. 10, Bryant Decl. ¶¶ 2-4. She registered to vote at the North Carolina DMV in 2011, and she has voted in every election held in her county since that time. *Id.* ¶¶ 8-9. In the November 2024 election, Dr. Bryant voted at an early voting site and used her North Carolina driver's license to vote without any complications. *Id.* ¶¶ 11-12. She feels that having her voter registration challenged repeatedly, without any proof of deficiency or information on how to fix the alleged issue, feels like a blow to our democracy. *Id.* ¶ 21.

**Ralim Allston**, a 35-year-old Black resident of Pasquotank County, has been a registered voter in North Carolina since 2008. Ex. 11, Allston Decl. ¶¶ 2, 5. He voted early in person for the November 2024 election with no issues, and showed his driver's license to comply with the photo voter ID requirement. *Id.* ¶ 7. He learned afterwards that his vote was being challenged by Judge Griffin for an allegedly incomplete registration, even though he had checked his registration before voting in the 2024 election, and he never received any notice of an issue with his registration. *Id.* ¶ 8. Mr. Allston is angry and disheartened that there are still questions about whether his registration is valid, because he knows he provided all of the information that was asked of him. *Id.* ¶ 12.

**Kemeka Sidbury,** a 48-year-old Black resident of Brunswick County, has taught middle school and adult education for two decades. Ex. 12, Sidbury Decl. ¶¶ 2-4. Ms. Sidbury is an active voter who believes that voting awards every citizen a voice and an opportunity to elect representatives who reflect what matters to their constituents. *Id.* ¶ 10. She early voted in the November 2024 election, presenting her North Carolina

driver's license as her identification. *Id.* ¶ 11. Ms. Sidbury was shocked to learn after the election that her registration was being challenged in Judge Griffin's election protest. *Id.* ¶ 13. Since that time, she has sought to remedy the alleged issue but has never received confirmation that the issue has been resolved. *Id.* ¶ 15. She is heartbroken to learn that her registration has been challenged once again. *Id.* ¶ 16.

Each Impacted Voter followed the laws that existed when they registered to vote. And each has gone above and beyond what a voter should have to do to remain on the voter rolls. Yet they are uncertain whether their registrations or ballots will be challenged due to a missing number in their registration record—which is not only no fault of their own, but also something they do not have the power to correct.

### B. The Impacted Groups Work to Protect the Rights of Voters in North Carolina.

The **League of Women Voters of North Carolina** ("LWVNC" or the "League") is a nonpartisan, nonprofit organization whose mission is to facilitate informed and active participation in government by all Americans, increase understanding of major policy issues, and advocate for legislative changes and policies for the public good. Ex. 8, Declaration of Jennifer, Rubin, President of the League of Women Voters of North Carolina ("Rubin Decl.") ¶ 5. LWVNC is the North Carolina state affiliate of the League of Women Voters ("LWV"), a nonprofit, nonpartisan, grassroots, community-based membership organization headquartered in Washington, D.C., working to protect and expand voting rights and ensure everyone is represented in our democracy. *Id.* ¶ 6. LWV empowers voters and defends democracy through advocacy, education, mobilization, and litigation at the local, state, and national levels. *Id.* Founded in 1920 as an outgrowth of the struggle to win voting rights for women, the League now has

more than a million members and supporters and is organized in nearly 800 communities and in every state and the District of Columbia. *Id.* Members of state and local Leagues are also members of LWV. *Id.* LWVNC accomplishes its mission, in part, by encouraging North Carolina citizens to register to vote, including by assisting them with the process, and promoting robust civic participation through voter education and assistance to facilitate participation in the electoral process. *Id.* ¶ 7. LWVNC has 14 local leagues and over 2,000 members throughout North Carolina. *Id.* ¶ 10. The League has several members who have been and will be impacted by threats to take away their right to vote. *Id.* ¶¶ 12-26.

**NAACP North Carolina State Conference ("NAACP North Carolina")** strives to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. Ex. 9, Declaration of Deborah Dicks Maxwell, NAACP North Carolina President ("Maxwell Decl.") ¶ 8. NAACP North Carolina has 70 adult branches and numerous student and youth branches, composed of over 10,000 members. *Id.* ¶ 10. Its members are predominantly Black or from other communities of color and include registered voters across the state. *Id.* ¶ 12. Public reporting has shown that voters being challenged in North Carolina due to incomplete registration are disproportionately Black. *Id.* ¶ 13. Furthermore, if the U.S. was successful in its goal of requiring the NCSBE to develop a plan that could remove approximately 200,000 voters from the voter rolls, members of the NAACP North Carolina would be adversely and illegally

impacted, and the NAACP North Carolina's voter education and mobilization programming would have to substantially change. *Id.* ¶¶ 15-25.

### C.    Despite Properly Registering, the Impacted Voters Have Now Faced Several Near-Identical Attacks on Their Right to Vote.

For the past year and a half, Impacted Voters have faced investigations or lawsuits alleging that their voter registration records lack required information, even though most of them specifically recall providing this information when registering to vote and/or have since confirmed that fact with their local election boards. *See, e.g.*, Ex. 3, Dasi Decl. ¶¶ 6-7, Ex. A. These include:

**In October 2023**, an administrative complaint[2] to the NCSBE alleged that the state voter-registration form did not indicate that it was mandatory for applicants to provide either a driver's license or social security number if they had one. The NCSBE agreed and later changed its form. Because affected voters would already have to produce additional identification during other parts of the voting process, the NCSBE rejected the complaint's demand that it identify and contact over 200,000 voters who allegedly lacked this information.[3]

**In August 2024**, the Republican National Committee filed a complaint in state court (which was later removed to federal court) alleging that North Carolina's voter-

---

[2] Carol Snow, N.C. HAVA Administrative Complaint Form (Oct. 6, 2023) https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Snow%20Amended%20HAVA%20Complaint.pdf [https://perma.cc/GGG6-4H3L].

[3] Order at 4–5, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6, 2023), https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023%20HAVA%20Complaint%20-%20Snow.pdf [https://perma.cc/YT6V-WRXX].

registration form violated HAVA. Compl. at 19-20, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 24CV026995-910 (N.C. Super. Ct. Aug. 23, 2024). Just two months before the 2024 General Election, the RNC asked the court to require the same 200,000 voters from the 2023 complaint either be removed from the state's voter registration lists or receive only provisional ballots. That case is pending in federal district court. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-547-M-RJ (E.D.N.C. 2024).

**In November 2024**, Judge Jefferson Griffin, the losing candidate for a state supreme court seat sought to invalidate over 60,000 ballots cast by individuals whose voter registration records allegedly lacked driver's license numbers or SSN-4 (the same information sought from the list of over 200,000 voters). In April 2025, the Supreme Court of North Carolina rejected that challenge. The court said that the record did not suggest that a significant number of those ballots "were cast by individuals whose identity was not verified by voter identification or who were not otherwise qualified to vote" and that "mistakes made by negligent election officials in registering citizens who are otherwise eligible to vote will not deprive the citizens of their right to vote." *Griffin*, 913 S.E.2d at 895-96.[4]

**In May 2025**, less than four weeks after the end of the *Griffin* matter, the United States filed this case. It appears the government is using the same list of over

---

[4] The Court upheld other parts of the candidate's challenge, but a federal court enjoined the NCSBE from taking action in furtherance of that order on due process grounds. *Griffin v. N. Carolina State Bd. of Elec.*, --- F. Supp.3d ---, 2025 WL 1292530 (E.D.N.C. May 5, 2025).

200,000 voters from the 2023 administrative complaint to allege that the NCSBE has failed to collect registration information. *See* Compl. ¶ 39(e).

Missing data does not evidence an unlawful registration or even the fact that required information was not provided. The October 2023 administrative complaint cited a list of over 200,000 voters produced from an August 2023 public records request. That request sought a list of voters that "d[id] not contain data in one or more of the following data fields: Drivers License, SSN-4."[5] But, as the NCSBE has explained, a voter's record might lack a driver's license number or SSN-4 in the state database for many reasons including: (1) the voter does not have a driver's license or social security number, but has a valid state unique identifier number that satisfies HAVA; (2) a database-matching or data-entry error that results in an ID number not being retained in the voter's record; or (3) the voter registered before HAVA was passed and was not asked to provide a driver's license number or SSN-4 during registration. Resp. Br. of Respondent-Appellee N.C. State Board of Elections, at 56, *Griffin v N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 764283 (Feb. 27, 2025). As the NCSBE itself has maintained through all of these challenges: allegedly incomplete registrations do not mean that these voters are not lawfully registered or otherwise unqualified to vote. *Id.* at *56–60.

In each instance the challenges have frustrated and perplexed the voters, who were unaware of the database issues despite, for many of them, voting under the

_____

[5] Carol Snow, North Carolina State Board of Elections Next Request, Request 23-128 (Aug. 23, 2023), https://ncsbe-nc.nextrequest.com/requests/23-128 [https://perma.cc/F2KH-68HC].

allegedly incomplete voter registrations for numerous election cycles without issue. When challenged during the 2024 state supreme court race, for example, each Impacted Voter had not been told by their county or the state that there were supposed problems with their registrations either before or after Election Day. Ex. 4, Meigs Decl., ¶ 10; Ex. 5, Adler-Espino Decl., ¶ 17.[6]

## D. The United States' Allegations.

On May 27, 2025, the United States filed this suit, alleging the NCSBE violated Section 303(a) of HAVA. The Complaint alleges that a "significant number" of North Carolina voters "did not provide a driver's license number or the last four digits of a social security number" when using the state's voter registration form yet were registered by election officials and are still on the state's voter rolls. Compl., ¶¶ 16, 19. The Complaint does not say what a "significant number" means, but it appears to point to "the allegation in the [2023] Administrative Complaint that over 200,000 records were not compliant with Section 303 of HAVA." *Id.* ¶ 39(e).

The United States alleges that the NCSBE failed to "ensure that all voter registration records in North Carolina's statewide voter registration list have a driver's

---

[6] Even if a voter tried to investigate claims around their registration, there is no publicly accessible resource that allows a voter to confirm whether their driver's license or SSN-4 is missing from their registration record. A voter can look up their registration through the State Board's Voter Search tool, bit the only unique identifier in that record is their "NCID." *See Your Voter Record*, N.C. State Bd. of Elections, https://www.ncsbe.gov/voting/your-voter-record [https://perma.cc/UGE7-5BL3] (last visited June 17, 2025) ("NCID shows your statewide unique identifier issued by your county board of elections."). Contrary to the United States's assertions, *see* Compl., ¶ 45(d), an NCID is assigned to every registration record regardless of whether it has a driver's license or social security number.

license number, or the last four digits of the social security number, for persons who do not have a driver's license number, or for persons who do not have these numbers, a unique identifier." *Id.* ¶ 47. It then asks this Court to order that the NCSBE contact every voter for whom this information is allegedly missing in the statewide database to obtain it and then "timely add" that information to the statewide voter registration list. *Id.* at 17 ¶ (D)(1). For voters who report not having either number, the United States seeks an order requiring the assignment of a unique identifier and "timely adding" that information to the statewide voter registration list. *Id.* at 17 ¶ (D)(2). Finally, the United States seeks an order that the NCSBE certify that "all records" in the state's voter registration list are now in "full compliance" with HAVA, and to provide "an electronic copy of all corrected records" to the United States. *Id.* at 17 ¶ (D)(3).

Notably, the Complaint does not say what the NCSBE should do for (i) voters who cannot be contacted for whatever reason (including reasons outside the voter's control), (ii) voters who are incorrectly contacted despite having provided the information already, (iii) voters who have the information but cannot comply in the time required, or (iv) voters with other issues unrelated to eligibility that prevent confirmation. But the consequence of demanding the timely addition of supposed "missing" information and a certification of "full compliance" is clear: those voters must be removed from the rolls. The United States has not disclaimed this possible outcome. In fact, its stated interest here in preventing "illegal voting" and "voter fraud," *Id.* ¶¶ 2-5, only makes sense if the NCSBE identifies and contacts supposedly ineligible voters and removes from the rolls those who do not respond.

## II.  ARGUMENT

### A.  Proposed Intervenors Are Entitled to Intervene as of Right Under Rule 24(a).

The proposed intervenors satisfy the requirements for intervention as of right under Rule 24(a). Under Rule 24(a)(2), the court must permit the intervention of a party who "(1) [o]n timely motion, (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, (3) unless existing parties adequately represent that interest." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 190 (2022) (internal quotations omitted). Courts in this circuit have long held that "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (citation and internal quotations omitted).

### i.  The Motion to Intervene Is Timely.

The present motion is timely. Courts in the Fourth Circuit assess three factors to decide whether a motion to intervene is sufficiently timely: (1) how far the underlying suit has progressed, (2) the prejudice any resulting delay may cause the other parties, and (3) why the applicant moved when they did. *Alt v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014).

Plaintiff filed the Complaint on May 27 and Defendants waived service on June 4. The present motion to intervene followed in less than two weeks after waiver of

service, with almost six weeks until the Defendants' deadline to respond to the Complaint on July 28.

As to the first and second factors, there have been no developments in the case beyond the filing of appearances and waiver of service. No motions are pending, other than two other motions to intervene, and discovery has not begun. The other parties have ample time to react to the presence of Proposed Intervenors in the case and no issues will need to be relitigated. There is thus no risk of prejudice and both factors weigh fully in favor of intervention. *See, e.g., Defs. of Wildlife v. N.C. Dep't of Transp.*, 281 F.R.D. 264 (E.D.N.C. 2012) (Flanagan, J.) (granting intervention for motion filed nearly two months after defendants' answers).

On the third factor, Proposed Intervenors began working immediately after the filing of the Complaint to prepare this lawsuit. They immediately began to assess their specific situations to determine if their rights may be affected by this suit and whether the existing parties would adequately protect those rights. After careful consideration of the issues, the Proposed Intervenors promptly prepared this filing. *See generally Alt*, 758 F.3d at 589-90 (granting motions to intervene filed approximately one month and six months after the filing of the lawsuit and denying intervention motion filed over a year after the complaint); *contrast Scottsdale Ins. Co. v. Children's Home Soc'y of N.C., Inc.*, No. 5:12-cv-00081-FL, 2013 WL 749817, at *2 (E.D.N.C. Feb. 27, 2013) (Flanagan, J.) (denying motion to intervene as untimely when motions for summary judgment were pending).

### ii. Proposed Intervenors Must Participate in This Case to Protect Against the Loss of Their Fundamental Right to Vote.

The second inquiry under Rule 24(a)(2) is whether Proposed Intervenors "claim[] an interest relating to the property or transaction that is the subject of the action, and [are] so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." *N.C. Green Party v. N.C. State Bd. of Elections*, 619 F. Supp. 3d 547, 561 (E.D.N.C. 2022). The answer is yes.

The factual allegations in the Complaint focus on election administration. But the requested relief, and the consequences of this case for the Impacted Voters, are about voting rights. The resolution of this matter could impose serious burdens on or even take away Proposed Intervenors' "fundamental political right" to vote. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). The right to vote is "of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Yet there is substantial risk that if relief is granted, Proposed Intervenors' access to that precious right will be in jeopardy. Their registrations may be cancelled with no notice or they may have to undertake burdensome efforts to prevent cancellation despite having already properly registered in accordance with state and federal rules. This is not speculative: it is the logical outcome of the United States' requested relief.

There is no dispute that voters have an interest in protecting their right to vote. It is settled law in this Circuit that impairment of the right to vote is sufficient injury to establish standing, a higher bar than the interest test under Rule 24(a). *See Green*

*Party*, 619 F. Supp. 3d at 562 ("[A]n interest sufficient to demonstrate injury-in-fact for standing purposes likely suffices to show a protectable interest under Rule 24(a)(2)."); *Democracy North Carolina v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 180 (M.D.N.C. 2020) ("[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue.") (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.").

Additionally, Proposed Intervenors meet the burden of establishing that this case's disposition could "as a practical matter impair or impede" their right to vote. *Green Party*, 619 F. Supp. 3d at 561. The federal government asks for several forms of relief, each of which would result in Proposed Intervenors having to dedicate extensive time and resources to securing their registrations or risk being removed from the rolls. After providing the information requested of them when they registered, the Impacted Voters have all already attempted to provide the "missing" information again. They have gotten a variety of responses from their counties, ranging from direct evidence that they did, indeed, provide the requested identification number at registration (*see* Ex. 3, Dasi Decl. ¶ 12, Ex. A), to reassurance that the problem has been addressed (Meigs Decl. ¶ 10) to no response at all (Adler-Espino Decl. ¶¶ 18-21). But none of them have the ability to check whether their registration records have been "fixed" and none can be confident that their registrations will not be targeted for removal if they are not able to protect their rights as parties to this litigation.

And the Impacted Groups have an interest in how this litigation could impair the state of the voter rolls. The League has over 2,000 members in 14 local Leagues

across the state. Ex. 8, Rubin Decl. ¶ 10. Its mission includes protecting voting rights, promoting voter registration, and ensuring fair representation in North Carolina. *Id.* ¶¶ 5-9. NAACP North Carolina has over 70 branches and more than 10,000 members in the state. Ex. 9, Maxwell Decl. ¶ 10. Its organizational missions include advocacy to ensure that communities of color and other marginalized communities throughout North Carolina can exercise the right to vote. *Id.* ¶ 9. Both organizations engage in voter outreach and education across the state to ensure that eligible North Carolinians are informed of their rights and prepared to participate in their democracy. Ex. 8, Rubin Decl. ¶¶ 8-9; Ex. 9, Maxwell Decl. ¶ 9. These projects include voter registration drives, voter mobilization efforts, election protection, and education campaigns. Ex. 8, Rubin Decl. ¶¶ 8-9; Ex. 9 Maxwell Decl. ¶ 9. What is more, both Impacted Groups have direct interests in preventing the potential removal of their constituents from the rolls—a real risk in this lawsuit.

The Complaint in this case cites data alleging that over 200,000 voters' records lack driver's license and SSN-4 numbers—data from an August 2023 list that contains members of the Impacted Groups. *See* Compl. ¶ 39(e); Ex. 8, Rubin Decl. ¶ 18; Ex. 9, Maxwell Decl. ¶ 25. Both Impacted Groups have seen firsthand how challenges can affect their constituents. As over 60,000 ballots were challenged in the 2024 state supreme court race, League members who were challenged reported that they did not receive notices telling them they were challenged, let alone that their registrations were allegedly lacking both a driver's license number and SSN-4. Ex. 8, Rubin Decl. ¶ 22. And NAACP North Carolina expressed concern that Black voters were twice as likely to be challenged as white voters. Ex. 9, Maxwell Decl. ¶ 13. Here, if the state

agrees to or is ordered to contact all voters who purportedly lack that information, the League and the North Carolina NAACP are both concerned that their affected members and other affected North Carolina voters may not receive their notices or may face an onerous process to respond to notices. Ex. 8, Rubin Decl. ¶ 23; Ex. 9, Maxwell Decl. ¶ 15. In turn, this, could result in members of the Impacted Groups being removed from the rolls. Ex. 8, Rubin Decl. ¶ 26; Ex. 9, Maxwell Decl. ¶¶ 16–17.

To that end, the Impacted Groups would be forced to dedicate significant resources to helping their members address the harms that could stem from this litigation. They would need to assist members contacted by election officials with providing requested documentation, educate voters on any new requirements, and ensure that members who are on the targeted lists actually receive notice and an opportunity to protect their registration. *See* Rubin Decl. ¶ 24; Maxwell Decl. ¶¶ 18–21. After all that, they would still have to re-register people who were properly registered, as the existing lists wrongly identify people who provided all the required documentation. *See* Rubin Decl. ¶ 26; Maxwell Decl. ¶ 18. The interests of the Impacted Groups to ensure that qualified voters are able to register and remain registered are commonly recognized interests supporting intervention by right. *See, e.g., Bellitto v. Snipes*, No.16-cv-61474-BLOOM/Valle, 2016 WL 5118568, at *2-3 (S.D. Fla. Sept. 21, 2016) (granting motion to intervene by right on behalf of defendant in NVRA matter); *NAACP v. Duplin Cnty.*, No. 7:88-cv-00005-FL, 2012 WL 360018, at *14 (E.D.N.C. Feb. 2, 2012) (Flanagan, J.) (granting motion to intervene by right where the defendant-intervenor held an interest in the "circumstances of voting in Duplin County").

Because the requested relief would "frustrate[] both [the Impacted Groups']
purpose and cause[] a drain on [their] resources," it would be enough to establish
standing, *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park
of W. Md.*, 843 Fed. Appx. 493, 496 (4th Cir. 2021), which means it is more than enough
to establish an impaired interest. *See also Republican Nat'l Comm. v. N.C. State Bd. of
Elections,* 120 F.4th 390, 395-98 (4th Cir. 2024) (plaintiffs satisfied organizational
standing where they alleged NCSBE's actions "forced them to divert significantly more
of their resources into combatting election fraud in North Carolina, efforts which have
frustrated their organizational and voter outreach efforts") (internal citation and
quotations omitted).

### iii. The Existing Parties and Other Potential Intervenors Do Not Adequately Represent the Proposed Intervenors' Fundamental Right to Vote.

The final inquiry for intervention as of right is whether the existing parties
adequately represent Proposed Intervenors' interests. In this case, they do not.

The outcome of this case—whether through a settlement reached by the parties
or an order of this Court—is likely to affect differently situated voters in different ways
based on what information they have provided at registration and how their local
election officials have stored that information (if at all). It is not enough, therefore, that
other parties may seek to resolve this case without giving in fully to the federal
government's demands. The contours of any court order or settlement are likely to
impair these voters' rights. They must have representation to ensure that no judgment
is ordered or settlement reached without consideration of the views of those most
directly affected.

The Supreme Court has stated that proposed intervenors face only a "minimal challenge" in establishing that existing parties do not adequately represent their interests. *Berger*, 597 U.S. at 195. The Court has rejected the application of a "presumption" that existing parties can adequately represent intervenors' interests when a private intervenor seeks to uphold a right in which governmental parties only have a partial interest. *Id.* at 195-96.

To the contrary, the presumption of adequacy applies only when proposed intervenors have the same "ultimate objective" as existing parties. *N.C. All. for Retired Ams. v. Hirsch*, No. 1:23-cv-00837, 2023 WL 9422596, at *2 (E.D.N.C. Dec. 15, 2023) (quoting *Commonwealth of Va. v. Westinghouse Elec. Corp.*, 542 F. 2d 214, 216 (4th Cir. 1976)). Proposed Intervenors' "ultimate objective" is to ensure that they (and similarly situated voters) and their constituents do not face disenfranchisement or extreme barriers in casting a ballot because of this litigation. This objective is distinct from the ultimate objective of the other parties. Thus, the minimal burden applies, although, in any case, Proposed Intervenors have unique interests in this case from the existing parties.

While the NCSBE's objectives may include ensuring that eligible voters are not mistakenly removed from the rolls, *see RNC*, No. 5:24-cv-00547-M, 2024 WL 4349904, at *3, the NCSBE prioritizes its interests differently from the singular interest of the Impacted Voters to stay on the rolls. The NCSBE must balance numerous competing priorities: resolving this litigation with minimal use of state resources, interpreting their obligations under HAVA and the National Voter Registration Act to maintain the rolls and remove voters they deem ineligible, complying with state law, and responding

to the priorities of the State Auditor, who recently gained appointment power over the NCSBE and emphasized eliminating "mismanagement" leading to "[in]accurate voter files."[7] Indeed, just days after this Complaint was filed, Sam Hayes, the newly-appointed executive director of the NCSBE, stated that his primary goal is to amend the rolls, possibly at the expense of the Impacted Voters. While he declined to "blam[e] those who registered under this old regime," he concluded that "the fact is we failed to collect this [missing voter] information over time, in violation of the law, and now we've got to fix it.  That's what my focus is."[8] This statement hardly suggests the NCSBE will fight in the same manner as Proposed Intervenors to protect these 200,000 voters. *See Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24-cv-01867, 2024 WL 3454706, at *4 (N.D. Ill. July 18, 2024) (the risk of a "more generous settlement agreement with Plaintiffs that might run contrary to Proposed Intervenors' interests" supported inadequate representation by the defendant State Board in NVRA action).

Moreover, the statement highlights a significant source of misalignment in interests between the NCSBE and Proposed Intervenors, namely the NCSBE's own

---

[7] *See* Theresa Opeka, "Exclusive: Boliek discusses NC election-board changes," Carolina Journal (May 12, 2025), https://www.carolinajournal.com/exclusive-boliek-discusses-nc-election-board-changes/ [https://perma.cc/5PED-2RXY] (quoting State Auditor Dave Boliek); *see also* Colin Campbell, "Q&A: State Auditor Dave Boliek on running elections, investigating DMV and Helene spending," WUNC (June 13, 2025, 12:37 PM), https://www.wunc.org/politics/2025-06-13/nc-state-auditor-dave-boliek-elections-helene-dmv [https://perma.cc/H7T5-2ZRC] (quoting Boliek, in an interview given after this lawsuit was filed, describing the importance of "election integrity.").

[8] Anderson, "NCSBE Executive Director Supports Trump Admin Voter Roll Lawsuit, Also Wants Detailed State Audit," Ex. 2 at 3.

culpability in creating this present situation.[9] The NCSBE's admitted errors have put in jeopardy the registrations of qualified voters who relied in good faith on the guidance they received from election officials when attempting to exercise their right to vote. Without intervention, those same voters are simply left to hope that the very election officials who placed their vote at risk can correctly rectify it without purposefully or inadvertently leaving any qualified voter behind. And removing affected voters who do not receive or respond to notices asking for further information, as the Complaint seeks, *see* Compl. 17 ¶ (D)(1)—including voters who have validly registered and voted, *see* Ex. 3, Dasi Decl.; Ex. 4, Meigs Decl.; Ex. 5, Adler-Espino Decl.; Ex. 6, Repanes Decl.; Ex. 7, Heling Decl.—would strike at the heart of Proposed Intervenors' rights.

The Proposed Intervenors' sole focus, then, is ensuring these lawfully registered citizens—and citizens like them who may be impacted in the future—remain properly registered to vote. While Proposed Intervenors' and the NCSBE's interests may "see[m] closely aligned," that is not sufficient to deny intervention. *Berger*, 597 U.S. at 196. Proposed Intervenors seek to uphold their interests "full stop" while the NCSBE must focus on, and per Hayes's comments is focusing on, "broader public-policy implications." *Id.* at 196 (citing *Trbovich v. Mine Workers*, 404 U.S. 528, 538-39 (1972)). As a result, Proposed Intervenors' and the NCSBE's interests diverge significantly. Defense of the Impacted Voters' interest in avoiding burdens on their right to vote or

---

[9] Order at 4–5, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6, 2023), https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023%20HAVA%20Complaint%20-%20Snow.pdf [https://perma.cc/YT6V-WRXX] (acknowledging violation of section 303 of HAVA could occur based on voter registration form).

disenfranchisement as a result of this litigation, "will not occur without" their intervention." *Duplin Cnty.,* 2012 WL 360018, at *4 (Flanagan, J.) (granting motion to intervene as defendants as of right to voters when litigation over a bill would affect their voting power); *see also Def. of Wildlife*, 281 F.R.D. at 269 (Flanagan, J.) (granting intervention to electric power cooperative where defendants sought "similar outcomes," but interests were "not directly aligned" and settlement could harm cooperative's interests); *Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-00518-CDS-MDC, 2024 WL 3409860, at *3 (D. Nev. July 12, 2024) (proposed intervenors' mission to "ensure that voters are retained on or restored to the rolls" was a helpful "counterbalance" to "plaintiffs' singular purpose" where defendant election administrator had competing interests under federal law).

As to the proposed interventions from the North Carolina Alliance for Retired Americans (the "Alliance") and the Democratic National Committee ("DNC"), the same analysis applies. As to the Alliance, while both it and Proposed Intervenors seek to protect eligible voters from removal from the rolls, the Alliance is focused on protecting its members who are mostly "retirees above the age of 60." Br. Supp. N.C. All. for Retired Ams. Mot. Intervene, 10-11. The Proposed Intervenors, meanwhile, are individual voters who are likely already identified for potential removal as a result of this lawsuit and two organizations with a different focus than the Alliance. The Alliance's focus on promoting "social and economic justice and full civil rights for retirees," *id.* at 11, only partially overlaps with the goals of the Impacted Voters to prevent significant burdens on their individual rights to vote and of the League and NAACP North Carolina to protect their own members' rights on the rolls and avoid

otherwise unnecessary use of resources. The DNC, meanwhile, claims interests in "protecting Democratic voters[]" and "running successful campaigns to elect Democratic candidates." Br. Supp. Dem. Nat'l Comm. Mot. Intervene, 9-10. To the contrary, Proposed Intervenors seek to protect their own and their members' rights to vote regardless of political party and without consideration towards electoral outcomes.

### B. Alternatively, the Court Should Grant Permissive Intervention Because the Proposed Intervenors Present Common Questions and Will Not Prejudice the Existing Parties.

Proposed Intervenors satisfy the requirements of Rule 24(b). On timely motion, a court "may permit" an applicant to intervene if the applicant has "a claim or defense that shares with the main action a common question of law or fact." *Stuart v. Huff*, 706 F.3d 345, 355 (4th Cir. 2013) (quoting Fed. R. Civ. P. 24(b)). "Permissive intervention is left to the broad discretion of the Court and should be construed liberally in favor of intervention." *Savannah Riverkeeper v. U.S. Army Corps of Eng'rs*, No. 9:12-cv-00610-RMG, 2012 WL 13008326, at *2 (D.S.C. Aug. 14, 2012). While a court must "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," Fed. R. Civ. P. 24(b)(3), "findings on those factors are not determinative of or sufficient to decide a permissive intervention motion." *McHenry v. Comm'r*, 677 F.3d 214, 222 (4th Cir. 2012). Moreover, "[a]dding parties to a case almost always results in some delay, and so usually delay alone does not mean that intervention should be denied . . . . Instead, Rule 24(b) requires *undue* delay." *Ohio Valley Env't Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 30 (D.W.V. Dec. 14, 2015) (emphasis in original) (internal citations omitted); *see also In re Sierra Club*, 945 F.2d 776, 780 n.10 (4th Cir.

1991) (rejecting arguments that permissive intervention would cause undue delay because that claim "ha[d] no apparent support in the record").

The Court should grant permissive intervention for four reasons. First, for the reasons stated above, the motion is timely. Second, as discussed above, Proposed Intervenors share questions of law and fact in common with the pending action, namely what steps the NCSBE can take to amend the voter rolls under HAVA without violating the rights of properly registered voters.

Third, Proposed Intervenors' intervention will not unduly delay this action or unduly prejudice adjudication of the United States' or the NCSBE's rights because this case has barely started. Defendants' answer is not due until July 28, 2025, and no motions, other than two motions to intervene, are pending.

Fourth, and most importantly, intervention will add missing voices to this process. As discussed above, the NCSBE is likely to zealously pursue alleged problems with voter registration information. This means that if the Impacted Voters' views are not represented in this case, they may face removal without any notice or hearing—the lodestars of due process. Indeed, as the parties build a record about the exact scope of purported issues with registrations, the Impacted Voters will bring to bear their experiences registering to vote, registering others to vote, and voting—experiences directly in line with the issues in this case that are not represented by the United States or the NCSBE. The Impacted Groups have track records of representing such issues and helping courts assess the full factual picture. *See, e.g.*, *Griffin*, 2025 WL 1292530, at *7 (thanking parties including the League for "thoughtful and comprehensive arguments" that "aided the court's decisional process"). With an

estimated 200,000 voters who stand to be affected by the parties' actions, voters' voices are necessary to get that full picture. Indeed, the potential to provide a fuller picture to the court explains why the Fourth Circuit's jurisprudence of "liberal intervention" favors granting Proposed Intervenors' motion. *See Defs. of Wildlife*, 281 F.R.D. at 267, 269; *see also Students for Fair Admissions Inc. v. Univ. of N.C.*, 319 F.R.D. 490, 497 (M.D.N.C. 2017) (granting permissive intervention to nine students in college admissions case in part because intervention was "in line with the Fourth Circuit's policy of favoring liberal intervention").

## III.  CONCLUSION

Proposed Intervenors respectfully request that the Court grant their motion to intervene as a matter of right under Rule 24(a), or, alternatively, permit them to intervene under Rule 24(b).

Respectfully submitted this 17th day of June 2025.

/s/ *Jeffrey Loperfido*
Jeffrey Loperfido

Caitlin A. Swain (No. 57042)
Kathleen Roblez (No. 57039)
Ashley Mitchell (No. 56889)
**FORWARD JUSTICE**
P.O. Box 1932
Durham, NC 27702
Telephone: 919-907-8586
cswain@forwardjustice.org
kroblez@forwardjustice.org
amitchell@forwardjustice.org

Jeffrey Loperfido (No. 52939)
jeffloperfido@scsj.org
**SOUTHERN COALITION FOR SOCIAL JUSTICE**
PO Box 51280
Durham, NC 27717
Telephone: 919-794-4213

Andrew Garber* (N.Y. Bar No.: 5684147)
**BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW**
120 Broadway
New York, NY 10005
Telephone: 646-292-8310
garbera@brennan.law.nyu.edu

Maura Eileen O'Connor* (N.Y. Bar No.: 4312302)
Justin Lam* (D.C. Bar No.: 1766514)
**BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW**
1140 Connecticut Avenue NW
Suite 1150
Washington, DC 20036
Telephone: 202-753-5911
oconnore@brennan.law.nyu.edu
lamju@brennan.law.nyu.edu

*Counsel for Proposed Intervenor-Defendants*

**Pro Hac Vice Application Forthcoming*

**CERTIFICATE OF WORD COUNT UNDER LOCAL RULE 7.2(F)**

I certify that this Memorandum complies with Local Rule 7.2(f), in that the word count function of Microsoft Word shows the brief to contain 8,335 words, excluding those portions of the brief permitted to be excluded by the Rule.

/s/ *Jeffrey Loperfido*
Jeffrey Loperfido

Jeffrey Loperfido (No. 52939)
jeffloperfido@scsj.org
**SOUTHERN COALITION FOR SOCIAL JUSTICE**
PO Box 51280
Durham, NC 27717
Telephone: 919-794-4213

*Counsel for Proposed Intervenor-Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2025, I electronically filed the foregoing

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS BY

GABRIELA ADLER-ESPINO, RANI DASI, MARY KAY HELING, AUDREY MEIGS, LARRY REPANES,

AMY GRACE BRYANT, RALIM ALLSTON, KEMEKA SIDBURY, NAACP NORTH CAROLINA, AND

THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA with the Clerk of Court using the

CM/ECF system which will send notification of such filing to counsel for all parties.

/s/ *Jeffrey Loperfido*
Jeffrey Loperfido

Jeffrey Loperfido (No. 52939)
jeffloperfido@scsj.org
**SOUTHERN COALITION FOR SOCIAL
JUSTICE**
PO Box 51280
Durham, NC 27717
Telephone: 919-794-4213

*Counsel for Proposed Intervenor-
Defendants*