IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:25-CV-283-M-RJ

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections; FRANCIS X. DE LUCA, JEFF CARMON, STACY EGGERS IV, SIOBHAN O'DUFFY MILLEN, and ROBERT RUCHO, in their official capacities as Members of the North Carolina State Board of Elections; and STATE OF NORTH CAROLINA,

    *Defendants.*

**THE DEMOCRATIC NATIONAL COMMITTEE'S CONSOLIDATED REPLY IN RESPONSE TO THE UNITED STATES' AND STATE DEFENDANTS' OPPOSITION TO ITS MOTION TO INTERVENE (DE 34)**

# INTRODUCTION

Just one day after the State Defendants told the Court that the Democratic National Committee has no interest that will be impaired by this case because there was no "risk of removal of registered voters" (DE 56 at 8), the State Board proved the opposite. The Board announced that it has begun discussions with the U.S. Department of Justice ("DOJ") to resolve this case with a consent decree, without any involvement by the other parties litigating the same issues before this Court. The decree (as outlined by the State Board) would make ineffective the registrations of approximately 98,000 North Carolina voters until they provide information to fix alleged deficiencies in their registrations, deficiencies that are artifacts of the State's supposed violation of the Help America Vote Act ("HAVA"). These voters may appear in poll books, but they will be removed from the official list of eligible voters in North Carolina elections, forced to cast provisional ballots that may not be counted. Until they provide additional information—and until that information matches administrative databases—these 98,000 voters will be disenfranchised. That is the very harm the DNC articulated as warranting its intervention.

Thus, "concern about an arbitrary voter purge" is not merely "imagined, speculative, and contrary to federal law," as DOJ suggests. DE 55 at 9. In fact, the planned requirement that "in-person voters who lack required info on their record must vote provisionally" was included at DOJ's request. *NCSBE*, 6/24/2025 State Board Meeting Recording ("Recording") at 21:53–22:02, 23:53–23:58, available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2025-06-24/State%20Board%20of%20Elections%20Meeting-20250624.mp4. *See generally id.* at 14:43-37:07. This is almost exactly the same relief plaintiffs request in *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-CV-547-M-RJ (E.D.N.C.) ("*RNC*"). Yet

1

neither the State Board nor DOJ alerted the Court about their plan or negotiations when opposing intervention by the DNC, and a consent judgment in this case would severely prejudice the DNC and other parties to *RNC*.

DNC participation in this litigation will protect the rights of tens of thousands of registered Democrats and other voters that support Democratic candidates who will be targeted by the Plan and any related consent decree. Any decree would require the DNC to expend significant resources to identify, contact, and educate Democrats and other voters to avoid their disenfranchisement and to train volunteers to assist those voters. The DNC's motion to intervene should be granted.

## SUPPLEMENTAL FACTS

On December 11, 2024, the Republican-controlled General Assembly enacted Session Law 2024-57, which transferred control of the State Board from the Governor (now a Democrat) to the State Auditor (now a Republican). The State Auditor exercised his new authority to appoint three Republicans to the five-member Board. Shortly thereafter, the reconstituted State Board hired Sam Hayes, a one-time Republican candidate for Attorney General, as its new Executive Director.

On June 20, the State Board gave notice that it would consider a "plan to collect incomplete registration information from certain voters" at its June 24, 2025, meeting. Ex. A, Notice of 6/24/2025 State Board Meeting. At the meeting, Mr. Hayes proposed a plan to collect "HAVA information" that is purportedly missing from voters' registration records. Plan (DE 58-1). Mr. Hayes stated that he had discussed the Plan with DOJ and that DOJ had "tentatively signed off," though DOJ was awaiting further details from the State Board. Recording at 17:06–17:26.

The Plan states that the State Board has concluded that 98,000 voters registered after HAVA became effective in 2004 "apparently lack HAVA info[rmation] and have not otherwise

2

complied with HAVA." Plan at 5.[1] And under the Plan, "[t]hese voters will vote provisionally until they provide the information." *Id.*; *see also id.* at 8 (future elections); Recording at 21:31–21:53 (same). Critically, Mr. Hayes explained at the June 24 meeting that even if these voters cast a provisional ballot and provide their driver's license number or the last four digits of their Social Security number, a provisional ballot will only count after a "verification process" and if the numbers provided are "correct." Recording at 25:01–25:54. This requirement was included in the Plan to satisfy DOJ. *Id.* at 21:53–22:02, 23:53–23:58. The State Defendants intend to send these voters mailers in July to inform them that their registrations are no longer effective. Plan at 5. The State Board will then send a follow-up mailer, at an unspecified date, to voters who do not respond to the first mailer. *Id.* at 6. However, the Plan omits critical details, including the methods used to identify the 98,000 voters who will be removed from the list of voters eligible to cast a ballot that will be counted, whether voters can contest inclusion on this list, the format and content of the mailers, and whether voters will receive notice and an opportunity to cure if newly submitted information fails verification.[2]

The Plan also includes a mailing to a second category of approximately 96,000 voters who, according to the State Board, "have complied with HAVA but for whom there is no DL# or SSN4 on file." Plan at 5. While these voters would continue to cast regular ballots, presumably because there is no alleged legal deficiency in their registration, the Plan says that "[c]ollecting this data will facilitate better list management going forward." *Id.* Once again, the Plan does not include

---

[1] Unless otherwise noted, page citations are to CM/ECF page numbers.
[2] Historically, more than 25% of Social Security numbers submitted with North Carolina voter registration applications could not be verified by an exact match against the limited data available to the Social Security Administration. *See* SSA, *HAVV Transactions by State*, https://www.ssa.gov/data/havv/havv-totals-since-2011.html.

3

information needed to determine whether these mailers might deter registered voters from participating in future elections.

Under the Plan, the State Board will require county boards of elections to (1) correct records where information was provided by a voter but not entered by the county, (2) correct records where voters registered before HAVA became effective and the registration database shows the wrong registration date, and (3) review inactive-status voters' information for corrections. Plan at 7. This would be done between June 24 and mid-August, *i.e.*, in parallel with the mailings. Recording at 20:29–20:38. But the Plan does not require that county boards inform voters who have already been told that they are no longer eligible to cast a regular ballot if further investigation leads to yet another change in status.

At multiple points, Mr. Hayes described the Plan as the basis for a consent decree with the DOJ as well as the plaintiffs in *RNC* and in *Kivett v. North Carolina State Board of Elections*, No. 24CV041789-910 (Wake Super. Ct.). Recording at 24:13–24:25, 29:21–29:35. Yet the State Board has not sought any input, let alone consent, to the Plan from the DNC. The State Board approved the Plan despite recognizing that the Plan puts the onus on voters to help the State Board correct its mistakes. *Id.* at 32:18–37:07.

## ARGUMENT

The DNC meets the requirements for intervention of right and permissive intervention in this case. State Defendants and DOJ argue that the DNC cannot intervene as of right because its interests would not be impaired by this lawsuit's resolution. DE 55 at 10–20; DE 56 at 6–8; DE 57 at 2. They also accuse the DNC of erroneously claiming a risk that voters will be removed from the list of eligible voters, DE 55 at 13–15; DE 56 at 7–8, even as the Plan—which neither party's opposition even *mentioned*—makes clear the reality of that risk. DOJ also claims that the

information needed to determine whether these mailers might deter registered voters from participating in future elections.

Under the Plan, the State Board will require county boards of elections to (1) correct records where information was provided by a voter but not entered by the county, (2) correct records where voters registered before HAVA became effective and the registration database shows the wrong registration date, and (3) review inactive-status voters' information for corrections. Plan at 7. This would be done between June 24 and mid-August, *i.e.*, in parallel with the mailings. Recording at 20:29–20:38. But the Plan does not require that county boards inform voters who have already been told that they are no longer eligible to cast a regular ballot if further investigation leads to yet another change in status.

At multiple points, Mr. Hayes described the Plan as the basis for a consent decree with the DOJ as well as the plaintiffs in *RNC* and in *Kivett v. North Carolina State Board of Elections*, No. 24CV041789-910 (Wake Super. Ct.). Recording at 24:13–24:25, 29:21–29:35. Yet the State Board has not sought any input, let alone consent, to the Plan from the DNC. The State Board approved the Plan despite recognizing that the Plan puts the onus on voters to help the State Board correct its mistakes. *Id.* at 32:18–37:07.

## ARGUMENT

The DNC meets the requirements for intervention of right and permissive intervention in this case. State Defendants and DOJ argue that the DNC cannot intervene as of right because its interests would not be impaired by this lawsuit's resolution. DE 55 at 10–20; DE 56 at 6–8; DE 57 at 2. They also accuse the DNC of erroneously claiming a risk that voters will be removed from the list of eligible voters, DE 55 at 13–15; DE 56 at 7–8, even as the Plan—which neither party's opposition even *mentioned*—makes clear the reality of that risk. DOJ also claims that the

DNC is not a proper party to HAVA actions, misunderstanding the requirements for intervention and the nature of the DNC's interests.  Finally, State Defendants and DOJ both argue that this Court's recognition that this case and *RNC* are related—and the resulting reassignment of this case to the judge already hearing *RNC*—somehow weighs against intervention.

None of these arguments has merit.  As the DNC has explained, it has substantial interests in this action and is entitled to intervene to prevent the impairment of those interests by the parties' apparent intent to quickly resolve this case.  DE 35 at 3–4, 9–10.  The Plan confirms that the interests would be impaired by resolution of this case.  The Plan's existence, its contents, and its legal infirmities highlight that the parties will not adequately represent the DNC's interests.

1. **The Plan Impairs the DNC's Interests.**

According to Mr. Hayes, DOJ and the State Defendants are already discussing a resolution of this case that would provide the relief requested by DOJ without any meaningful test of DOJ's legal claims or third-party examination of its proposed remedy.  That resolution, *i.e.*, the Plan's contemplated consent decree, will impair a variety of DNC interests.

First, the contemplated consent decree would require significant DNC resource expenditures to prevent disenfranchisement and harm the DNC's interests in winning elections, including costs to contact voters; to train election observers, volunteers, and others about the envisioned provisional-voting rules; and more.  DE 35 at 10–12; *supra* p. 2.  Intervention is warranted when a change in election procedures "regulates the conduct of [party] Committees' members, and the outcome of this lawsuit may change what the [party] Committees must do to prepare for upcoming elections."  *La Unión del Pueblo Entero v. Abbott*, 29 F.4th 299, 307 (5th Cir. 2022) (allowing intervention of right).  The Plan also directly impairs the right of tens of thousands of registered North Carolina voters, many of whom are registered Democrats and many

of whom will vote for Democratic candidates, "to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554–55 & n.29 (1964). The impairment of these legally protectable interests alone is sufficient to warrant intervention.

Second, the contemplated consent decree would grant precisely the relief sought by the plaintiffs in *RNC*, *i.e.*, requiring targeted voters to cast provisional ballots. It would thus impair the DNC's participation in *RNC*, *i.e.*, its ability to successfully oppose the relief being sought there (and here).

The State Defendants concede that the DNC is "already litigating these issues," DE 56 at 6–7, but assert that the DNC's intervention should only be permitted in *RNC*. This makes no sense. The State Defendants have publicly stated that they intend to enter a consent decree in *this* action that will prejudice the same interests the DNC is currently defending in *RNC*. *See supra* p. 4. They have also conceded that the cases are related. DE 56 at 4–5. It is thus no answer to say that the DNC can just litigate *RNC*; the contemplated consent decree there would likely preclude such litigation. *See Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991) (explaining that intervenors stood to gain or lose by direct operation of the district court's judgment on the parallel complaint).[3]

Nor is the alleged lack of a private right of action in HAVA (DE 55 at 10–13) an obstacle to the DNC's intervention here. The DNC seeks to intervene as a defendant. A proposed intervenor requires no cause of action. *See, e.g.*, *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 319–320 (D.C. Cir. 2015) ("In a motion to intervene under Rule 24, the question is not whether the applicable law assigns the prospective intervenor a cause of action. Rather, the

---

[3] In the event the Court is not inclined to permit the DNC to intervene, it should consolidate this case with *RNC* to ensure consistency and efficiency, including joining any hearing concerning a proposed consent decree. *See* Fed. R. Civ. P. 42(a)(1) (permitting joining of any "hearing or trial any or all matters at issue in the actions").

6

question is whether the individual may intervene in an already pending cause of action." (internal citation and quotation marks omitted)). Moreover, "a would-be defendant . . . is not bringing a new cause of action." *Id.* at 320. The DNC has interests here that warrant intervention under Rule 24. DE 35 at 3–4, 9–10; *supra* pp. 5–6. The DNC is seeking to intervene in this case to protect the multiple statutory and constitutional defenses it has asserted in *RNC* and *Kivett*, including the constitutional right to vote of its members that would be infringed by an erroneous application of HAVA in this case. It does not need a private cause of action to do so. *See, e.g.*, *LULAC v. City of Boerne*, 659 F.3d 421, 429–30 (5th Cir. 2011) (allowing intervention to contest consent decree limiting the right to vote in a VRA case); *NAACP, Inc. v. Duplin Cnty.*, No. 7:88-CV-00005-FL, 2012 WL 360018, at *3–5 (E.D.N.C. Feb. 2, 2012) (same). DOJ's argument is at best a non sequitur.

Even if this Court were to apply the standards applicable to a plaintiff in a new case—and it should not—DOJ's arguments would fail. Voters have a private right of action under 42 U.S.C. § 1983 in the narrow context applicable here: the right under HAVA to have a provisional ballot counted. *See, e.g.*, *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 572–73 (6th Cir. 2004) (per curiam) (citing 52 U.S.C. § 21082); *Bay Cnty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 425–27 (E.D. Mich. 2004); *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1077–78 (N.D. Fla. 2004); *see also* 52 U.S.C. § 21082(a)(4) (requiring counting of provisional ballots cast by voters who meet eligibility requirements). There is also no question that a private cause of action exists under the National Voter Registration Act ("NVRA"), which the Plan implicates. *See* 52 U.S.C. § 20510(b); *see also id.* § 20507(a)(3) (limiting removal of registrants "from the list of eligible voters"). And fundamentally, the DNC has asserted constitutional defenses in *RNC* and

*Kivett* for which a private cause of action exists under 42 U.S.C. § 1983. *See, e.g.*, *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 171 (2023).

As to the adequacy of representation, the proposed resolution of this lawsuit outlined in the Plan underscores that this case raises serious legal questions that the parties have not addressed, let alone as to which they adequately represent the DNC's interests. For example, both federal and state law require voters to cast provisional ballots—which are effectively "questioned ballot[s]," *Nageak v. Mallott*, 426 P.3d 930, 936 (Alaska 2018)—*only* if they do not present HAVA-compliant ID at the polls or their name is absent from the polling place's list of registered voters. *See* 52 U.S.C. §§ 21083(b)(2)(B), 21082(a); N.C. Gen. Stat. § 163-166.12(e). Eligible voters, in other words, have a right to cast a regular, non-provisional ballot that they can be sure will be counted by supplying the requisite identification when they show up to vote. The Plan would impermissibly deny that right. Moreover, the NVRA prohibits removal of a registrant "from the official list of eligible voters" for reasons other than those listed in the statute. 52 U.S.C. § 20507(a)(3). A voter who must cast a provisional ballot that may be discarded is no longer a presumptively *eligible* voter; they have been removed from the list of eligible voters, even if they remain in the poll book. *See, e.g.*, *Common Cause / New York v. Brehm*, 344 F. Supp. 3d 542, 555 (S.D.N.Y. 2018) (recognizing that the voters on the "official list of eligible voters" must be permitted to cast valid votes that will be counted); *see also Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021).

The State Defendants and DOJ argue that the *complaint* does not call for removal of voters from the rolls. But the *Plan* would in every meaningful sense remove registrants from the list of eligible voters: It would require 98,000 voters to cast provisional ballots for all future elections that will not be counted until they provide additional information and until that information

8

matches administrative databases. That outcome, compared to outright removal from the voting rolls, "is a distinction without a difference." *Majority Forward*, 512 F. Supp. 3d at 1368. This is true because the State Board intends to require voters' numbers to be "verified" before a provisional ballot can be counted. Recording at 25:01–25:54. Neither HAVA nor state law requires such verification if a voter presented a photo identification or a HAVA ID in their first federal election. *See* 52 U.S.C. §21083(b); N.C. Gen. Stat. § 163-166.12(d).

In short, it does not matter what relief is demanded in the complaint. What matters is the relief the State Defendants are evidently planning to give. That relief underscores the need for participation by the DNC in this case to protect its interests, which are not remotely adequately protected by the State Defendants.

Allowing the parties here to negotiate what would in effect be a resolution of multiple cases, by reaching a settlement here that excludes the parties to the other cases, would be inequitable and would will injure the rights of the excluded parties like the DNC.

**2. This Case Raises Common Questions of Law and Fact.**

With respect to permissive intervention, the State Defendants appear to concede that this case implicates issues of law and fact common to *RNC* and *Kivett*. They could hardly do otherwise, as Mr. Hayes (a Defendant here) asserted that the Plan is intended to resolve litigation to which the DNC is a party, including *RNC* and *Kivett*. Recording at 24:13–24:25, 29:21–29:35. And as the State Defendants point out, this case has been reassigned *because* it is related to (*i.e.*, shares common issues of law and fact with) *RNC*. (DE 56 at 4–5.) DOJ does not meaningfully dispute that the three cases share common issues of law and fact.

State Defendants and DOJ instead oppose permissive intervention by making generalized assertions that the addition of parties will complicate this case. (DE 55 at 20–21; DE 56 at 9.) But

9

the discovery here and in RNC will likely overlap substantially, so the DNC's participation here will not result in additional proceedings or discovery. To the contrary, the DNC's direct participation in this case will facilitate a global resolution of all factual and legal issues at stake in both this case and the *RNC* case.

**CONCLUSION**

The Court should grant the DNC's motion to intervene.

Respectfully submitted, this 28th day of June, 2025.

| | |
|---|---|
| | /s/ William A. Robertson |
| SETH P. WAXMAN* | JIM W. PHILLIPS, JR. |
| DANIEL S. VOLCHOK* | N.C. BAR NO. 12516 |
| CHRISTOPHER E. BABBITT* | SHANA L. FULTON |
| WILMER CUTLER PICKERING | N.C. BAR NO. 27836 |
|    HALE AND DORR LLP | WILLIAM A. ROBERTSON |
| 2100 Pennsylvania Avenue N.W. | N.C. BAR NO. 53589 |
| Washington, D.C. 20037 | JAMES W. WHALEN |
| Phone: (202) 663-6000 | N.C. Bar No. 58477 |
| Fax: (202) 663-6363 | BROOKS, PIERCE, MCLENDON |
| seth.waxman@wilmerhale.com |   HUMPHREY & LEONARD, LLP |
| daniel.volchok@wilmerhale.com | 150 Fayetteville Street |
| christopher.babbitt@wilmerhale.com | 1700 Wells Fargo Capitol Center |
| (*Pro Hac Vice application forthcoming) | Raleigh, N.C. 27601 |
| | Phone: (919) 839-0300 |
| | Fax: (919) 839-0304 |
| | jphillips@brookspierce.com |
| | sfulton@brookspierce.com |
| | wrobertson@brookspierce.com |
| | jwhalen@brookspierce.com |

## CERTIFICATE OF SERVICE

    I certify that the foregoing document was served upon counsel of record by filing the same using the Court's Case Management and Electronic Case Filing system.

    This the 28th day of June, 2025.

    /s/ William A. Robertson
    William A. Robertson