# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### CASE NO. 5:25-CV-283-M-RJ

UNITED STATES OF AMERICA,

              *Plaintiff*,

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS; SAM HAYES, in his official
capacity as Executive Director of the North
Carolina State Board of Elections; FRANCIS
X. DE LUCA, JEFF CARMON, STACY
EGGERS IV, SIOBHAN O'DUFFY MILLEN,
and ROBERT RUCHO, in their official
capacities as Members of the North Carolina
State Board of Elections; and STATE OF
NORTH CAROLINA,

              *Defendants.*

## THE DEMOCRATIC NATIONAL COMMITTEE'S
## REPLY MEMORANDUM IN SUPPORT OF ITS
## RENEWED MOTION TO INTERVENE

## I. Introduction

The United States' response to the Democratic National Committee's renewed request to intervene boils down to a simple request: Trust us. However, the Justice Department's nationwide demands for complete, unredacted voter files and its admitted intention to provide those files to the Department of Homeland Security precludes such trust. Any such transfer would harm the personal privacy interests of Democratic voters and would not further compliance with the Help America Vote Act. Therefore, the DNC respectfully requests that this Court grant its renewed motion to intervene.

## II. The DNC's Motion Is Not Moot.

As an initial matter, the United States does not contest that the DNC's renewed motion presents a live controversy. *See* U.S. Opp., ECF No. 80 (Opp.); *see also* DNC Mem. 5-7, ECF No. 76 (Mem.) (arguing against mootness); *cf.* Consent Decree ¶ 17, ECF No. 72 (denying prior motion to intervene as moot). Indeed, the United States relies on the fact that Defendants have "reserve[d] the right to seek a protective order from the court" if the United States requests the North Carolina voter file pursuant to Paragraph 11 of the Consent Decree. Opp. 10. Because this Court has retained the authority to grant such relief to Defendants, the DNC's request to intervene and seek the same "type of relief" is not moot. *Lancaster v. Sec'y of the Navy*, 109 F.4th 283, 289 (4th Cir. 2024).[1]

---

[1] In its opening memorandum, the DNC incorporated by reference its earlier arguments in favor of intervention of right and permissive intervention, rather than repeating them. DNC Mem. 3. The United States does not directly address these arguments. *See* Opp. 5 (limiting response to the DNC to privacy interests). In any case, the United States errs by asserting that contested negotiations and this Court's prior ruling establish adequacy of representation under Rule 24(a). Opp. 6-7. Agreement between parties to enter a consent decree can fail to represent all impacted entities and individuals, *see, e.g.*, *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 507-09 (1986), and this Court's mootness ruling rendered dicta its observation on

## III. The Consent Decree Raises Serious Privacy Concerns.

The United States takes aim at the DNC's privacy interests but offers nothing more than unearned and insufficient assurances that any collection of North Carolina's complete, unredacted voter file will comply with federal law. Opp. 5, 10-12. Fundamentally, the United States makes no attempt to rebut the basic proposition that conditioning the right to vote on the release of private information "creates an intolerable burden on that right." *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). More pointedly, the United States fails to grapple with the facts presented in the DNC's renewed motion to intervene or privacy interests beyond those enshrined in federal statutes. All this makes clear that the DNC's privacy concerns are not "unsubstantiated alarmist arguments." Opp. 5.

Indeed, the Consent Decree by its terms affords the United States the right to demand from the North Carolina State Board of Elections (SBE) core personally identifiable information: "each registrant's full name, date of birth, residential address, his or her driver's license number or state identification number or the last four digits of the registrant's social security number." Consent Decree ¶ 11. This creates an enormous potential for mischief and harm, because a Social Security number, driver's license number, and date of birth are "the holy trinity of identity theft." Liz Landers and Doug Adams, *How the Trump Administration Is Trying to Change the Way People Vote*, PBS News Hour, Sept. 26, 2025, https://perma.cc/7V2J-QY9V. And as the DNC previously explained, the demand for North Carolina's complete, unredacted voter file appears to be part of a larger project to obtain complete state voter files and to develop a national voter file. Mem. 4 n.1 (citing Devlin Barrett and Nick Corasaniti, *Trump Administration Quietly*

---

adequacy of representation, *see, e.g.*, *United States v. McPherson*, 840 F.2d 244, 245 (4th Cir. 1988) (describing comparable analysis). In any case, permissive intervention under Rule 24(b) does not turn on adequacy of existing representation.

*Seeks to Build National Voter Roll*, N.Y. Times, Sept. 9, 2025, https://perma.cc/9PM4-2A6R).

In turn, the Justice Department has publicly confirmed that it "is sharing state voter roll

information with the Department of Homeland Security." *See* Jonathan Shorman, *DOJ Is

Sharing State Voter Roll Lists with Homeland Security*, Stateline, Sept. 12, 2025,

https://perma.cc/C6RQ-6ATP (quoting DOJ and DHS statements). Voters may reasonably

prefer that their private, personal information not be compiled in a nationwide voter database or

shared with the Department of Homeland Security.

The DNC's concerns are amplified by the Justice Department's failure to articulate the

relevance of the complete, unredacted voter file to ensuring compliance with Section 303(a)(5)

of the Help America Vote Act (HAVA), 52 U.S.C. § 21083(a)(5), the only statutory violation

identified in the Consent Decree. In its opening memorandum, the DNC pointed out that the

only datapoints relevant to Section 303(a)(5) compliance "are registration dates and empty data

fields." Mem. 3-4. The United States responds that this action "is directed at ensuring 'the

accuracy of voter records used for Federal elections.'" Opp. 2 (quoting Compl. ¶ 14, ECF

No. 1). However, the United States has no free-floating interest in overseeing state voter files.

The Justice Department enforces only four provisions of HAVA, *see* 52 U.S.C. § 21111, and the

"specific choices on the methods of complying" with even those provisions are "left to the

discretion of the State," *id.* § 21085. Where Congress has chosen not to legislate, the times,

places, and manners of conducting federal elections are left to the states. *See* U.S. Const. Art. I,

§ 4, cl.1; *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) ("[S]o far as [the

power of Congress] is exercised, *and no farther*, the regulations effected supersede those of the

State." (emphasis added)). The United States thus cannot claim a general interest in overseeing

federal elections as justification for its data-gathering efforts. *See, e.g.*, *League of United Latin*

3

*Am. Citizens v. Exec. Off. of the President*, No. 25-9446, ___ F. Supp. 3d ___, 2025 WL 3042704, at *4 (D.D.C. Oct. 31, 2025) ("The States have initial authority to regulate elections. Congress has supervisory authority over those regulations. The President does not feature at all.").

The United States also claims that the DNC has no valid privacy concerns here because the United States will comply with federal law when handling the unredacted North Carolina voter file. Opp. 5, 10-11. But personal privacy interests extend beyond the federal Privacy Act (5 U.S.C. § 552a). *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61 (1958). Notably, the Privacy Act recognizes an interest in personally identifiable information, while nonetheless permitting a "routine use" of such information spelled out in a published system of records notice. *See* 5 U.S.C. § 552a(a)(4), (b)(3). Mere disclosure of the use of personal data does not negate all potential privacy concerns. *See Brennan v. Dickson*, 45 F.4th 48, 64-65 (D.C. Cir. 2022). The Justice Department has newly embraced an expansive understanding of its core system of records notice to authorize the creation of a national voter file, *see* Opp. 10-11, and a federal court has "doubt[ed] the lawfulness" of the Department of Homeland Security receipt and review of voter data. *League of Women Voters v. U.S. Dep't of Homeland Security*, No. 25-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). Moreover, though the Consent Decree preempts state privacy law, that does not invalidate the personal interests underlying those protections. *See, e.g.*, N.C. Gen. Stat. § 132-1.2(4) (protecting voter data). Thus, the DNC continues to press serious privacy interests on behalf of its members in North Carolina.

**IV.    Intervention Is Necessary to Protect the DNC's Privacy Interests.**

Finally, the DNC cannot protect the interests of North Carolina Democrats merely by participating as an amicus curiae, as the United States suggests. Opp. 11-12. Rather than

4

negotiating a protective order governing voter-file productions as part of the Consent Decree, the SBE has merely "reserve[d] the right to seek a protective order from the court."  Consent Decree ¶ 11.  Thus, it remains possible that the SBE will produce the complete, unredacted voter file without exercising that right.  The DNC can ensure that this Court addresses the proper use of North Carolina voters' sensitive personal information only if it receives party status and the same right to seek a protective order.  Without such a request, this Court might not even have the opportunity to impose the reasonable limitations already raised in the DNC's opening memorandum.  *See* Mem. 6; *see also* U.S. Opp 11 (suggesting that this Court might "take that input into consideration").

The United States' accusation (Opp. 11) that the DNC has offered a "poorly thought-out proposal[]" that "risk[s] violating the privacy rights of North Carolina voters" is unfounded.  The principles outlined by the DNC are distilled from protective orders negotiated between the United States and North Carolina officials in earlier litigation, as well as negotiations in other states.  *See* Mem. 6 (citing Protective Order, *N.C. State Conf. NAACP v. McCrory*, No. 1:13-cv-658 (M.D.N.C. Jan. 3, 2014), ECF No. 47; Protective Order, *La Unión del Pueblo Entero v. Abbott*, 5:21-cv-844 (W.D. Tex. Dec. 23, 2021), ECF No. 162).  By attacking the basic notions that sensitive personal data collected under the Consent Decree should be used only to assess compliance with the Decree, should remain with Justice Department officials, and should remain separated from networked systems—principles adopted by the United States in the past—the United States essentially concedes that it will grab sensitive voter data wherever it can and use that data however it wants, including sharing the data with anyone it chooses.  The DNC should be permitted to protect North Carolina Democrats against such abuse of their personal information.

## V.    Conclusion

This Court should grant the DNC's renewed motion to intervene.

Respectfully submitted, this 1st day of December, 2025.


SETH P. WAXMAN
DANIEL S. VOLCHOK
CHRISTOPHER E. BABBITT
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com

/s/ William A. Robertson
JIM W. PHILLIPS, JR.
N.C. BAR NO. 12516
SHANA L. FULTON
N.C. BAR NO. 27836
WILLIAM A. ROBERTSON
N.C. BAR NO. 53589
JAMES W. WHALEN
N.C. Bar No. 58477
BROOKS, PIERCE, MCLENDON
   HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com